IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

Melissa S. Landon,
Edward P. Landon,
Shane Auxier, and
Mu Hpare,
On behalf of themselves and
all others similarly situated,

**COMPLAINT - CLASS ACTION**

    Plaintiffs,

 Case No.: 18-CV-994

vs.

Bluegreen Vacations Unlimited, Inc.
and Bluegreen Vacations Corporation
f/k/a Bluegreen Corporation,

**Jury Trial Demanded**

    Defendants.

---

**First Amended Class Action Complaint For
Damages, Declaratory and Injunctive Relief**

---

## I. INTRODUCTION

l.    Plaintiffs Melissa S. Landon, Edward P. Landon, Shane Auxier, and Mu

Hpare, by their attorneys, bring this amended Class Action Complaint for damages,

injunctive and declaratory relief, specific performance, rescission, and any other available

legal or equitable remedies, against Defendants Bluegreen Vacations Unlimited, Inc. and

Bluegreen Vacations Corporation, formerly known as Bluegreen Corporation, for their

illegal, deceptive and misleading business and sales practices, including violations of:

1) Wis. Stat. § 707.55 of the Wisconsin Timeshare Act; 2) Wis. Stat. §§ 707.46, 707.47,

and 707.41 pertaining to their Wisconsin timeshare cancellation rights; 3) Wisconsin's laws prohibiting illegal referral selling as provided by the Wisconsin Administrative Code Chapter ATCP 121 and Wis. Stat. § 100.20(5); and 4) violation of Wisconsin laws prohibiting defendants from contracting or arranging for loans or consumer credit transactions containing illegal attorney's fees provisions in contracts under Wis. Ch. 428.

2.     These provisions are intended to provide minimum disclosures to persons purchasing timeshare interests in Wisconsin, to afford cancellation rights to such persons, and to prohibit various contract provisions and practices deemed oppressive by the Wisconsin legislature.

3.     Unless otherwise indicated, the use of Defendants' names in this Complaint includes all of their agents, employees, officers, directors, principals, trustees, participating affiliates, representatives and insurers.

## II.  JURISDICTION AND VENUE

4.     Jurisdiction of this court arises under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Supplementary jurisdiction is proper under 28 U.S.C. § 1367.

5.     As set forth below, each Plaintiff is a resident and citizen of Wisconsin or Iowa.  Defendants are Florida corporations with their principal places of business in Florida.  The amount in controversy exceeds $5 million, exclusive of interests and costs. There are more than 100 class members.

6.     Venue is proper in the United States District Court for the Eastern District of Wisconsin (Milwaukee) pursuant to 28 U.S.C. § 1391(c), because:

   a.    Defendants' contacts with this District are sufficient to subject them to personal jurisdiction; and

   b.    Events, including solicitations to attend timeshare presentations which gave rise to the claims alleged, occurred in this district.

### III.  PARTIES

7.     Plaintiff Melissa S. Landon is a natural person and citizen of the State of Wisconsin residing in Slinger, WI.

8.     Plaintiff Edward P. Landon is a natural person and citizen of the State of Wisconsin residing in Slinger, WI.

9.     Plaintiff Shane M. Auxier is a natural person and citizen of the State of Iowa residing in Des Moines, IA.

10.     Plaintiff Mu Hpare is a natural person and citizen of the State of Iowa residing in Des Moines, IA.

11.     Defendant Bluegreen Vacations Corporation, formerly known as Bluegreen Corporation, is a Florida corporation engaged in, *inter alia*, the marketing, sale, management and operation of timeshare interests, real property, and vacation ownership interests throughout the United States, including Wisconsin.

12. Bluegreen Vacations Corporation's principal business address is 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431.

13. Defendant Bluegreen Vacations Unlimited, Inc. is a Florida corporation engaged in, *inter alia*, the marketing, sale, management and operation of timeshare interests, real property, and vacation ownership interests throughout the United States, including Wisconsin, in concert with various affiliate companies, including Bluegreen Vacations Unlimited, Inc.

14. Bluegreen Vacations Unlimited, Inc.'s principal business address also is 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431, and it is located at the same address as Bluegreen Vacations Corporation.

15. Defendants Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc. at all relevant times acted jointly and in concert in the marketing, offering, and selling timeshare interests to the named Plaintiffs and to Class Members and both defendants derived profit directly from those sales.

16. Defendants offer to sell and sell time share interests and/or real property from their resorts at Christmas Mountain Village and, upon information and belief, from Bluegreen Odyssey Dells, both located in Wisconsin Dells, Wisconsin.

17. According to Defendants' SEC filings, Christmas Mountain Village has 381 units and Bluegreen Odyssey Dells has 92 units.

18.     Bluegreen Vacations Corporation is a worldwide company that develops, markets, sells, and manages timeshare vacation ownership interests to consumers to be used primarily for personal, family, or household purposes.

19.     Bluegreen Vacations Corporation is a "developer" as that term is defined by Wis. Stat. § 707.02(11) and/or a "special developer" under Wis. Stat. § 707.31(1).

20.     Bluegreen Vacations Corporation is a corporate affiliate of Bluegreen Vacations Unlimited, Inc., which is a wholly owned subsidiary of Bluegreen Vacations Corporation.

21.     Bluegreen Vacations Unlimited, Inc. offers to sell and sells "time shares" as that term is defined by Wis. Stat. § 707.02(24) in Wisconsin and elsewhere.

22.     Bluegreen Vacations Corporation, acting jointing and in concert with Bluegreen Vacations Unlimited, Inc. and other corporate affiliates, offers to sell and sells and/or manages "time shares" as that term is defined by Wis. Stat. § 707.02(24) in Wisconsin and elsewhere.

23.     Bluegreen Vacations Unlimited, Inc. is a "developer" as that term is defined by Wis. Stat. § 707.02(11) and/or a "special developer" under Wis. Stat. § 707.31(1).

**Bluegreen Vacations Corporation Is A Proper Party**

24.     Bluegreen Vacations Corporation markets, manages, and sells timeshare interests in Wisconsin and elsewhere, and it provides multiple services relating to these timeshare interests, including reservation services, billing and collections, and other

services to timeshare owners, the Bluegreen Vacation Club, and homeowners associations related to these timeshare interests.

25.     Bluegreen Vacations Corporation is a publicly traded corporation which trades on the New York Stock Exchange under the symbol "BXG" and has done so since the initial public offering of its common stock on November 17, 2017.

26.     BBX Capital Corporation ("BBX Capital") owns approximately 90% of Bluegreen's outstanding common stock according to its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017.

27.     According to its 10-K filed by BBX Capital with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation is a "Division" of BBX Capital.

28.     According to its 10-K filed by BBX Capital with the Securities and Exchange Commission for the fiscal year ending December 31, 2017"

> Bluegreen is a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in top leisure and urban destinations. Bluegreen's resort network includes 43 Club Resorts (resorts in which owners in its Vacation Club have the right to use most of the units with their VOI ownership) and 24 Club Associate Resorts (resorts in which owners in its Vacation Club have a right to use a limited number of units in connection with their VOI ownership).  Our Club Resorts and Club Associate Resorts are primarily located in popular, high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach and Charleston, among others. Through our points-based system, the approximately 213,000 owners in our Vacation Club have the flexibility to stay at units available at any of our resorts and have access to almost 11,000 other hotels and resorts through partnerships and exchange networks.

29.     Bluegreen Vacations Corporation has described its timeshare operations

variously in filings with the Securities and Exchange Commission and in documents

given to timeshare purchasers.

30.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with

the Securities and Exchange Commission for the fiscal year ending December 31, 2017,

Bluegreen Vacations Corporation stated (at p. 5):

> Except as otherwise noted or where the context requires otherwise, references in
> this Annual Report on Form 10-K to "Bluegreen Vacations," "Bluegreen," "the
> Company," "we," "us" and "our" refer to Bluegreen Vacations Corporation,
> together with its consolidated subsidiaries.

31.     In its 2018 10-K filed in March 2018 by Bluegreen Vacations Corporation

with the Securities and Exchange Commission for the fiscal year ending December 31,

2017, Bluegreen Vacations Corporation stated (at p. 6):

> We are a leading vacation ownership company that markets and sells VOIs and
> manages resorts in top leisure and urban destinations. Our resort network includes
> 43 Club Resorts (resorts in which owners in the Bluegreen Vacation Club
> ("Vacation Club") have the right to use most of the units in connection with their
> VOI ownership) and 24 Club Associate Resorts (resorts in which owners in our
> Vacation Club have the right to use a limited number of units in connection with
> their VOI ownership). Our Club Resorts and Club Associate Resorts are primarily
> located in popular, high-volume, "drive-to" vacation locations, including Orlando,
> Las Vegas, Myrtle Beach and Charleston, among others. Through our points-based
> system, the approximately 213,000 owners in our Vacation Club have the
> flexibility to stay at units available at any of our resorts and have access to almost
> 11,000 other hotels and resorts through partnerships and exchange networks.

32.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with

the Securities and Exchange Commission for the fiscal year ending December 31, 2017,

Bluegreen Vacations Corporation stated (at p. 7):

> Prior to 2009, our vacation ownership business consisted solely of the sale of VOIs in resorts that we developed or acquired ("developed VOI sales"). While we continue to conduct such sales and development activities, we now also derive a significant portion of our revenue from our capital-light business model, which utilizes our expertise and infrastructure to generate both VOI sales and recurring revenue from third parties without the significant capital investment generally associated with the development and acquisition of resorts. Our capital-light business activities include sales of VOIs owned by third-party developers pursuant to which we are paid a commission ("fee-based sales") and sales of VOIs that we purchase under just-in-time ("JIT") arrangements with third-party developers or from secondary market sources. In addition, we provide resorts and resort developers with other fee based services, including resort management, mortgage servicing, title services and construction management. We also offer financing to qualified VOI purchasers, which generates significant interest income.

33.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with

the Securities and Exchange Commission for the fiscal year ending December 31, 2017,

Bluegreen Vacations Corporation explained its history as follows (at p. 7):

> We were organized in 1985 as a Massachusetts corporation named Patten Corporation, primarily focused on retail land sales to consumers. In 1994, we entered into the vacation ownership industry. In 1996, we changed our name to Bluegreen Corporation. From 1986 through April 2, 2013, our common stock was publicly listed and traded on the NYSE. On April 2, 2013, Woodbridge Holdings, LLC ("Woodbridge"), a wholly owned subsidiary of BBX Capital, acquired all of the shares of our common stock not previously owned by it, and we became a wholly-owned subsidiary of Woodbridge. BBXCapital (NYSE: BBX) is a Florida-based publicly traded diversified holding company. On March 10, 2014, we were redomiciled from a Massachusetts corporation to a Florida corporation. On September 25, 2017, we changed our name to Bluegreen Vacations Corporation.
>
> On November 17, 2017, we consummated the initial public offering of our common stock. In the initial public offering, we sold 3,736,723 shares of our common stock at the public offering price of $14.00 per share, less underwriting discounts and commissions, and BBX Capital, as selling shareholder, sold

3,736,722 shares of our common stock, including 974,797 shares sold on December 5, 2017 pursuant to the underwriters exercise of its option to purchase additional shares, at the public offering price of $14.00 per share, less underwriting discounts and commissions. BBX Capital continues to own approximately 90% of our outstanding common stock. Our common stock began trading on the NYSE on November 17, 2017 under the symbol "BXG."

34.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation further reported about its business as follows (at p. 7):

> We report our results of operations through two reportable segments: (i) Sales of VOIs [defined elsewhere as Vacation Ownership Interests] and financing; (ii) resort operations and club management. Our sales of VOIs and financing segment includes our marketing and sales activities related to the VOIs that we own, our sale of VOIs through fee-for-service arrangements with third-party developers, our provision of consumer financing in connection with sales of VOIs that we own, and our provision of title services through a wholly-owned subsidiary. Our resort operations and club management includes our provision of management services to our Vacation Club and to a majority of the homeowners associations ("HOAs") of the resorts within our Vacation Club. In connection with those services, we also provide club reservation services, services to owners and billing and collections services to our Vacation Club and certain HOAs.

35.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described "Our Products": "Vacation Ownership Interests" on p. 7 as follows:

> Since entering the vacation ownership industry in 1994, we have generated over 627,000 VOI sales transactions, including over 124,000 fee-based sales transactions. Our Vacation Club owners receive an annual or biennial allotment of "points" in perpetuity (supported by an underlying deeded VOI held in trust for the owner) that may be used to stay at any of our 43 Club Resorts and 24 Club Associate Resorts.

36.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described its "Marketing and Sale of Inventory" at p. 12 as follows:

> VOI sales are typically generated by attracting prospective customers to tour a resort and attend a sales presentation. Our sales and marketing platform utilizes a variety of methods to generate new owner prospects, drive tour flow and sell VOIs in our Vacation Club. We utilize marketing alliances with nationally-recognized brands, which provide exclusive access to venues which target consumers generally matching our core demographic. In addition, we source sales prospects through programs which generate leads at high-traffic venues and in high-density tourist locations and events, as well as from telemarketing and referrals from existing owners and exchangers and renters staying at our properties.

37.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described its "Risk Related to Our Business and Industry" at p. 26 as follows:

> From time to time, consumers file complaints against us in the ordinary course of our business. We could be required to incur significant costs to resolve these complaints or enter into consents with regulators regarding our activities, including that we may be required to refund all or a portion of the purchase price paid by the customer for the VOI. We may not remain in compliance with all applicable federal, state and local laws and regulations, and violations of applicable laws may have adverse implications on us, including negative publicity, potential litigation and regulatory sanctions. The expense, negative publicity and potential sanctions associated with any failure to comply with applicable laws or regulations could have a material adverse effect on our business, results of operations or financial position.

38.     Per Bluegreen Vacations Corporation's Form 10-K filing for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation had total assets of $1,236,424,000.00.

39.     Upon information and belief, some Class Members bought timeshare interests sold and/or financed by Bluegreen Corporation during presentations in Wisconsin within six years of the filing of the complaint in this action.

40.     Upon information and belief, some Class Members financed their timeshares through loans directly offered by Bluegreen Corporation.

41.     Upon information and belief, some Class Members had payments relating to their timeshare purchases taken out of their checking or other financial accounts at their banks and or credit unions. Some of these payments were deducted from the Class Members' accounts and were paid directly to Bluegreen Corporation.

42.     Upon information and belief, Bluegreen Corporation, now known as Bluegreen Vacations Corporation, sent certain members of the Class IRS Forms and/or Substitute Forms 1098 Mortgage Interest Statements annually to report to the Internal Revenue Service mortgage interest payments made to Bluegreen Corporation as the "Recipient/Lender" between the years 2012 through present.

43.     Bluegreen Corporation, now known as Bluegreen Vacations Corporation, sent some Members of the Class, including the Landons, an IRS Form 1099-A reporting "Acquisition or Abandonment of Secured Property."  This form identified the "lender" as

Bluegreen Corporation or Bluegreen Vacations Corporation.

44. Bluegreen Vacations Corporation is an issuer of securities and raises funds to securitize the obligations relating to timeshare contracts of Class Members.

45. Bluegreen Vacations Corporation is an asset-backed securitizer. Once a Class Member's timeshare contract is signed, it is securitized by Bluegreen Vacations Corporation.

46. Bluegreen Vacations Corporation takes the proceeds of unlawfully conducted activities in selling timeshares complained of in this lawsuit and turns those proceeds into money from which it benefits.

47. Bluegreen Vacations Corporation is aware of the unlawful activities of its affiliates in marketing and selling timeshares to consumers, including the Class Members.

48. Upon information and belief, Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has employees in common with Bluegreen Vacations Unlimited, Inc.

49. Upon information and belief, Bluegreen Corporation has, as a garnishee defendant, garnished wages of various employees of those common employees during the relevant time period (within six years of the filing of the complaint) after being served with Earnings Garnishments in various counties in Wisconsin.

50. Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has officers and/or directors in common with Bluegreen Vacations Unlimited, Inc. According to documents filed by Defendants with the State of Florida Secretary of State

in 2018, these common officers and/or directors include:

| Officer/Director | Bluegreen Vacations Corporation | Bluegreen Vacations Unlimited Inc. |
|---|---|---|
| Anthony M. Puleo | Executive Vice President, CFO, Treasurer, Secretary | Vice President, Treasurer |
| David Pontius | Executive Vice President, COO | President |
| Leslie Branham | Vice President | Director, Vice President |
| Adrienne Kelley | Senior Vice President, CAO | Vice President |
| Valerie Koshman | Assistant Vice President | Vice President |
| Allan Kerz | Senior Vice President, Assistant Treasurer | Vice President, Assistant Treasurer |
| Paul Humphrey | Senior Vice President | Vice President |
| Melissa East | Assistant Secretary | Assistant Secretary |
| Jorge De La Osa | Executive Vice President, Chief Legal and Compliance Officer, Secretary | Director, Vice President, Secretary |

51.    Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has shared the same address and office space as Bluegreen Vacations Unlimited, Inc. during the relevant time period.

52.    Bluegreen Corporation, now known as Bluegreen Vacations Corporation, routinely has sent letters to individuals who purchased timeshares during presentations made in Wisconsin Dells during the relevant period and financed those timeshares through Bluegreen Corporation. The letters were sent from the "Mortgage Department" of "Bluegreen Corporation - Customer Service Department."

53. Bluegreen Corporation routinely has retained one or more third-party debt collection agencies to send debt collection letters to collect debts alleged to be owed to "Bluegreen Corporation" for timeshares purchased in Wisconsin during the relevant time period.

54. Bluegreen Corporation universally presents timeshare buyers with a document at the closing entitled "Consent to be Contacted," which Bluegreen has buyers sign giving express consent to be contacted by "BLUEGREEN CORPORATION, ITS SUBSIDIARIES AND AFFILIATES ("COLLECTIVELY, BLUEGREEN") AND EACH OF THEIR RESPECTIVE CONTRACTORS AND AGENTS" for marketing their promotions, products and services via telephone, including through the use of an automated telephone dialer.

55. Bluegreen Corporation routinely provides timeshare buyers its "Bluegreen Privacy Notice" upon purchasing timeshares at presentations in Wisconsin. The Bluegreen Privacy Notice states that it is given by "Bluegreen Corporation, on behalf of itself, its subsidiaries, and its affiliates (collectively "Bluegreen").

56. Bluegreen Corporation's Privacy Notice states that it is an explanation about how Bluegreen on behalf of itself, its subsidiaries, and its affiliates, may use or share information provided to Bluegreen and how Bluegreen keeps the information secure.

57. Bluegreen's Privacy Notice states that it may share information Bluegreen has received from Class Members on applications or other forms, such as name, Social

Security Number, telephone number, occupation, assets, and income, as well as various other information, with Bluegreen's affiliates, third party servicers, and nonaffiliated parties as described in the Bluegreen Privacy Notice.

58.     Bluegreen's privacy Notice requires timeshare buyers who want to limit Bluegreen's disclosure to third-party non-affiliates of information about Class Members to complete a "Bluegreen Privacy Notice Opt-Out Request Form" and mail it to "Bluegreen Corporation, Attn: Privacy Notice Opt-Out Request, 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431-3311."

59.     When buyers purchase timeshares at presentations given in Wisconsin in which they obtain purchase money loans, Bluegreen Vacations Corporation refers Class Members to purchase title and settlement services from Resort Title Agency, Inc., a wholly owned subsidiary of Bluegreen Vacations Corporation.  Bluegreen Vacations Corporation receives financial or other benefits as a result of those referrals.

60.     In or about April 2018, Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc., through their common officer, Anthony M. Puleo, jointly signed an Acquisition Loan and Security Agreement for the two companies to co-borrow $27,500,000.00 from ZB, N.A., dba National Bank of Arizona ("the joint loan").

61.     Defendants co-borrowed this money in the joint loan in order to acquire the (currently called) Eilan Hotel and Spa located in San Antonio, Texas, to develop and add as a timeshare property as a Bluegreen "Vacation Club Resort."

62. Vacation Club Resorts, together with "Club Associate Resorts," are the timeshare properties available for use of members of the Bluegreen Vacation Club, including Class Members.

63. Bluegreen "Vacation Club Resorts" are discussed more at length below in this amended Complaint and are also discussed and listed in the 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, primarily at pp. 7-12.

64. Future references to "Bluegreen" in this complaint will refer collectively to Bluegreen Vacations Corporation and Bluegreen Vacation Resorts, Inc., who knowingly have acted jointly and in concert regarding all of the events alleged in this amended Complaint.

## IV. FACTUAL ALLEGATIONS

### A. Bluegreen Business Model

65. Bluegreen is a leader in the vacation ownership industry and sells timeshare contracts to consumers through "front-line" and "in-house" sales.

66. Front-line sales consists of selling "timeshare points" to individuals who do not already own Bluegreen "timeshare points.

67. In-house sales consists of selling "timeshare points" to individuals who already own Bluegreen "timeshare points."

68. Although Bluegreen's front-line sales and in-house sales offer to sell what it refers to as "timeshare points," what Bluegreen actually sells is interests in real property.

69.     Bluegreen sells real property that it or one of its subsidiaries owns, as well as real property owned by third parties.

70.     From 2010 to the present, at its resort at Christmas Mountain Village in Wisconsin Dells, Wisconsin, Bluegreen offered to sell and sold real property located in Wisconsin and other states.

71.     Some of the real property Bluegreen offered to sell from 2010 to the present was developed and owned by Bluegreen or one of its subsidiaries.

72.     The real property Bluegreen offered to sell and sold from 2010 to the present that was developed and owned by Bluegreen or one of its subsidiaries is referred to by Bluegreen as "Vacation Club Resorts."

73.     Some of the real property Bluegreen offered to sell from 2010 to the present was developed and owned by third-party companies, hereinafter referred to as "Third-Party Developers."

74.     The real property Bluegreen offered to sell and sold from 2010 to the present that was developed and owned by Third-Party Developers is referred to by Bluegreen as "Club Associate Resorts."

75.     Bluegreen's primary method of selling the real property it offers to sell and sells from Christmas Mountain Village is through in-person sales presentations.

76.     Bluegreen sales presentations are face-to-face meetings between Bluegreen sales representatives and prospective purchasers ("guests"), and face-to-face meetings between Bluegreen sales representatives and current owners ("owners") of Bluegreen

"timeshare points."

77.     The goal of Bluegreen sales presentations, or "tours" as Bluegreen sometimes refers to them, is to sell Bluegreen "timeshare points."  The more money the buyers pay, the more points they can purchase.

78.     Bluegreen solicits and requests payments from guests and owners at sales presentations.

79.     Bluegreen sales representatives who offer to sell and sell "timeshare points" to individuals who do not—at the time of the sales presentation—already own Bluegreen "timeshare points," *i.e.* guests, are referred to by Bluegreen as "Front-line Sales Representatives."

80.     Bluegreen sales representatives who offer to sell and sell "timeshare points" to individuals who own Bluegreen "timeshare points" at the time of the sales presentation, *i.e.*, owners, are referred to by Bluegreen as "In-house Sales Representatives."

81.     Bluegreen sales representatives are trained to used standardized selling pitches and procedures.

82.     Even though Bluegreen was actually offering to sell interests in real property, Bluegreen's sales employees told guests and owners that what they were offering to sell and selling were "timeshare points."

83.     According to Bluegreen, "timeshare points" represent an owner's beneficial ownership and use rights in the real property Bluegreen actually sells guests and owners.

84.     According to Bluegreen, "timeshare points" can be used by owners to stay at Vacation Club Resorts and Club Associate Resorts.

85.     The Front-line Sales Representatives meet with the guests and introduce the guests to the concept of "timeshare points."

86.     The In-house Sales Representatives meet with owners and try and sell them additional "timeshare points."

87.     When a Bluegreen sales representative offers to sell "timeshare points" to a guest or owner, the sales representatives do not know where the real property they are selling is located.

88.     When Bluegreen sales representatives offer to sell "timeshare points" to a guest or owner, the sales representatives also do not know who the owner of the real property they are offering to sell is.

89.     At the time Bluegreen sales representatives offer to sell "timeshare points" to a guest or owner, the owner of the real property could be Bluegreen or one of its subsidiaries or one of many different Third-Party Developers with whom Bluegreen has business relationships.

90.     In fact, at the time of the sales presentation, Bluegreen sales representatives can never tell a guest or owner where the real property that Bluegreen is actually offering to sell the guest or owner is located because neither the sales representatives nor Bluegreen knows where the real property they are selling is located at that point in time.

91.     Bluegreen does not determine where the real property it is actually selling is located—or the identity of the seller of the real property—until after the guest or owner agrees to purchase a certain number of "timeshare points," after the guest or owner makes a down payment, and after the guest or owner signs a document referred to as a "Purchase Proposal," which only makes reference to the number of "timeshare points" being sold.

92.     The failure of Bluegreen and its employees to disclose the identity of the seller of the real property Bluegreen is offering to sell at the beginning of Bluegreen's initial contact with the guest or owner is a violation of Wis. Stat. § 707.55(8).

93.     Wis. Stat. § 707.55(8) provides:

In connection with the offer or sale of a time share, no person may engage in any of the following practices:

(8) SELLER'S IDENTITY. Failing to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with a prospective purchaser, if the contact is initiated by or on behalf of a seller.

94.      Bluegreen violates Wis. Stat. § 707.55(8) using the sales process it uses at Christmas Mountain Village, *i.e.*, determining the location of the real property it is selling, as well as the identity of the seller of the real property, only after the guest or owner agrees to purchase "timeshare points," and only after the guest or owner receives a "Purchase Proposal."

95.     The Purchase Proposal does not indicate that what Bluegreen is actually selling the guest or owner is real property.

96. The Purchase Proposal states the following: "The seller is Bluegreen Vacations Unlimited, Inc."

97. The statement that "The seller is Bluegreen Vacations Unlimited, Inc." is a material misrepresentation and a violation of Wis. Stat. § 707.55(1) in instances where Bluegreen is actually selling real property owned by a Third-Party Developer.

98. The statement that "The seller is Bluegreen Vacations Unlimited, Inc." is a material misrepresentation and a violation of Wis. Stat. § 707.55(1) in instances where Bluegreen is actually selling real property located at a Club Associate Resort.

99. After the guest or owner makes the down payment on the "timeshare points," a "Quality Assurance Specialist" (QAS) prepares the contract documents associated with the sales transaction.

100. The QAS inputs the information form the Purchase Proposal into a computer software program called SPI, and processes the guest's or owner's down payment.

101. The SPI software program then determines, based on the number of "timeshare points" Bluegreen is selling the guest or owner—as well as the inventory of real property available at Club Resorts and Club Associate Resorts—where the real property Bluegreen is actually selling to the guest or owner is located and the identity of the seller of the real property.

102. If the real property is located at a Vacation Club Resort, the seller is Bluegreen or one of its subsidiaries.

103. If the real property is located at a Club Associate Resort, the seller is a Third-Party Developer.

104. Bluegreen sells real property owned by, and on behalf of, more than a dozen Third-Party Developers.

105. Consumers, including Class Members, initially believe that they are buying points in the Bluegreen resort located in Wisconsin where they have toured and listened to a sales presentation.

106. Bluegreen does not inform prospective buyers in Wisconsin, nor do the prospective buyers have any way to know, whether the timeshare "assigned" to them by Bluegreen is a Vacation Club Resort (owned by Bluegreen) or a Club Associate Resort (owned by a third-party developer).

107. Prospective buyers, including the Class Members, who sign contracts in Wisconsin universally do not request that their timeshares be located in other states; rather, it is Bluegreen who assigns Wisconsin buyers timeshares located in distant states after the consumers have signed the Purchase Proposal.

108. When buyers finally get a copy of the contract at the sales presentation after they have signed the Purchase Proposal and notice the timeshare is located in another state and ask Bluegreen about this, as a matter of policy and practice, the Bluegreen sales representatives tell the buyers that it does not matter where their timeshare is located.

109. Bluegreen's statement that it does not matter where the timeshare is located is a material misrepresentation, because the Wisconsin Timeshare Act, Wis. Stat.

§ 707.59, provides for substantially limited consumer rights if the timeshare property is located outside of Wisconsin.

110.    Wisconsin Timeshare Act, Wis. Stat. § 707.59 provides:

**707.59  Time-share units not within state.**

(1)  Except as provided in sub. (2), if time shares in a time-share unit located outside of this state are offered or sold in this state, the laws of the state where the time-share unit is located which relate to a general matter covered by this chapter apply to the offer or sale of those time shares in this state. If the state in which the time-share unit is located has no laws relating to a general matter covered by this chapter, the provision in this chapter relating to that matter applies to the offer or sale of those time shares in this state.

(2) Section 707.55 applies to any offer or sale of a time share in a time-share unit, whether the time-share unit is located in this state or outside this state.

111.    Bluegreen's sales practices of assigning Wisconsin buyers timeshares located outside of Wisconsin are designed to deprive Wisconsin buyers of additional rights they would have if the timeshare is located in Wisconsin.

112.    The Wisconsin Timeshare Act, Chapter 707, provides stronger consumer protections than the timeshare laws of the other states in which Bluegreen is selling timeshares to buyers in Wisconsin.

113.    Bluegreen's statement that it does not matter where the timeshare is located is also a material misrepresentation because if it is a Club Associate Resort at the time of purchase, that resort may or may not continue to be a Club Associate Resort in the future.

114.    The sales practices discussed above tend to induce consumers into entering into improvident and expensive contracts.

## B.  Buyers' Cancellation Rights

115.    When Bluegreen sells timeshares to buyers from their sales offices in
Wisconsin where the actual timeshare interests sold are located outside of Wisconsin, the
contract documents have a choice of law provision stating that Florida law applies, except
that the Wisconsin Timeshare Act applies to the buyer's cancellation rights, as well as
the escrow payments of the purchaser before closing.

116.    Bluegreen contracts refer in two places to the applicability of the Wisconsin
Timeshare Act to a buyer's cancellation rights if the contract is signed in Wisconsin.  In
the first reference, the choice of law provision provides in the "Terms and Conditions" of
the contract under "GOVERNING LAW":

> This agreement shall be construed in accordance with the laws of the State of
> Florida; excepting, however, that the provisions relating to the Purchaser's right to
> cancel this Agreement and the escrow of Purchaser deposit payments made prior to
> closing, which provisions shall be construed, interpreted, and enforced in
> accordance with the laws of the state where Purchaser executes this Agreement.

117.    Plaintiffs and each of the Class Members signed timeshare contracts in
Wisconsin.

118.    The second place in the timeshare contracts which provides that the
Wisconsin Timeshare statute applies to the Class Members' cancellation rights is on the
last page of the contract, which states (emphasis in original):

**IF YOU EXECUTE THIS AGREEMENT IN WISCONSIN, YOUR
CANCELLATION RIGHTS ARE SUBJECT TO AND PROTECTED BY
WISCONSIN LAW. THE REFERENCES TO THE TEN (10) DAY
CANCELLATION PERIOD PURSUANT TO FLORIDA STATUTES,
CHAPTER 721, CONTAINED IN THE TEXT OF THE PUBLIC**

**OFFERING STATEMENT ARE NOT APPLICABLE TO YOU, AS THEY ONLY APPLY TO CONTRACTS EXECUTED IN THE STATE OF FLORIDA. WISCONSIN LAW PROVIDES YOU WITH THE FOLLOWING CANCELLATION RIGHTS:**

**YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR OBLIGATION WITHIN 5 BUSINESS DAYS FROM THE DATE YOU SIGN THIS CONTRACT OR UNTIL 5 BUSINESS DAYS LATER. IF YOU DECIDE TO CANCEL, YOU MUST NOTIFY THE DEVELOPER, IN WRITING, OF YOUR INTENT TO CANCEL. YOUR NOTICE OF CANCELLATION SHALL BE EFFECTIVE UPON THE DATE SENT AND SHALL BE SENT TO: BLUEGREEN VACATIONS UNLIMITED, INC., ATTN: CORPORATE SALES ACCOUNTING DEPARTMENT., 4960 CONFERENCE WAY N STE 100, BOCA RATON FL 33431-3311. ANY ATTEMPT TO OBTAIN A WAIVER OF YOUR CANCELLATION RIGHTS IS UNLAWFUL. WHILE YOU MAY EXECUTE ALL CLOSING DOCUMENTS IN ADVANCE, THE CLOSING, AS EVIDENCED BY DELIVERY OF THE DEED OR OTHER DOCUMENT TO THE TRUSTEE, BEFORE EXPIRATION OF YOUR 5 BUSINESS DAY CANCELLATION PERIOD, IS PROHIBITED.**

**In addition, if the Purchaser has used or occupied any Bluegreen Vacation Club Component Site resort for more than 12 hours prior to delivering a notice of cancellation, the funds to be returned to the Purchaser may be reduced by a reasonable charge to cover the length of stay, plus the cost for damages, if any, to the resort directly attributable to the Purchaser's use or occupancy.**

119.     The Wisconsin Timeshare Act's relevant statutory sections of Wisconsin's timeshare cancellation law are comprised of three statutes: Wis. Stats. §§ 707.47, 707.46, and 707.41.

120.     Wis. Stat. § 707.47 provides:

**707.47  Purchaser's right to cancel.**

(1)  Provision of statement. A person required to deliver a time-share disclosure statement under s. 707.41(2) shall, before transfer of a time share and no later than the date of any contract for the purchase of a time share, provide a prospective purchaser with a copy of the time-share disclosure statement and all amendments

and supplements to the statement.

(2) Right to cancel. If delivery of a time-share disclosure statement is required under s. 707.41(2), the purchaser may cancel a contract for the purchase of a time share until midnight of the 5th business day after whichever of the following is later:

    (a) The date that the contract is executed.

    (b) The date on which the purchaser receives the last of the documents required to be provided to the purchaser under sub. (1).

(3) Activity before cancellation period expires. No title may be recorded, deed delivered or deposit released until the cancellation period under sub. (2) has expired. Nothing in this subsection or sub. (4) precludes the execution of documents before the cancellation period expires, for delivery after the cancellation period expires.

(4) Waiver prohibited. The purchaser or any person on behalf of the purchaser may not waive the right to cancel under sub. (2).

(5) Notice of cancellation. If a purchaser elects to cancel a contract under sub. (2), the purchaser may do so by personally-delivering notice of the cancellation to the seller or by mailing the notice to the developer or to the developer's agent for service of process. If mailed, any notice of cancellation shall be considered given on the date that the notice is postmarked.

(6) Refund.

    (a) Cancellation under sub. (2) shall be without penalty, and, except as provided in par. (b), all payments made by the purchaser before cancellation shall be refunded within 20 days after receipt of the notice of cancellation or within 5 days after receipt of funds from the purchaser's cleared check, whichever is later.

    (b) If the purchaser has used or occupied the time-share property for more than 12 hours before cancellation, the funds to be returned to the purchaser may be reduced by a reasonable charge to cover the length of stay plus the cost for damages, if any, to the time-share property directly attributable to the purchaser's use or occupancy of the time share property.

121.    An important part of the cancellation rights of a buyer who signs a

timeshare contract is also found in Wis. Stat. § 707.46, which provides, in pertinent part:

**707.46  Contract; minimum requirements**.

(1)  Required provisions. All contracts for the purchase of a time share shall
contain at least all of the following provisions:

(a) The actual date that the contract is executed by each party.

(b) The name and address of the developer or seller and of any agent acting
on behalf of the developer or seller, and, if different than the developer or
seller, any owner of the land or buildings included in the project of which
the time shares are a part.

(c) The total financial obligation of the purchaser, including the initial
purchase price and any additional charges to which the purchaser may be
subject, such as financing, reservation and recreation charges and
time-share expenses.

(d) The projected date of completion of construction, as defined in s. 707.49
(1) (a), of each part of the project of which time shares are a part which is
not completed at the time the purchase contract is executed.

(e) A description of the nature and duration of the time share being sold.

(f) A description of the purchaser's rights under s. 707.47 [the Wisconsin
timeshare cancellation rights].

122.    The Wisconsin Timeshare Act's reference in Wis. Stat. § 707.47(1) and (2)

of the cancellation rights refer to the "timeshare disclosure statement" required under

Wis. Stat. § 707.41(2), Wis. Stats.

123.    Bluegreen has failed to provide a "timeshare disclosure statement" under

Wis. Stat. § 707.41 to any person who purchased in Wisconsin timeshare located outside

of Wisconsin.

124.    Bluegreen has failed to provide complete and accurate timeshare disclosure statement to anyone who has purchased timeshares located in Wisconsin, as is required by Wis. Stat. § 707.41(2).

125.    The statute relating to timeshare disclosure statements provide as follows:

**707.41  Time-share disclosure statement.**

(1)  Preparation of statement.

> (a) Except as provided in par. (b), a developer, before offering an interest in a time-share unit, shall prepare a time-share disclosure statement conforming to the requirements of this section and, if applicable, ss. 707.42 to 707.45.

> (b) A developer may transfer responsibility for preparation of all or a part of the time-share disclosure statement to a successor developer or to a person in the business of selling real estate who intends to offer time shares in the time-share property for the person's own account. The developer shall provide the transferee with any information necessary to enable the transferee to fulfill the requirements of this section.

(2)  Delivery of statement; single statement.

> (a) A developer or other person in the business of selling real estate who offers a time share for the person's own account to a purchaser shall deliver a time-share disclosure statement to a prospective purchaser in the manner prescribed in s. 707.47 (1).

> (b) If a time-share property is part of any other real estate venture in connection with the sale of which the delivery of a disclosure statement is required under the laws of this state, a single disclosure statement conforming to the requirements of this section and, if applicable, ss. 707.42 to 707.45, as those requirements relate to all real estate ventures in which the time-share property is located, and to any other requirements imposed under the laws of this state, may be prepared and delivered in lieu of providing 2 or more disclosure statements.

(3) Liability for statement. The person who prepared all or a part of the time-share disclosure statement is liable under ss. 707.47 and 707.57 for any false or misleading statement set forth in, or any omission of material fact from, that portion of the time-share disclosure statement which the person prepared.

(4) Contents of statement. A time-share disclosure statement shall contain or fully and accurately disclose all of the following:

(a) A cover sheet bearing the title "Time-Share Disclosure Statement" and the name and principal business address of the developer and the developer's agent, if any, the name and location of the time-share property and the following 3 statements in boldface type or capital letters no smaller than the largest type on the page:

1. THESE ARE THE LEGAL DOCUMENTS COVERING YOUR RIGHTS AND RESPONSIBILITIES AS A TIME-SHARE OWNER. IF YOU DO NOT UNDERSTAND ANY PROVISIONS CONTAINED IN THEM, YOU SHOULD OBTAIN PROFESSIONAL ADVICE.

2. THESE DISCLOSURE MATERIALS GIVEN TO YOU AS REQUIRED BY LAW MAY BE RELIED UPON AS CORRECT AND BINDING. ORAL STATEMENTS MAY NOT BE LEGALLY BINDING.

3. YOU MAY CANCEL IN WRITING ANY CONTRACT FOR THE PURCHASE OF A TIME SHARE, WITHOUT ANY PENALTY OR OBLIGATION, WITHIN 5 BUSINESS DAYS FROM THE DATE YOU SIGN THE CONTRACT OR UNTIL 5 BUSINESS DAYS AFTER YOU RECEIVE THE TIME-SHARE DISCLOSURE STATEMENT, WHICHEVER IS LATER. IF YOU SO CANCEL THE CONTRACT, YOU ARE ENTITLED TO RECEIVE A FULL REFUND OF ANY DEPOSITS MADE, EXCEPT, IF YOU HAVE USED OR OCCUPIED THE TIME-SHARE PROPERTY FOR MORE THAN 12 HOURS, THE MANAGING ENTITY OR CAMPGROUND OPERATOR MAY SUBTRACT FROM DEPOSITS MADE A REASONABLE CHARGE TO COVER THE LENGTH OF STAY PLUS THE COST FOR DAMAGES TO THE TIME-SHARE PROPERTY DIRECTLY ATTRIBUTABLE TO YOU OR ANY MEMBER OF YOUR PARTY.

(b) A general description of the time-share property and the time-share units, including the number of units in the time-share property and in any project of which it is a part, and the schedule of commencement and completion of all promised improvements as described in the time-share instrument, promotional materials, advertising and the time-share disclosure statements.

(c) As to all units owned or offered by the developer in the same project, all of the following:

1. The types and number of units.
2. Identification of units that are time-share units.
3. The types and durations of the time shares.
4. The maximum number of units that may become part of the time-share property.
5. A statement of the maximum number of time shares that may be created or a statement that there is no maximum.

(d) Copies and a brief narrative description of the significant features of the time-share instrument and any documents, other than plats and plans, referred to in the time-share instrument, copies of any contracts or leases to be signed by the purchaser at closing, and a brief narrative description of any contracts or leases that may be canceled by the association under s. 707.32.

(e) The identity of the managing entity and the manner, if any, by which the developer may change the managing entity or its control.

(f) A current balance sheet and budget for the association, if there is an association, either within or as an exhibit to the time-share disclosure statement. During the 12 months after the date of the first transfer to a purchaser the budget may be a projected budget. The budget shall include all of the following:

1. A statement of who prepared the budget and the budgetary assumptions concerning occupancy and inflation factors.

2. A statement of the amount, or a statement that there is no amount, included in the budget as a reserve for repairs and replacement.

3. A statement of any other reserves.

4. The projected time-share expenses by category of expenditure, for the time-share units.

5. The projected time-share liability for each time share.

(g) A description of the nature and purposes of all charges, dues, maintenance fees and other expenses that may be assessed, the current amounts assessed and the method and formula for changes.

(h) Any services provided by the developer or expenses paid by the developer which the developer expects may become a time-share expense, and the projected time-share liability attributable to each of those services or expenses for each time share.

(i) Any initial or special fee due from the purchaser at closing and a description of the purpose of, and method of calculating, the fee.

(j) A statement of the effect on the time-share owners of liens, defects or encumbrances on, or affecting the title to, the time-share units.

(k) A description of any financing offered by the developer.

(L) The terms and significant limitations of any warranties provided by the developer, including statutory warranties and limitations on the enforcement of the warranties or on damages.

(m) If of significance to the time-share units, a statement of any unsatisfied judgments against the managing entity or the developer, the status of any pending suits involving the sale or management of real estate to which the managing entity or the developer or an affiliate of the developer is a defending party, and the status of any pending suits of which the developer has actual knowledge.

(n) A statement that an amount equal to 50 percent of the deposits, as defined in s. 707.49 (1) (b), made in connection with the purchase of a time share will be held in an escrow account, except as provided in s. 707.49 (4), until all of the events listed in s. 707.49 (3) (b) 3. have occurred or any later time specified in the contract to purchase the time share, and that the full amount of the deposit, minus any amount that may be withheld under s. 707.47 (6) (b), will be returned to the purchaser if the purchaser cancels the contract under s. 707.47.

(o) Any restraints on transfer of time shares or portions of time shares.

(p) A description of the insurance coverage provided for the benefit of time-share owners in accordance with s. 707.35.

(q) Any current or expected fees or charges to be paid by time-share owners for the use of any facilities related to the project.

(r) The extent to which financial arrangements have been provided for completion of all promised improvements as described in the time-share instrument, promotional materials, advertising and the time-share disclosure statements.

(s) The extent to which a time-share unit may become subject to a tax or other lien arising out of claims against other time-share owners of the same time-share unit.

(t) A description of the rights and remedies provided in the time-share instrument to a time-share owner who is prevented from enjoying exclusive occupancy of a time-share unit by others, or a statement that there are none provided in the time-share instrument.

126. Bluegreen has taken the position that it can provide a "Public Offering Statement" to persons who purchase in Wisconsin in lieu of a timeshare disclosure statement.

127. A Public Offering Statement is not a timeshare disclosure statement, and Bluegreen's Public Offering Statement does not comply with what must be provided to persons who sign contracts in Wisconsin to purchase timeshares.

128. Bluegreen's contracts state that Wisconsin cancellation rights apply to timeshare purchases made in Wisconsin, regardless of where the property is located.

129. Under Wisconsin's timeshare cancellation rights set forth is Wis. Stat. § 707.41(2), the five business days for cancellation begins to run only after midnight of the 5th business day after whichever of the following is later:

(a) The date that the contract is executed.

(b) The date on which the purchaser receives the last of the documents required to be provided to the purchaser under sub. (1).

130. Because Bluegreen failed to give a complete and accurate timeshare disclosure statement to any person who purchased in Wisconsin (regardless of where the timeshares were located), the cancellation period has not expired for these buyers, including all Class Members.

131. Bluegreen has misstated the buyer's right to cancel in every timeshare contract sold in Wisconsin at all relevant times, which is a material misrepresentation under Wis. Stat. § 707.55(1), as well as a violation of §§ 707.46 and 707.47.

132. Bluegreen's stated cancellation policy in its contracts sold in Wisconsin **only** permit a buyer to cancel by sending written notice to "Bluegreen Vacations Unlimited, Inc., ATTN: Corporate Sales Accounting Dept., 4960 Conference Way N Ste 100, Boca Raton FL 33431-3311." (All caps omitted.)   That is contrary to Wisconsin Timeshare Act cancellation rights which expressly permit buyers to cancel in two other ways:

a. by personally delivering notice of the cancellation to the seller; and

b. by mailing the notice to the developer's agent for service of process.

133.    Bluegreen's stated cancellation policy in all contracts sold in Wisconsin also provides for a reduction in the refund if the buyer does not return all of the point of purchase materials.

134.    Nothing in the Wisconsin Timeshare Act's cancellation provisions permit Bluegreen to deduct from the buyer's refund for not returning the contract documents and other point of purchase materials.

135.    Bluegreen's misrepresentations of a timeshare buyer's cancellation rights is a violation of Wis. Stats. §§ 707.47 and 707.55(1).

136.    Under Wis. Stat. § 707.47(5), a buyer who signed a timeshare contract in Wisconsin expressly is permitted to cancel by personally delivering the cancellation notice to Bluegreen in Wisconsin, where the timeshare contract was signed and the Bluegreen resort is located.

137.    Under Wis. Stat. § 707.47(5), a buyer who signed a timeshare contract in Wisconsin expressly is permitted to cancel by mailing the cancellation notice to the developer's agent for service of process.

138.    Bluegreen Vacations Unlimited, Inc. has had a registered agent for service of process in Wisconsin during all of the relevant period of time.

139.    Mailing to a professional registered agent is a means of cancellation that is even more reliable than mailing it to Bluegreen in Florida, where Bluegreen has multiple divisions and corporate affiliates at the same address, yet Bluegreen failed to advise persons who bought timeshares in Wisconsin that they had a legal right to cancel in this

manner.

140. Bluegreen universally misrepresents the buyers' cancellation rights, because Bluegreen's stated cancellation notice in the timeshare contract does not permit in-person cancellations to Bluegreen in Wisconsin or mailing to Bluegreen's registered agent for service of process, thus materially depriving Wisconsin buyers of this alternative means of cancellation.

141. By misstating the timeshare cancellation rights of buyers who sign timeshare contracts in Wisconsin, both in the way the buyer may cancel and by how much a buyer may be charged if they do not return contract documents or other point of purchase materials, consumers who sign contracts with Bluegreen in Wisconsin are discouraged from exercising their contract rights.

142. It is particularly important for buyers of timeshare contracts sold by Bluegreen to be provided complete and accurate cancellation rights and not simply partial or inaccurate cancellation rights, because unless the timeshare contracts are canceled properly (or judicially rescinded or Bluegreen forecloses on the timeshare property), the buyers are responsible for paying expenses relating to the timeshares, including contract payments, fees, and costs, **in perpetuity**.

143. Bluegreen's contracts consist of multiple documents containing confusing legal provisions and often contradictory terms. They are expensive and difficult to understand. Many consumers, including Plaintiffs, desire to cancel them once they understand what they have gotten into. Bluegreen's purpose and the effect of the

misrepresentation of cancellation rights is to make cancellation more difficult and burdensome and to create an *in terrorem* effect on the buyers.

### C. Illegal Attorney's Fee Provision in Timeshare Contracts

144.    All contracts during the relevant period that Bluegreen has prepared and/or arranged for purchasers in Wisconsin to sign, regardless of where the timeshare is located, provide for the buyer to pay the attorney's fees and all costs of collection of the seller and/or lender and/or creditor in the case of default or breaking any promise related to the contract.

145.    All timeshare contracts Bluegreen sold to consumers during the relevant period consist of numerous separate documents. The terms of the Bluegreen contracts specifically incorporate by reference all of the documents mentioned in the Bluegreen Vacation Club "Bluegreen Owner Beneficiary Agreement" or which are attached or provided at the time of closing.

146.    In order to use their timeshares, buyers must become and remain a member in good standing of the "Bluegreen Vacations Club."

147.    In all timeshare contracts purchased in Wisconsin in which buyers financed purchase of timeshare, Bluegreen is identified as a "seller" and arranged the loans and provided the loan documents for to buyers to sign at the closing.

148.    In some contracts purchased in Wisconsin during the relevant period, Bluegreen was the seller, the arranger of credit and the lender, directly providing financing to buyers to pay for the timeshares.

149.    In some contracts, Bluegreen is the seller, the arranger of credit to pay for the timeshare purchase and presented buyers at the closing with documents to sign to obtain loans from third party lenders.

150.    Wisconsin Chapter 428 pertaining to first lien real estate and other mortgage loans under $25,000.00 applies to loans taken out in Wisconsin to finance the purchases of timeshares wherever located.

151.    Wis. Stat. § 428.102(2) defines "creditor" as "a person who regularly engages in, arranges for or procures from 3rd persons, loans within the scope of this subchapter."

152.    Wis. Stat. § 428.102(4) defines "loan" as "the creation of debt by the creditor's payment of or agreement to pay money to the customer or to a 3rd party for the account of the customer, or a forbearance by a lender of a debt arising from a loan."

153.    In some of the timeshare purchases in Wisconsin during the relevant period, Bluegreen directly and regularly provided financing and was the lender on the loan and/or accepted loan payments, as well as being the arranger of the loan.

154.    In other of the timeshare purchases in Wisconsin during the relevant period, Bluegreen arranged for credit for customers with third-party lenders, who forebeared on the debts arising from the loan, and Bluegreen presented the buyers with all loan documents on the day of purchase.

155.    In all timeshare purchases in which the buyer obtained a loan to finance the timeshare purchase, Bluegreen universally arranged the credit, either directly or through a

third-party lender.

156.    In all timeshare purchases in Wisconsin in which the buyer obtained a loan
to finance the timeshare purchase, the loans were made on the day of the sales
presentation, Bluegreen presented the buyers (whether directly providing financing or
arranging for financing with third party lenders) with numerous legal documents to sign at
the "closing," which took place on the same day the buyers purchased the timeshares.

157.    In all timeshare purchases at Bluegreen in Wisconsin during the relevant
period in which the buyer obtained a loan to finance the timeshare purchase, Bluegreen
was a "creditor" under Wis. Stat. § 428.102(2).

158.    Wis. Stat. § 428.103(3)(e) provides:

**428.103 Limitations**

(e) The creditor shall not contract for or charge its attorney fees to the customer
except as follows:

    1. Reasonable fees for opinions of title.

    2.  In foreclosure cases, 5 percent of the amount adjudged due the creditor;
    or if the dispute is settled prior to judgment, a reasonable fee based on the
    time, nature and extent of the work involved, but not to exceed 2-1/2
    percent of the unpaid principal balance of the loan.

159.    Bluegreen universally and as a regular practice required and arranged for
consumers who bought timeshares in Wisconsin (wherever located) to sign contracts
which illegally provided that in the event of a broken promise or default by consumers,
the consumers would be liable to the Club Developer (Bluegreen Vacations Unlimited,
Inc.), the Facilitator's (timeshare resort where that particular timeshare was located);

and/or the Lender's attorney's fees if they prevailed in any action.

160. Bluegreen universally and as a regular practice required and arranged for consumers who bought timeshares in Wisconsin (wherever located) to sign contracts which illegally provided that if the Bluegreen Club or Vacation Club Managing Entity referred the buyer's account for collection, the buyer would be liable to pay the costs and collection fees.

161. Bluegreen universally and as a regular practice required and arranged for consumers who bought timeshares in Wisconsin (wherever located) to sign contracts which illegally provided that the buyers agreed to defend and indemnify the Club Developer, Facilitator, and Lender against all claims of real estate brokers or sales personnel due to acts of the Purchaser or Purchaser's representatives other than brokers or sales personnel employed by the Club Developer, Facilitator and/or Lender.

162. Bluegreen universally and as a regular practice required and arranged for consumers who bought timeshares in Wisconsin (wherever located) to sign contracts during the relevant period in which the "Trustee" of the Trust Agreement acted as a representative of buyers.

163. Bluegreen's practice of contracting for and arranging for buyers to sign timeshare contracts illegally providing that in the event of a broken promise or default by consumers, the consumers would be responsible to pay the creditor's or seller's or facilitator's or developer's or lender's attorney's fees was a material misrepresentation of the buyers' rights and obligations under Wis. Stat. § 707.55(1) as well as a violation of

Wis. Stat. § 428.103.

164.   The purpose and effect of Bluegreen's illegal attorney's fee provision is to materially increase the liability consumers perceive that they face if they attempt to cancel or decide not to proceed with their timeshare purchases, thus discouraging and deterring cancellation of undesirable contracts.

165.   Bluegreen's contracts with Class Members also materially misrepresent that persons who bought timeshares in Wisconsin (wherever located) which were financed subject to Wisconsin Chapter 428 could be liable for attorney's fees of the developer, seller, faciliator, or lender.

166.   Bluegreen's representations of the buyers' potential obligation to pay attorney's fees was materially false, deceptive, and misleading and thus also a violation of Wis. Stat. § 707.55(1).

### D.  Bluegreen Offering Incentives "Today Only"

167.   As part of its usual and customary practice and Bluegreen's high pressure sales techniques, Bluegreen offers incentives such as special prices, discounts, special memberships and prizes to prospective purchasers which Bluegreen tells the prospective buyers are good only for that day.  Some incentives are offered in writings which state that they are only good for that day.

168.   Wis. Stat. § 707.55(2) provides:

**707.55  Prohibited advertising and sales practices.** In connection with the offer or sale of a time share, no person may engage in any of the following practices:

(2) Incentives. Making any assertion, representation or statement that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a prospective purchaser for the remainder of the day on which the assertion, representation or statement is made, except that the person may state that the incentives are not guaranteed in the future and that they may be subject to negotiation in the future.

169.    Bluegreen's representing incentives to purchase as being available "today only" is a deceptive and misleading sales practice prohibited by Wis. Stat. § 707.55(2).

170.    As part of its regular business practices, Bluegreen violates the "today only" prohibition of Wis. Stat. § 707.55(2).

171.    As a universal practice during the relevant period, before they sign their timeshare contracts, Bluegreen does not permit prospective buyers in Wisconsin to take copies of the numerous legal documents (totaling many hundred of pages) which are part of their contract away with them to review and decide at a later time whether they want to proceed with buying the timeshare on another date.  This universal practice deprives buyers from carefully reviewing (or even completely reading) the contract documents or consulting with legal counsel or another individuals about contracts. This practice creates an atmosphere of urgency that induces customers to enter into improvident and expensive timeshare contracts which will obligate them in perpetuity.

172.    Bluegreen's contracts include documents which state that the buyer has had an opportunity to review the contract documents, including the Bluegreen Vacation Club Multi Site Public Offering Statement (which is several hundred pages in length), even though Bluegreen knows that this statement is false, because this Public Offering

Statement is not even provided to buyers until after the contract documents have been signed. Other documents referred to in the contract documents are not provided to the buyers at all.

173.    The Bluegreen Owner Beneficiary Agreement vaguely refers to the Agreement being subject to "all terms and conditions hereafter set forth, or attached hereto, which are incorporated herein by reference."  Such documents are not identified, and the only way that anything is "attached" at all is by Bluegreen presenting all point of purchase materials to buyers in a folder or binder.

### E.  Illegal Referral Selling

174.    As a matter of its usual business practices, Bluegreen used a referral selling program to induce the sales of timeshare interests.

175.    The product being sold buy Bluegreen is vacation ownership interests (VOIs) or timeshares, which Bluegreen sells primarily for personal, family, or household purposes.

176.    As part of the program, as an inducement to selling timeshares to prospective buyers, Bluegreen solicited names from prospective buyers of other people who might be interested in touring Bluegreen as prospective buyers and/or to help Bluegreen in making other consumer sales.

177.    Bluegreen promised to pay money to prospective buyers for each qualified person who toured Bluegreen that the prospective buyer referred.

178.    Prospective buyers in the Class gave names of others to Bluegreen under its referral program.

179.    Bluegreen did not first give prospective buyers the full amount of potential compensation offered to them before using Bluegreen's referral selling plan to induce the sale of vacation timeshares, which is a violation of Wisconsin law.

180.    Class Members were induced to purchase expensive timeshares as a result of Bluegreen's referral selling program and suffered pecuniary losses.

## V.  Factual Allegations of Class Representatives

### A.  Melissa Landon and Edward Landon

181.    Plaintiffs incorporate by reference the preceding paragraphs.

182.    On or about January 18, 2015, Melissa and Edward Landon, a married couple, went to Christmas Mountain Village Resort after receiving a telephone call a few weeks earlier from Bluegreen soliciting them to come to Christmas Mountain Village Resort.

183.    The Landons were told that they would receive a $100 gift card if they spent 60 minutes listening to a presentation.

184.    A Front-Line sales representative made a high-pressure sales pitch to the Landons to buy timeshare points.

185.    The Landons did not receive their $100 gift card until after the sales presentation was completed.

186.     In the sales presentation, Bluegreen told the Landons that certain incentives to purchase, such as the Charter VIP 20,000 Points program giving them unlimited bonus times at Bluegreen Resorts and discounted prices on rooms and the waiver of their Travelers Plus program, were available that day only.

187.     Bluegreen's representing incentives to purchase as being available "today only" is a deceptive and misleading sales practice prohibited by Wis. Stat. § 707.55(2).

188.     In the sales presentation and during the sales negotiations, Bluegreen told the Landons that they could save money on maintenance fees if they gave Bluegreen the names of friends or relatives who might be interested in coming to tour Bluegreen.

189.     The sales representative told the Landons that they would get $50 off maintenance fees for every person who toured Bluegreen that the Landons referred.

190.     Bluegreen discussed the referral program before the Landons purchased the timeshare interest, and the sales representative explained that people have gone for years not paying any maintenance fees just through their referrals to Bluegreen.

191.     The Landons gave Bluegreen the names of people to tour Bluegreen as potential referrals.

192.     Bluegreen did not give the Landons compensation for the names they gave in the referral program, either at the time they gave Bluegreen the referrals or at any time.

193.     The Landons were induced, in whole or in part, to buy the timeshare as a result of Bluegreen's referral selling program.

194.    The Landons suffered a pecuniary loss as a result of Bluegreen's violations of Wisconsin law regarding referral selling.

195.    As a matter of its usual business practices, Bluegreen used a referral program to induce the sales of timeshare interests.

196.    As a matter of its usual business practices, Bluegreen never gave any compensation to its buyers at the time they made referrals.

197.    After the Landons agreed in the sales presentation to buy 6,000 bi-annual "points" for $8,300 and paid $1,180 down, they were given a "Purchase Proposal" which stated that "The seller is Bluegreen Vacations Unlimited, Inc."

198.    According to the purchase contract documents eventually presented to the Landons for signature, the property was not owned by Bluegreen Vacations Unlimited, Inc.; the seller and creditor was Cibola Vista Resort & Spa in Peoria, AZ.

199.    When the Landons noticed that their timeshare location was in Arizona, they were puzzled and questioned this, because they did not want to own a timeshare in Arizona.

200.    The Landons thought they were buying a timeshare interest in Christmas Mountain Village, where they had toured and seen the property and which was located much closer to them than Arizona.

201.    In response to their inquiry, the Bluegreen representative told them that the Arizona timeshare was simply a matter of assignment, and that it did not matter where the timeshare was  located, because the Landons would have all of the same rights and

benefits as they would have with a Wisconsin timeshare at Christmas Mountain Village.

202.    The statement that owning a timeshare in Arizona was the same as owning a timeshare in Wisconsin and that it didn't matter where the timeshare was located was a material misrepresentation, in violation of Wis. Stat. § 707.55(1).

203.    The location of a timeshare matters greatly when the purchase is made in Wisconsin, because Wis. Stat. § 707.59 significantly limits the rights and consumer protections under the Wisconsin Timeshare Act of timeshare owners who buy a timeshare located outside of Wisconsin.

204.    Wis. Stat. § 707.59 provides:

**707.59  Time-share units not within state.**
(1)  Except as provided in sub. (2), if time shares in a time-share unit located outside of this state are offered or sold in this state, the laws of the state where the time-share unit is located which relate to a general matter covered by this chapter apply to the offer or sale of those time shares in this state. If the state in which the time-share unit is located has no laws relating to a general matter covered by this chapter, the provision in this chapter relating to that matter applies to the offer or sale of those time shares in this state.

(2) Section 707.55 applies to any offer or sale of a time share in a time-share unit, whether the time-share unit is located in this state or outside this state.

205.    Bluegreen's practice of simply "assigning" real estate to buyers after they have made a down payment and when they believe they are buying a timeshare interest located in Wisconsin is part of its usual and customary and standardized business practices.

206.    Bluegreen's practice of telling consumers that it does not matter where their timeshare is located is part of its usual and customary and standardized business practices.

46

207. The Landons were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex legalese, and refer to and/or incorporate other documents which were are not given to them in hard copy or at all at the time of closing.

208. According to the contract documents presented to the Landons, their timeshare contract or agreement consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents. These documents included, without limitation:

    a.    Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club;

    b.    the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

    c.    the "Underlying Declaration" of the Trust Agreement;

    d.    the Bluegreen Vacation Club Multi-State Public Offering Statement and any approved amendments thereto and any other Component Site documents;

    e.    the Bluegreen Vacation Club Articles of incorporation and By-Laws;

    f.    Bluegreen Vacations credit application;

    g.    Promissory Note - Cibola Vista Resort and Spa, LLC;

    h.    a Mortgage executed by the Trustee of the Trust Agreement;

i.  any security instruments requested by the Facilitator or lender, including a UCC financing statement;

j.  Temporary Payment Coupon for 2/17/15 Mortgage payment - to be paid to Bluegreen Corporation;

k.  All documents referred to in the Bluegreen Owner Beneficiary Agreement;

l.  Special Warranty Deed (CV Condominiums) the Property to the Trust;

m.  the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n.  the Multi-State Vacation Plan;

o.  The title insurance policy of Resort Title Agency, Inc. [a wholly owned subsidiary of Bluegreen Vacations Corporation, fka Bluegreen Corporation];

p.  the applicable Exchange Company Disclosure Statement(s);

q.  Biennial Owner Confirmation Interview;

r.  the Bluegreen Vacation Club binder;

s.  Truth-in-Lending Disclosure Statement;

t.  Settlement Statement (HUD-1);

u.  Good Faith Estimate (GFE);

v.    Bluegreen Vacation Club Alternate Media Disclosure Statement for Multi-State Timeshare Plan;

w.    the Bluegreen Vacation Club Certificate of Owner Beneficiary Rights;

x.    Bluegreen Vacations Privacy Notice;

y.    Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.    Bluegreen Corporation Affiliated Business Arrangement Disclosure Statement;

aa.    Bluegreen Vacation Club Compliance Agreement;

bb.    Cibola Vista Resort & Spa, LLC Service Disclosure Statement;

cc.    Cibola Vista Resort & Spa Privacy Notice;

dd.    Deed of Trust, Assignment of Rents And Security Agreement;

ee.    Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program Enhanced/Traveler Plus Membership Enrollment Agreement;

ff.    Bluegreen Vacations Membership Application;

gg.    Information on referral selling program;

ii.    Purchase Proposal;

jj.    First Visit Incentives Good for Today Only!

kk.    Charter Certificate for VIP Program;

ll.    Bonus Certificate;

mm.  Bluegreen Vacations Maintenance Fee and Club Dues Waiver Certificate;

nn.  Consent to Be Contacted by Bluegreen Corporation and affiliates and others;

oo.  Request for Taxpayer Identification Number and Certification for Melissa Landon;

pp.  Request for Taxpayer Identification Number and Certification for Edward Landon;

qq.  Acknowledgment, Disclosure Statement, and Terms and Conditions of Use For Cruise Vacation Certificate Benefit;

rr.  Bluegreen Vacations How to Redeem Your Cruise Certificate;

ss.  30 Day Same as Cash Payoff Coupon (to be submitted to Bluegreen Corporation - Mortgage Operations);

tt.  Quorum Membership Application; and

uu.  CD of Public Offering Statement.

209.  The Landons returned to Christmas Mountain Village on or about May 30, 2015 after receiving a letter asking them to return so that Bluegreen could further explain their benefits.

210.  On their second visit, an In-house sales representative made a sales presentation to the Landons to persuade them to buy more points, ostensibly so that they could better use their timeshare interest.

211. The sales representative offered a "highly reduced cost" for 6,000 additional points, telling the Landons that they needed to buy more points in order to properly use their first timeshare.

212. Once again, the Landons negotiated "timeshare points" and did not know until they made a down payment who the seller would be or where the timeshare would be located.

213. Once again, the Landons were presented with a "Purchase Proposal" stating "The seller is Bluegreen Vacations Unlimited, Inc."

214. The Landons eventually learned (when asked to sign contract paperwork) that the timeshare they bought in May 2015 would be located in Virginia, and it was called both Landmark Resort Properties of VA, LLC and Parkside in their contract paperwork.

215. The Landons never requested or desired to own a timeshare located in Virginia and never mentioned Virginia as a place they wanted to own real property.

216. Once again, Bluegreen assured the Landons that it did not matter where their timeshare was located and that they had all the privileges and rights to the Virginia timeshare as they would have at Christmas Mountain Village in Wisconsin.

217. In both of their 2015 timeshare purchases, the Landons were presented with numerous documents to sign relating to the timeshare contracts.

218. In May 2015, the Landons again were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex

legalese, and refer to and/or incorporate other documents which were are not given to them in hard copy or at all at the time of closing.

219. According to the contract documents presented to the Landons, their second timeshare contract or agreement consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents. These documents included, without limitation:

a. Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club stamped "OWNER RELOAD";

b. the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

c. the "Underlying Declaration" of the Trust Agreement;

d. the Bluegreen Vacation Club Multi-State Public Offering Statement and any approved amendments thereto and any other Component Site documents;

e. the Bluegreen Vacation Club Articles of incorporation and By-Laws;

f. Bluegreen Vacations Membership Application;

g. Deferred Purchase Deed of Trust Note - Landmark Resort Properties of VA, LLC;

h. Credit Application;

i.      Deferred Purchase Deed of Trust - Parkside;

j.      Vacation Ownership Deed - Parkside, A Vacation Ownership Resort;

k.      any security instruments requested by the Facilitator or lender, including a UCC financing statement;

l.      All documents referred to in the Bluegreen Owner Beneficiary Agreement;

m.      the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n.      the Multi-State Vacation Plan;

o.      Notice of Availability of "Optional" Owner's Title Insurance;

p.      the applicable Exchange Company Disclosure Statement(s);

q.      Biennial Owner Confirmation Interview;

r.      the Bluegreen Vacation Club binder;

s.      Truth-in-Lending Disclosure Statement;

t.      Settlement Statement (HUD-1);

u.      Good Faith Estimate (GFE);

v.      Bluegreen Vacation Club Alternate Media Disclosure Statement for Multi-State Timeshare Plan;

w.      the Bluegreen Vacation Club Certificate of Owner Beneficiary Rights;

x.      Bluegreen Vacations Privacy Notice;

y.    Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.    Bluegreen Corporation Affiliated Business Arrangement Disclosure Statement;

aa.    Bluegreen Vacation Club Compliance Agreement;

bb.    Landmark Resort Properties of VA, LLC Service Disclosure Statement;

cc.    Parkside Privacy Notice;

dd.    Extra Vacations Getaway Certificate;

ee.    Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program Enhanced/Traveler Plus Membership Enrollment Agreement;

ii.    Purchase Proposal;

jj.    Bonus Certificate;

kk.    Consent to Be Contacted by Bluegreen Corporation and affiliates and others;

ll.    Acknowledgment, Disclosure Statement, and Terms and Conditions of Use For Cruise Vacation Certificate Benefit;

mm.    30 Day Same as Cash Payoff Coupon;

nn.    Quorum Membership Application; and

oo.    Bluegreen Vacation Club Receipt For Time-Share Documents, Parkside, A Vacation Ownership Resort - Wisconsin; and

pp.    CD of Public Offering Statement.

220.    In both of their 2015 timeshare purchases, Bluegreen, as is its customary and usual and standardized practice, presented the Landons with contracts which provided that they had to pay the seller's or creditor's reasonable attorney's fees in the event of a broken promise or default.

221.    In both of their 2015 timeshare purchases, Bluegreen misstated the Landons' right to cancel their timeshare contracts under Wisconsin law, as Bluegreen did in all timeshare contracts sold in Wisconsin.

### B. Shane Auxier and Mu Hpare

222.    Plaintiffs incorporate by reference the preceding paragraphs.

223.    On or about September 28, 2014, Shane Auxier and Mu Hpare went to Christmas Mountain Village Resort after being solicited in person while checking in to the Poseidon Resort a few miles away from Bluegreen's Christmas Mountain Village Resort in Wisconsin Dells.

224.    The woman who solicited them told Mr. Auxier and Ms. Hpare ("the Auxiers") that they would receive a free $100 VISA gift card if they spent 60 minutes listening to a presentation at Christmas Mountain Village.

225.    The "free $100 gift card" Bluegreen used to induce the Auxiers to listen to the sales presentation was not given to them until they were leaving Christmas Mountain Village after buying a timeshare.

226.    The Auxiers initially spent approximately two hours listening to a sales presentation at Christmas Mountain Village given to a group of people, including them.

227.    After the group presentation was completed, a Front-Line sales 213.  The sales representative made a high-pressure sales pitch to the Auxiers to buy timeshare points.

228.    The sales representative offered them inducements to buy, such as "free" and reduced-price vacations in all Bluegreen locations, a cruise, a free RCI membership and other incentives.

229.    When the Auxiers showed reluctance to buy, the Bluegreen sales representative would increase the offer to provide additional incentives that Bluegreen offered to induce the sale of 20,000 points.

230.    In the sales presentation, Bluegreen told the Auxiers that certain incentives to purchase, such as the Charter VIP 20,000 Points program giving them unlimited bonus times at Bluegreen Resorts and discounted prices on rooms and the waiver of their Travelers Plus program were available that day only.

231.    In the sales presentation and during the sales negotiations, Bluegreen told the Auxiers that they could save money on maintenance fees if they gave Bluegreen the names of friends or relatives who might be interested in coming to tour Bluegreen.

232.    The sales representative told the Auxiers that they would get $50 off maintenance fees for every person who toured Bluegreen that the Auxiers referred.

233. The referral program was explained before the Auxiers purchased the timeshare interest.

234. Although the Auxiers were hesitant about whether they could afford the timeshare, the prospect of paying their maintenance fees through referring names to Bluegreen helped justify the cost to them and induced them to purchase the timeshare.

235. Mu Hpare gave Bluegreen the names of people to tour Bluegreen as potential referrals.

236. Bluegreen did not give the Auxiers compensation for the names they gave in the referral program, either at the time they gave Bluegreen the referrals or at any time.

237. The Auxiers suffered a pecuniary loss as a result of being induced to buy a timeshare, in whole or in part, by Bluegreen's referral selling techniques during the sales presentation.

238. After the Auxiers agreed in the sales presentation to buy 20,000 annual "points" for $27,000.00 and made a down payment of $3,050.00, they were given a "Purchase Proposal" which stated that "The seller is Bluegreen Vacations Unlimited, Inc."

239. According to the purchase contract documents eventually presented to the Auxiers for signature, the property was not owned by Bluegreen Vacations Unlimited, Inc.; the seller and creditor was InnSeason Resorts South Mountain Condominium in Lincoln, NH.

240. When the Auxiers noticed that their timeshare location was in New Hampshire, they questioned this, because they did not want to own a timeshare in New Hampshire.

241. The Auxiers thought they were buying a timeshare interest in Christmas Mountain Village in Wisconsin Dells, where they had toured and seen the property and which was located much closer to them than New Hampshire.

242. In response to their inquiry, the Bluegreen representative told them that it did not matter where the timeshare was located, because the timeshare need not be used at a specific location. Bluegreen said that they simply needed to put in a physical address for the paperwork only. The Auxiers understood from the sales representations that they would have all of the same rights and benefits as they would have with a Wisconsin timeshare at Christmas Mountain Village.

243. The statements that: 1) owning a timeshare in New Hampshire was the same as owning a timeshare in Wisconsin; and 2) and that it didn't matter where the timeshare was located was a material misrepresentation, in violation of Wis. Stat. § 707.55(1).

244. The Auxiers' timeshare, InnSeason Resorts South Mountain Condominium in Lincoln, NH, is not currently listed as a Club Associate Resort on Bluegreen Vacations Corporation's 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017.

245. At the closing on September 28, 2014, the Auxiers were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex legalese, and refer to and/or incorporate other documents which were are not given to them in hard copy or at all.

246. According to the contract documents presented to the Auxiers, their timeshare contract consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents. These documents included, without limitation:

      a.      Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club;

      b.      the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

      c.      the "Underlying Declaration" of the Trust Agreement;

      d.      the Bluegreen Vacation Club Multi-State Public Offering Statement and any approved amendments thereto and any other Component Site documents;

      e.      the Bluegreen Vacation Club Articles of incorporation and By-Laws;

      f.      Bluegreen Vacations credit application;

      g.      a promissory note ("the Note") with Southern Peaks Resorts, LLC;

      h.      a Mortgage executed by the Trustee of the Trust Agreement if the

buyer sought a loan in connection with the timeshare purchase;

i.      any security instruments requested by the Facilitator or lender, including a UCC financing statement;

j.      A Pre-Authorized Check Plan ("PAC Plan");

k.      All documents referred to in the Bluegreen Owner Beneficiary Agreement;

l.      the Warranty Deed or other instrument conveying the Property to the Trustee;

m.      the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n.      the Multi-State Vacation Plan;

o.      The title insurance policy of Resort Title Agency, Inc. [a wholly owned subsidiary of Bluegreen Vacations Corporation, fka Bluegreen Corporation];

p.      the applicable Exchange Company Disclosure Statement(s);

q.      Owner Confirmation Interview;

r.      the Bluegreen Vacation Club binder;

s.      Truth-in-Lending Disclosure Statement;

t.      Settlement Statement (HUD-1);

u.      Good Faith Estimate (GFE);

v.      Bluegreen Vacation Club Alternate Media Disclosure Statement for Multi-State Timeshare Plan;

w.      the Bluegreen Vacation Club Certificate of Owner Beneficiary Rights;

x.      Bluegreen Vacations Privacy Notice;

y.      Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.      Bluegreen Corporation Affiliated Business Arrangement Disclosure Statement

aa.      Bluegreen Vacation Club Compliance Agreement;

bb.      Southern Peaks Resorts, LLC Service Disclosure Statement;

cc.      Southern Peaks Resorts-InnSeason Resorts South Mountain Policy Regarding Your Financial Privacy;

dd.      Certificate of Beneficial Interval Ownership;

ee.      Bluegreen Vacation Club InnSeason Resorts South Mountain Assignment of Beneficial Interest in Trust;

ff.      Interval Ownership Declaration;

gg.      Bluegreen Vacations Membership Application;

hh.      Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program Enhanced/Traveler Plus Membership Enrollment Agreement;

      ii.     Terms and Conditions Relating to Participants Enhanced/Traveler

             Plus;

      jj.     Bluegreen Vacations Club Extra Vacations Getaway;

      kk.    Purchase Proposal;

      ll.     Charter Certificate for VIP Program;

      mm.   Charter Certificate First-Visit Incentive;

      nn.    Bluegreen Vacations Maintenance Fee and Club Dues Waiver

             Certificate;

      oo.    Consent to Be Contacted by Bluegreen Corporation and affiliates

             and others;

      pp.    Request for Taxpayer Identification Number and Certification;

      qq.    Vacation Membership Application at Quorum Federal Credit Union;

      rr.     Quorum Visa Platinum Credit Card Account Opening Disclosure;

             and

      ss.     CD of Public Offering Statement.

247.   Bluegreen did not provide the Auxiers copies of all of the documents which comprised their contract and which were referred to in their contract documents as being part of their agreement.

## VI.  FIRST CLAIM FOR RELIEF
## VIOLATION OF THE WISCONSIN TIMESHARE ACT
## WIS. STAT. § 707.55

248.    Plaintiffs incorporate by reference the preceding paragraphs.

249.    Bluegreen committed numerous violations of the Wisconsin Timeshare Act, Wis. Stats. Chapter 707, including without limitation: Wis. Stats. §§ 707.41, 707.46, 707.47 and 707.55.

250.    Wis. Stats. §§ 707.41, 707.46, 707.47 apply to all contracts signed with Bluegreen in Wisconsin, because these contracts all specify that the Wisconsin Timeshare law applies to cancellation rights.

251.    The Wisconsin Timeshare Act cancellation statute, § 707.47, incorporates § 707.41 (requirements of a Timeshare Disclosure Statement) and § 707.46 (Minimum contract requirements) into the cancellation law.

252.    Bluegreen failed to provide a Timeshare Disclosure Statement at all to any person that signed a contract with Bluegreen in Wisconsin for timeshares located outside of Wisconsin.

253.    Bluegreen failed to provide a Timeshare Disclosure Statement which complied with Wis. Stat. §§ 707.41 and 707.47 to any person who purchased in Wisconsin timeshares located in Wisconsin or elsewhere.

254.    Under the express terms of Wis. Stat. § 707.59(2), Wis. Stat. § 707.55 (Prohibited Advertising and Sales Practices) applies to any offer or sale of a timeshare in a time-share unit, whether the time-share unit is located in this state or outside this state.

255. Bluegreen misrepresented and failed to accurately disclose the Class Members' cancellation rights.

256. Bluegreen made other material misrepresentations and made representations in the sales presentation that were false, deceptive and misleading.

257. Bluegreen gave every Class Member documents which were deceptive, misleading, and contradictory to other documents, which is a violation of Wis. Stat. § 707.55(6).

258. Bluegreen failed to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with Class Members, which is a violation of Wis. Stat. § 707.55(8).

259. Each of the Class Members were adversely affected by Bluegreen's failure to comply with the applicable provisions of the Wisconsin Timeshare Act, Chapter 707.

260. Each of the Class Members are entitled to the remedies of Wis. Stat. § 707.57(1), which provides:

**Private remedies.**

(a) If a developer or any other person subject to this chapter fails to comply with this chapter or the time-share instrument, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief, including but not limited to damages, injunctive or declaratory relief, specific performance and rescission.

(b) A person or class of persons entitled to relief under par. (a) is also entitled to recover costs, disbursements and reasonable attorney fees, notwithstanding s. 814.04 (1).

## CLASS ALLEGATIONS

261.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

262.    The class consists of (a) any person (b) who purchased in Wisconsin (c) from either defendant (d) one or more timeshares (whether for property in Wisconsin or elsewhere) (e) on or after a date six years prior to the filing of this action.

263.    The class includes at least hundreds of persons and is so numerous that joinder of all members is not practicable.

264.    There are questions of law and fact common to class members, which common questions predominate over any questions relating to individual class members.

265.    The predominant common questions include:

  a.    Whether Bluegreen provided compliant (or any) Timeshare Disclosure Statements to the class members;

  b.    Whether Bluegreen's contracts with the class members correctly stated their right to cancel under Wisconsin law;

  c.    Whether Bluegreen's contracts with the class members improperly provided for reductions in the required refund;

  d.    Whether Bluegreen told class members that the offer of incentives to purchase were good for only the day of the presentation.

e.      Whether Bluegreen violated Wis. Stat. § 707.55(1) by making misrepresentations of material fact that were false, deceptive or misleading relating to the buyers' cancellation rights;

f.      Whether Bluegreen violated Wis. Stat. § 707.55(1) by making misrepresentations of material fact that were false, deceptive or misleading relating to where the timeshares were located and that it did not matter to buyers signing contracts in Wisconsin as to where their timeshares were located;

g.      Whether Bluegreen violated Wis. Stat. §707.55(6) through making assertions, representations or statements of material fact which were inconsistent with or contradictory to the terms or provisions of the purchase contract or material provided with the purchase contract.

h.      Whether Bluegreen violated Wis. Stat. § 707.55(8) by failing to identify the seller and that timeshares were being offered for sale at the beginning of the initial contact with the prospective purchaser, if the contact was initiated by Bluegreen.

266.    These questions predominate over any questions peculiar to individual class members.

267.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

268.     Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer litigation.

269.     A class action is superior for the fair and efficient adjudication of this matter, in that:

a.     Members of the class are likely to be unaware of their rights;

b.     There is no reason to have multiple lawsuits raising the same issues;

c.     Prior individual lawsuits have not been effective in halting the practices complained of.

### VII.   SECOND CLAIM FOR RELIEF
### ILLEGAL REFERRAL SELLING
### WISCONSIN ADMIN. CODE CHAPTER ATCP 121
### AND WIS. STAT. § 100.20(5)

270.     Plaintiffs incorporate by reference the preceding paragraphs.

271.     Bluegreen is a "seller" as defined in Wis. Admin. Code Chapter ATCP § 121.01(4).

272.     The vacation timeshare sales Bluegreen made to Class Members were primarily for personal, family, or household purposes and are therefore "consumer sales" as defined in Wis. Admin. Code Chapter ATCP § 121.01(2).

273.     A "referral selling plan" is "any method of sale where the seller or lessor, as an inducement for a consumer sale, offers compensation to a prospective buyer or lessee either for a) names of other prospective buyers or lessees, or b) otherwise aiding the seller or lessor in making consumer sales" under Wis. Admin. Code Chapter ATCP § 121.01(3).

274.   " Compensation" means "anything of value, including commissions, fees, money, credits, discounts, rebates, premiums, goods, or any other kind of property and services" under Wis. Admin. Code Chapter ATCP § 121.01(1) .

275.   Wis. Admin. Code Chapter ATCP § 121.02 provides: "No seller or lessor may use a referral selling plan to make a consumer sale unless the seller or lessor first gives the buyer or lessee the full amount of potential compensation offered to that buyer or lessee under that plan."

276.   Bluegreen, as an inducement to sell the Class Members timeshares, offered compensation to each of the Class Members, as prospective buyers, either for (a) names of other prospective buyers or lessees, or (b) otherwise aiding Bluegreen in selling timeshares to others.  Thus Bluegreen used a "referral selling plan" as that term is defined in Wis. Admin. Code Chapter ATCP § 121.01(3).

277.   Bluegreen required its in-house sales representatives to ask customers and prospective customers for the names of other people to refer to Bluegreen's marketing department for the purpose of a future Bluegreen sales presentation.

278.   Bluegreen sales representatives obtained referral names from guests and owners during the sales presentation and before the completion of the sale.

279.   Bluegreen solicited names from the Class Members as an inducement to make a consumer sale before their purchase of a timeshare interest was finalized.

280.   Bluegreen, as a universal practice to induce the sale of timeshares, tells guests and owners about its referral plan during its sales presentation and does not give

guests or owners the gifts it promises until after a the referral attends a sales presentation in the future.

281.    Bluegreen did not first give the Class Members the full amount of potential compensation offered to those buyers and instead induced the sales of timeshares to Class Members under Bluegreen's referral selling plan that promised future benefits that may or may not have come to fruition.

282.    Bluegreen's practice of how it used its referral selling program was universal and Bluegreen's standard practice.

283.    Bluegreen solicited names from the Class Members as an inducement to make a consumer sale of timeshares to them and offered compensation for the names of other prospective buyers or for other aid in making subsequent consumer sales.

284.    None of the Class Members received the promised compensation prior to the completion of the sale of the consumer transaction (i.e., the sale of timeshares) to them.

285.    Many Class Members gave Bluegreen the names of other prospective buyers as a result of Bluegreen's referral selling program; however, in the case of *Pliss/Phelps v. Peppertree Resort Villas, inc. et al.,* 264 Wis. 2d 735, 748, 663 N.W.2d 851858 (Ct. App. 2003), the Wisconsin court of appeals held a claim for violation of referral selling under Wis. Admin. Code Chapter ATCP § 121.02 did not require that consumers provided names or were due compensation at the time of sale.

286.    The Wisconsin Department of Agriculture, Trade, and Consumer Protection issued an order in 2001clarifying the purpose of ATCP § 121.02 as follows:

> A referral selling plan operates like a pyramid scheme or lottery. Each buyer purchases in reliance upon promised future payments that *may* result if the buyer refers other sales prospects who purchase in turn. But the payments may never occur, and the "chain" of prospects inevitably breaks. In 1968, the department prohibited referral selling plans unless the seller compensates the buyer *before* making any sale to *that* buyer (thus eliminating the element of "Chance"). This rule clarifies but does not change the current prohibition.

Wisconsin Admin. Reg.. No. 543, at 17 (emphasis in original.)

287.    Once Bluegreen told the Class Members of their referral selling program during the sales presentation and the promise in the future of money or other compensation for each referral that came to Bluegreen for a sales presentation, that knowledge influenced the Class Members and induced them into buying vacation timeshares as a result, creating a pecuniary loss for the Class Members.

288.    The Class Members suffered pecuniary losses due, in whole or in part, as a result of Bluegreen's use of the illegal referral selling program to induce the sale of timeshares.

289.    The measure of pecuniary loss in the case of sale of vacation timeshares through the use of referral selling is the amount actually paid for the timeshare.  In *Pliss/Phelps v. Peppertree Resort Villas, inc. et al.,* 264 Wis. 2d 735, 74, 663 N.W.2d 851, 858 (Ct. App. 2003), the Wisconsin court of appeals held:

> [T]he prohibition is designed to protect buyers from being induced into a consumer sale by a referral selling plan by promising future payments that may never occur. Therefore, the pecuniary loss is not any lost referral compensation, but rather, the money paid for the product that the consumer was improperly induced into buying due, in part or in whole, to the referral selling plan.

290.     The Class Members suffered pecuniary losses because of Bluegreen's violations of Wis. Admin. Code Chapter ATCP 121, and are entitled to recover double their pecuniary loss, together with costs and reasonable attorney fees from Bluegreen, pursuant to Wis. Stat. § 100.20(5).

## CLASS ALLEGATIONS

291.     Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

292.     The class consists of (a) any person (b) who purchased in Wisconsin (c) from either defendant (d) one or more timeshares (whether for property in Wisconsin or elsewhere) (e) on or after a date six years prior to the filing of this action.

293.     The class includes at least hundreds of persons and is so numerous that joinder of all members is not practicable.

294.     There are questions of law and fact common to class members, which common questions predominate over any questions relating to individual class members.

295.     The predominant common questions include:

a.     Whether Bluegreen, as an inducement to sell the Class Members timeshares, offered compensation to each of the Class Members, as prospective buyers, either for (a) names of other prospective buyers or lessees, or (b)  otherwise aiding Bluegreen in selling timeshares to others.

    b.    Whether Bluegreen failed to first give the Class Members the full

amount of potential compensation offered to those buyers under

Bluegreen's referral selling plan, thus violating Wis. Admin. Code

Chapter ATCP § 121.02.

    c.    The appropriate remedy.

296.    These questions predominate over any questions peculiar to individual class

members.

297.    Plaintiffs' claims are typical of the claims of the class members. All are

based on the same factual and legal theories.

298.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs

have retained counsel experienced in class actions and consumer litigation.

299.    A class action is superior for the fair and efficient adjudication of this

matter, in that:

    a.    Members of the class are likely to be unaware of their rights;

    b.    There is no reason to have multiple lawsuits raising the same issues;

    c.    Prior individual lawsuits have not been effective in halting the

practices complained of.

### VIII.  THIRD CLAIM FOR RELIEF
### ILLEGAL ATTORNEY'S FEES PROVISIONS
### WIS. STAT. § 428.103(1)(e)

300.    Plaintiffs incorporate by reference the preceding paragraphs.

301.    Defendants violated Wis. Stat. § 428.103(1)(e) by contracting for attorney's

fees in excess of the amounts permitted.

302. This provision was common to all contracts defendants entered into in the state of Wisconsin.

## CLASS ALLEGATIONS

303. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

304. The class consists of (a) any person (b) who purchased in Wisconsin (c) from either defendant (d) one or more timeshares (whether for property in Wisconsin or elsewhere) (e) on or after a date six years prior to the filing of this action (f) where the credit extended was $25,000 or less.

305. The class includes at least hundreds of persons and is so numerous that joinder of all members is not practicable.

306. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.

307. The predominant common questions include:

    a. Whether Bluegreen contracted for improper attorney's fees; and

    b. The appropriate remedy.

308. These questions predominate over any questions peculiar to individual class members.

309. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

310. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer litigation.

311. A class action is superior for the fair and efficient adjudication of this matter, in that:

      a.     Members of the class are likely to be unaware of their rights;

      b.     There is no reason to have multiple lawsuits raising the same issues;

      c.     Prior individual lawsuits have not been effective in halting the practices complained of.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members respectfully request that judgment be entered as follows:

I.     Certifying the Classes as requested herein;

ii.     Providing that each plaintiff and class member may elect to rescind their timeshare contract and obtain restitution of amounts paid, under Wis. Stat. § 707.57(1);

iii.     Double the pecuniary loss of those Class Members whom Bluegreen engaged in illegal referral selling, under Wisconsin Admin. Code Chapter ATCP § 121 and Wis. Stat. § 100.20(5);

iv.     Double the finance charge up to $1,000.00 for all persons who signed contracts providing for illegal attorney's fees, under § 428.103(2);

v.     A declaration that Bluegreen violated Wis. Stat. § 709.55, Wis. Admin. Code ATCP Chapter 121, and § 428.103(1)(e);

vi.     Injunctive relief enjoining Bluegreen from engaging in future violations of Wis. Stat. § 707.55, Wis. Admin. Code ATCP Chapter 121, and § 428.103(1)(e);

vii.    All reasonable and necessary attorneys' fees and costs provided by Wis. Stats. §§ 707.57, 100.20(5), 428.106(1), 425.308, and the Court's inherent power; and

viii.   for such other and further relief as the Court deems just and proper.

## X.  JURY DEMAND

Plaintiffs hereby demand that this case be tried by a jury.

Dated this 24$^{d}$ day of October, 2018.

/s/__DeVonna Joy_____
DeVonna Joy
Attorney for Plaintiffs

Consumer Justice Law Center, LLC
P.O. Box 51
Big Bend, WI 53103-0051
Tele:  262- 662-3982
E-mail: djlaw@wi.rr.com; jgiove@wi.rr.com; consumerjusticelaw@wi.rr.com

Daniel A. Edelman
Cathleen M. Combs
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
Tele: 312-739-4200
Fax: 312-419-0379 (FAX)
E-mail address for service: courtecl@edcombs.com