## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

Melissa S. Landon,
Edward P. Landon,
Shane Auxier, and
Mu Hpare,
On behalf of themselves and
all others similarly situated,

          Plaintiffs,

vs.

Bluegreen Vacations Unlimited, Inc.
and Bluegreen Vacations Corporation
f/k/a Bluegreen Corporation,

          Defendants.

**COMPLAINT - CLASS ACTION**

Case No.: 18-CV-994

**Jury Trial Demanded**

---

### Second Amended Class Action Complaint For
### Damages, Declaratory and Injunctive Relief

---

## I. INTRODUCTION

l.    Plaintiffs Melissa S. Landon, Edward P. Landon, Shane Auxier, and Mu

Hpare, by their attorneys, bring this amended Class Action Complaint for damages,

injunctive and declaratory relief, specific performance, rescission, and any other available

legal or equitable remedies, against Defendants Bluegreen Vacations Unlimited, Inc. and

Bluegreen Vacations Corporation, formerly known as Bluegreen Corporation, for their

illegal, deceptive and misleading business and sales practices, including violations of:

1)  Various provisions of the Wisconsin Timeshare Act;  2)  Wisconsin's laws prohibiting illegal referral selling as provided by the Wisconsin Administrative Code Chapter ATCP 121 and Wis. Stat. § 100.20(5); and 3) violation of Wisconsin laws prohibiting defendants from contracting or arranging for loans or consumer credit transactions containing illegal attorney's fees provisions in contracts under Wis. Ch. 428.

2.     These provisions are intended to provide minimum disclosures to persons purchasing timeshare interests in Wisconsin, to afford cancellation rights to such persons, and to prohibit various contract provisions and practices deemed oppressive, deceptive, and misleading by the Wisconsin legislature.

3.     Unless otherwise indicated, the use of Defendants' names in this Complaint includes all of their agents, employees, officers, directors, principals, trustees, participating affiliates, representatives and insurers.

## II.  JURISDICTION AND VENUE

4.     Jurisdiction of this court arises under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).  Supplementary jurisdiction is proper under 28 U.S.C. § 1367.

5.     As set forth below, each Plaintiff is a resident and citizen of Wisconsin or Iowa.  Defendants are Florida corporations with their principal places of business in Florida.  The amount in controversy exceeds $5 million, exclusive of interests and costs. There are more than 100 class members.

2

6.     Venue is proper in the United States District Court for the Eastern District of Wisconsin (Milwaukee) pursuant to 28 U.S.C. § 1391(c), because:

    a.     Defendants' contacts with this District are sufficient to subject them to personal jurisdiction; and

    b.     Events, including solicitations to attend timeshare presentations which gave rise to the claims alleged, occurred in this district.

### III.  PARTIES

7.     Plaintiff Melissa S. Landon is a natural person and citizen of the State of Wisconsin residing in Slinger, WI.

8.     Plaintiff Edward P. Landon is a natural person and citizen of the State of Wisconsin residing in Slinger, WI.

9.     Plaintiff Shane M. Auxier is a natural person and citizen of the State of Iowa residing in Des Moines, IA.

10.     Plaintiff Mu Hpare is a natural person and citizen of the State of Iowa residing in Des Moines, IA.

11.     Defendant Bluegreen Vacations Corporation, formerly known as Bluegreen Corporation, is a Florida corporation engaged in, *inter alia*, the marketing, sale, management and operation of timeshare interests, real property, and vacation ownership interests throughout the United States, including Wisconsin.

3

12.     Bluegreen Vacations Corporation's principal business address is 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431.

13.     Defendant Bluegreen Vacations Unlimited, Inc. is a Florida corporation engaged in, *inter alia*, the marketing, sale, management and operation of timeshare interests, real property, and vacation ownership interests throughout the United States, including Wisconsin, in concert with various affiliate companies, including Bluegreen Vacations Unlimited, Inc.

14.     Bluegreen Vacations Unlimited, Inc.'s principal business address also is 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431, and it is located at the same address as Bluegreen Vacations Corporation.

15.     Defendants Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc. at all relevant times acted jointly and in concert in the marketing, offering, and selling timeshare interests to the named Plaintiffs and to Class Members and both defendants derived profit directly from those sales.

16.     Defendants offer to sell and sell time share interests and/or real property from their resorts at Christmas Mountain Village and, upon information and belief, from Bluegreen Odyssey Dells, both located in Wisconsin Dells, Wisconsin.

17.     According to Defendants' SEC filings, Christmas Mountain Village has 381 units and Bluegreen Odyssey Dells has 92 units.

4

18.     Bluegreen Vacations Corporation is a worldwide company that develops, markets, sells, and manages timeshare vacation ownership interests to consumers to be used primarily for personal, family, or household purposes.

19.     Bluegreen Vacations Corporation is a "developer" as that term is defined by Wis. Stat. § 707.02(11) and/or a "special developer" under Wis. Stat. § 707.31(1).

20.     Bluegreen Vacations Corporation is a corporate affiliate of Bluegreen Vacations Unlimited, Inc., which is a wholly owned subsidiary of Bluegreen Vacations Corporation.

21.     Bluegreen Vacations Unlimited, Inc. offers to sell and sells "time shares" as that term is defined by Wis. Stat. § 707.02(24) in Wisconsin and elsewhere.

22.     Bluegreen Vacations Corporation, acting jointly and in concert with Bluegreen Vacations Unlimited, Inc. and other corporate affiliates, offers to sell and sells and/or manages "time shares" as that term is defined by Wis. Stat. § 707.02(24) in Wisconsin and elsewhere.

23.     Bluegreen Vacations Unlimited, Inc. is a "developer" as that term is defined by Wis. Stat. § 707.02(11) and/or a "special developer" under Wis. Stat. § 707.31(1).

**Bluegreen Vacations Corporation Is A Proper Party**

24.     Bluegreen Vacations Corporation markets, manages, and sells timeshare interests in Wisconsin and elsewhere, and it provides multiple services relating to these timeshare interests, including reservation services, billing and collections, and other

5

services to timeshare owners, the Bluegreen Vacation Club, and homeowners associations related to these timeshare interests.

25. Bluegreen Vacations Corporation is a publicly traded corporation which trades on the New York Stock Exchange under the symbol "BXG" and has done so since the initial public offering of its common stock on November 17, 2017.

26. BBX Capital Corporation ("BBX Capital") owns approximately 90% of Bluegreen's outstanding common stock according to its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017.

27. According to its 10-K filed by BBX Capital with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation is a "Division" of BBX Capital.

28. According to its 10-K filed by BBX Capital with the Securities and Exchange Commission for the fiscal year ending December 31, 2017"

> Bluegreen is a leading vacation ownership company that markets and sells vacation ownership interests ("VOIs") and manages resorts in top leisure and urban destinations. Bluegreen's resort network includes 43 Club Resorts (resorts in which owners in its Vacation Club have the right to use most of the units with their VOI ownership) and 24 Club Associate Resorts (resorts in which owners in its Vacation Club have a right to use a limited number of units in connection with their VOI ownership). Our Club Resorts and Club Associate Resorts are primarily located in popular, high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach and Charleston, among others. Through our points-based system, the approximately 213,000 owners in our Vacation Club have the flexibility to stay at units available at any of our resorts and have access to almost 11,000 other hotels and resorts through partnerships and exchange networks.

6

29. Bluegreen Vacations Corporation has described its timeshare operations variously in filings with the Securities and Exchange Commission and in documents given to timeshare purchasers.

30. In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation stated (at p. 5):

> Except as otherwise noted or where the context requires otherwise, references in this Annual Report on Form 10-K to "Bluegreen Vacations," "Bluegreen," "the Company," "we," "us" and "our" refer to Bluegreen Vacations Corporation, together with its consolidated subsidiaries.

31. In its 2018 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation stated (at p. 6):

> We are a leading vacation ownership company that markets and sells VOIs and manages resorts in top leisure and urban destinations. Our resort network includes 43 Club Resorts (resorts in which owners in the Bluegreen Vacation Club ("Vacation Club") have the right to use most of the units in connection with their VOI ownership) and 24 Club Associate Resorts (resorts in which owners in our Vacation Club have the right to use a limited number of units in connection with their VOI ownership). Our Club Resorts and Club Associate Resorts are primarily located in popular, high-volume, "drive-to" vacation locations, including Orlando, Las Vegas, Myrtle Beach and Charleston, among others. Through our points-based system, the approximately 213,000 owners in our Vacation Club have the flexibility to stay at units available at any of our resorts and have access to almost 11,000 other hotels and resorts through partnerships and exchange networks.

32. In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017,

7

Bluegreen Vacations Corporation stated (at p. 7)(emphasis supplied):

> Prior to 2009, our vacation ownership business consisted solely of the sale of VOIs in resorts that we developed or acquired ("developed VOI sales"). While we continue to conduct such sales and development activities, we now also derive a significant portion of our revenue from our capital-light business model, which utilizes our expertise and infrastructure to generate both VOI sales and recurring revenue from third parties without the significant capital investment generally associated with the development and acquisition of resorts. Our capital-light business activities include sales of VOIs owned by third-party developers pursuant to which we are paid a commission ("fee-based sales") and sales of VOIs that we purchase under just-in-time ("JIT") arrangements with third-party developers or from secondary market sources. In addition, **we provide resorts and resort developers with other fee based services**, including resort management, **mortgage servicing, title services** and construction management. **We also offer financing to qualified VOI purchasers, which generates significant interest income**.

33.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with

the Securities and Exchange Commission for the fiscal year ending December 31, 2017,

Bluegreen Vacations Corporation explained its history as follows (at p. 7):

> We were organized in 1985 as a Massachusetts corporation named Patten Corporation, primarily focused on retail land sales to consumers. In 1994, we entered into the vacation ownership industry. In 1996, we changed our name to Bluegreen Corporation. From 1986 through April 2, 2013, our common stock was publicly listed and traded on the NYSE. On April 2, 2013, Woodbridge Holdings, LLC ("Woodbridge"), a wholly owned subsidiary of BBX Capital, acquired all of the shares of our common stock not previously owned by it, and we became a wholly-owned subsidiary of Woodbridge. BBXCapital (NYSE: BBX) is a Florida-based publicly traded diversified holding company. On March 10, 2014, we were redomiciled from a Massachusetts corporation to a Florida corporation. On September 25, 2017, we changed our name to Bluegreen Vacations Corporation.
>
> On November 17, 2017, we consummated the initial public offering of our common stock. In the initial public offering, we sold 3,736,723 shares of our common stock at the public offering price of $14.00 per share, less underwriting

8

discounts and commissions, and BBX Capital, as selling shareholder, sold 3,736,722 shares of our common stock, including 974,797 shares sold on December 5, 2017 pursuant to the underwriters exercise of its option to purchase additional shares, at the public offering price of $14.00 per share, less underwriting discounts and commissions. BBX Capital continues to own approximately 90% of our outstanding common stock. Our common stock began trading on the NYSE on November 17, 2017 under the symbol "BXG."

34.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation further reported about its business as follows (at p. 7):

> We report our results of operations through two reportable segments: (I) Sales of VOIs [defined elsewhere as Vacation Ownership Interests] and financing; (ii) resort operations and club management. Our sales of VOIs and financing segment includes our marketing and sales activities related to the VOIs that we own, our sale of VOIs through fee-for-service arrangements with third-party developers, our provision of consumer financing in connection with sales of VOIs that we own, and our provision of title services through a wholly-owned subsidiary. Our resort operations and club management includes our provision of management services to our Vacation Club and to a majority of the homeowners associations ("HOAs") of the resorts within our Vacation Club. In connection with those services, we also provide club reservation services, services to owners and billing and collections services to our Vacation Club and certain HOAs.

35.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described "Our Products": "Vacation Ownership Interests" on p. 7 as follows:

> Since entering the vacation ownership industry in 1994, we have generated over 627,000 VOI sales transactions, including over 124,000 fee-based sales transactions. Our Vacation Club owners receive an annual or biennial allotment of "points" in perpetuity (supported by an underlying deeded VOI held in trust for the owner) that may be used to stay at any of our 43 Club Resorts and 24 Club

9

Associate Resorts.

36.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described its "Marketing and Sale of Inventory" at p. 12 as follows:

> VOI sales are typically generated by attracting prospective customers to tour a resort and attend a sales presentation. Our sales and marketing platform utilizes a variety of methods to generate new owner prospects, drive tour flow and sell VOIs in our Vacation Club. We utilize marketing alliances with nationally-recognized brands, which provide exclusive access to venues which target consumers generally matching our core demographic. In addition, we source sales prospects through programs which generate leads at high-traffic venues and in high-density tourist locations and events, as well as from telemarketing and referrals from existing owners and exchangers and renters staying at our properties.

37.     In its 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation described its "Risk Related to Our Business and Industry" at p. 26 as follows:

> From time to time, consumers file complaints against us in the ordinary course of our business. We could be required to incur significant costs to resolve these complaints or enter into consents with regulators regarding our activities, including that we may be required to refund all or a portion of the purchase price paid by the customer for the VOI. We may not remain in compliance with all applicable federal, state and local laws and regulations, and violations of applicable laws may have adverse implications on us, including negative publicity, potential litigation and regulatory sanctions. The expense, negative publicity and potential sanctions associated with any failure to comply with applicable laws or regulations could have a material adverse effect on our business, results of operations or financial position.

38.     Per Bluegreen Vacations Corporation's Form 10-K filing for the fiscal year ending December 31, 2017, Bluegreen Vacations Corporation had total assets of $1,236,424,000.00.

39.     Per Bluegreen Vacations Corporation's Form 10-K filing for the fiscal year ending December 31, 2018, Bluegreen Vacations Corporation had total assets of $1,346,467,000.00.

40.     Upon information and belief, some Class Members bought timeshare interests sold and/or financed by Bluegreen Corporation during presentations in Wisconsin within six years of the filing of the complaint in this action.

41.     Upon information and belief, some Class Members financed their timeshares through loans directly offered by Bluegreen Corporation.

42.     Upon information and belief, some Class Members had payments relating to their timeshare purchases taken out of their checking or other financial accounts at their banks and or credit unions. Some of these payments were deducted from the Class Members' accounts and were paid directly to Bluegreen Corporation.

43.     Upon information and belief, some Class Members took out loans directly from Bluegreen to finance the purchase of the timeshare contracts.

44.     Upon information and belief, Bluegreen Corporation, now known as Bluegreen Vacations Corporation, sent certain members of the Class IRS Forms and/or Substitute Forms 1098 Mortgage Interest Statements annually to report to the Internal

11

Revenue Service mortgage interest payments made to Bluegreen Corporation as the "Recipient/Lender" between the years 2012 through present.

45.    Bluegreen Corporation, now known as Bluegreen Vacations Corporation, sent some Members of the Class, including the Landons, an IRS Form 1099-A reporting "Acquisition or Abandonment of Secured Property."  This form identified the "lender" as Bluegreen Corporation or Bluegreen Vacations Corporation.

46.    Bluegreen Vacations Corporation is an issuer of securities and raises funds to securitize the obligations relating to timeshare contracts of Class Members.

47.    Bluegreen Vacations Corporation is an asset-backed securitizer.  Once a Class Member's timeshare contract is signed, it is securitized by Bluegreen Vacations Corporation.

48.    Bluegreen Vacations Corporation takes the proceeds of unlawfully conducted activities in selling timeshares complained of in this lawsuit and turns those proceeds into money from which it benefits.

49.    Bluegreen Vacations Corporation is aware of the unlawful activities of its affiliates in marketing and selling timeshares to consumers, including the Class Members.

50.    Upon information and belief, Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has employees in common with Bluegreen Vacations Unlimited, Inc.

51.    Upon information and belief, Bluegreen Corporation has, as a garnishee defendant, garnished wages of various employees of those common employees during the

12

relevant time period (within six years of the filing of the complaint) after being served with Earnings Garnishments in various counties in Wisconsin.

52.    Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has officers and/or directors in common with Bluegreen Vacations Unlimited, Inc. According to documents filed by Defendants with the State of Florida Secretary of State in 2018, these common officers and/or directors include:

| Officer/Director | Bluegreen Vacations Corporation | Bluegreen Vacations Unlimited Inc. |
|---|---|---|
| Anthony M. Puleo | Executive Vice President, CFO, Treasurer, Secretary | Vice President, Treasurer |
| David Pontius | Executive Vice President, COO | President |
| Leslie Branham | Vice President | Director, Vice President |
| Adrienne Kelley | Senior Vice President, CAO | Vice President |
| Valerie Koshman | Assistant Vice President | Vice President |
| Allan Kerz | Senior Vice President, Assistant Treasurer | Vice President, Assistant Treasurer |
| Paul Humphrey | Senior Vice President | Vice President |
| Melissa East | Assistant Secretary | Assistant Secretary |
| Jorge De La Osa | Executive Vice President, Chief Legal and Compliance Officer, Secretary | Director, Vice President, Secretary |

53.    Bluegreen Corporation, now known as Bluegreen Vacations Corporation, has shared the same address and office space as Bluegreen Vacations Unlimited, Inc. during the relevant time period.

13

54.     Bluegreen Corporation, now known as Bluegreen Vacations Corporation, routinely has sent letters to individuals who purchased timeshares during presentations made in Wisconsin Dells during the relevant period and financed those timeshares through Bluegreen Corporation. The letters were sent from the "Mortgage Department" of "Bluegreen Corporation - Customer Service Department."

55.     Bluegreen Corporation routinely has retained one or more third-party debt collection agencies to send debt collection letters to collect debts alleged to be owed to "Bluegreen Corporation" for timeshares purchased in Wisconsin during the relevant time period.

56.     Bluegreen Corporation universally presents timeshare buyers with a document when they sign the documents entitled "Consent to be Contacted," which Bluegreen has buyers sign giving express consent to be contacted by "BLUEGREEN CORPORATION, ITS SUBSIDIARIES AND AFFILIATES ("COLLECTIVELY, BLUEGREEN") AND EACH OF THEIR RESPECTIVE CONTRACTORS AND AGENTS" for marketing their promotions, products and services via telephone, including through the use of an automated telephone dialer.

57.     Bluegreen Corporation routinely provides timeshare buyers its "Bluegreen Privacy Notice" upon purchasing timeshares at presentations in Wisconsin.  The Bluegreen Privacy Notice states that it is given by "Bluegreen Corporation, on behalf of itself, its subsidiaries, and its affiliates (collectively "Bluegreen").

14

58.     Bluegreen Corporation's Privacy Notice states that it is an explanation about how Bluegreen on behalf of itself, its subsidiaries, and its affiliates, may use or share information provided to Bluegreen and how Bluegreen keeps the information secure.

59.     Bluegreen's Privacy Notice states that it may share information Bluegreen has received from Class Members on applications or other forms, such as name, Social Security Number, telephone number, occupation, assets, and income, as well as various other information, with Bluegreen's affiliates, third party servicers, and nonaffiliated parties as described in the Bluegreen Privacy Notice.

60.     Bluegreen's privacy Notice requires timeshare buyers who want to limit Bluegreen's disclosure to third-party non-affiliates of information about Class Members to complete a "Bluegreen Privacy Notice Opt-Out Request Form" and mail it to "Bluegreen Corporation, Attn: Privacy Notice Opt-Out Request, 4960 Conference Way North, Suite 100, Boca Raton, Florida 33431-3311."

61.     When buyers purchase timeshares at presentations given in Wisconsin in which they obtain purchase money loans, Bluegreen Vacations Corporation refers Class Members to purchase title and settlement services from Resort Title Agency, Inc., a wholly owned subsidiary of Bluegreen Vacations Corporation.  Bluegreen Vacations Corporation receives financial or other benefits as a result of those referrals.

62.     In or about April 2018, Bluegreen Vacations Corporation and Bluegreen Vacations Unlimited, Inc., through their common officer, Anthony M. Puleo, jointly

15

signed an Acquisition Loan and Security Agreement for the two companies to co-borrow $27,500,000.00 from ZB, N.A., dba National Bank of Arizona ("the joint loan").

63.     Defendants co-borrowed this money in the joint loan in order to acquire the (currently called) Eilan Hotel and Spa located in San Antonio, Texas, to develop and add as a timeshare property as a Bluegreen "Vacation Club Resort."

64.     Vacation Club Resorts, together with "Club Associate Resorts," are the timeshare properties available for use of members of the Bluegreen Vacation Club, including Class Members.

65.     Bluegreen "Vacation Club Resorts" are discussed more at length below in this second amended Complaint and are also discussed and listed in the 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017, primarily at pp. 7-12, as well as in the 10-K filed in March 2019 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2018, primarily at pp. 9-12.

66.     Future references to "Bluegreen" in this complaint will refer collectively to Bluegreen Vacations Corporation and Bluegreen Vacation Resorts, Inc., who knowingly have acted jointly and in concert regarding all of the events alleged in this amended Complaint.

16

# IV.  FACTUAL ALLEGATIONS

## A.  Bluegreen Business Model

67.     Bluegreen is a leader in the vacation ownership industry and sells timeshare contracts to consumers through "front-line" and "in-house" sales.

68.     Front-line sales consists of selling "timeshare points" to individuals who do not already own Bluegreen "timeshare points.

69.     In-house sales consists of selling "timeshare points" to individuals who already own Bluegreen "timeshare points."

70.     Although Bluegreen's front-line sales and in-house sales offer to sell what it refers to as "timeshare points," what Bluegreen actually sells is interests in real property.

71.     Bluegreen sells real property that it or one of its subsidiaries owns, as well as real property owned by third parties.

72.     From 2010 to the present, at its resort at Christmas Mountain Village in Wisconsin Dells, Wisconsin, Bluegreen offered to sell and sold real property located in Wisconsin and other states.

73.     Some of the real property Bluegreen offered to sell from 2010 to the present was developed and owned by Bluegreen or one of its subsidiaries.

74.     The real property Bluegreen offered to sell and sold from 2010 to the present that was developed and owned by Bluegreen or one of its subsidiaries is referred to by Bluegreen as "Vacation Club Resorts."

17

75.     Some of the real property Bluegreen offered to sell from 2010 to the present was developed and owned by third-party companies, hereinafter referred to as "Third-Party Developers."

76.     The real property Bluegreen offered to sell and sold from 2010 to the present that was developed and owned by Third-Party Developers is referred to by Bluegreen as "Club Associate Resorts."

77.     Bluegreen's primary method of selling the real property it offers to sell and sells from Christmas Mountain Village is through in-person sales presentations.

78.     Bluegreen sales presentations are face-to-face meetings between Bluegreen sales representatives and prospective purchasers ("guests"), and face-to-face meetings between Bluegreen sales representatives and current owners ("owners") of Bluegreen "timeshare points."

79.     The goal of Bluegreen sales presentations, or "tours" as Bluegreen sometimes refers to them, is to sell Bluegreen "timeshare points."  The more money the buyers pay, the more points they can purchase.

80.     Bluegreen solicits and requests payments from guests and owners at sales presentations.

81.     Bluegreen sales representatives who offer to sell and sell "timeshare points" to individuals who do not—at the time of the sales presentation—already own Bluegreen "timeshare points," *i.e.* "guests," are referred to by Bluegreen as "Front-line Sales Representatives."

18

82.     Bluegreen sales representatives who offer to sell and sell "timeshare points" to individuals who already own Bluegreen "timeshare points" at the time of the sales presentation, *i.e.*, "owners," are referred to by Bluegreen as "In-house Sales Representatives."

83.     Bluegreen sales representatives are trained to used standardized selling pitches and procedures.

84.     Even though Bluegreen was actually offering to sell interests in real property, Bluegreen's sales employees told guests and owners that what they were offering to sell and selling were "timeshare points."

85.     According to Bluegreen, "timeshare points" represent an owner's beneficial ownership and use rights in the real property Bluegreen actually sells guests and owners.

86.     According to Bluegreen, "timeshare points" can be used by owners to stay at Vacation Club Resorts and Club Associate Resorts.

87.     The Front-line Sales Representatives meet with the guests and introduce the guests to the concept of "timeshare points."

88.     The In-house Sales Representatives meet with owners and try and sell them additional "timeshare points."

89.     When a Bluegreen sales representative offers to sell "timeshare points" to a guest or owner, the sales representatives do not know where the real property they are selling is located.

19

90.    When Bluegreen sales representatives offer to sell "timeshare points" to a guest or owner, the sales representatives also do not know who the owner of the real property they are offering to sell is.

91.    At the time Bluegreen sales representatives offer to sell "timeshare points" to a guest or owner, the owner of the real property, and thus the true "seller" of the property, could be Bluegreen or one of its subsidiaries or one of many different Third-Party Developers with whom Bluegreen has business relationships.

92.    In fact, at the time of the sales presentation, Bluegreen sales representatives can never tell a guest or owner where the real property that Bluegreen is actually offering to sell the guest or owner is located because neither the sales representatives nor Bluegreen knows where the real property they are selling is located at that point in time.

93.    Bluegreen does not determine where the real property it is actually selling is located—or the identity of the seller of the real property—until after the guest or owner agrees to purchase a certain number of "timeshare points," after the guest or owner makes a down payment, and after the guest or owner signs a document referred to as a "Purchase Proposal," which only makes reference to the number of "timeshare points" being sold.

94.    As a regular and universal practice, at the beginning of an in-person sales presentation, the Bluegreen sales representative takes information from prospective buyers, including the buyers' names, social security numbers, dates of birth, addresses, home and work telephone numbers and e-mail addresses.

20

95.     Nowhere on the purchase proposal does Bluegreen disclose that the real property being purchased may not be located in Wisconsin.

96.     Nowhere on the purchase proposal does Bluegreen disclose that the real property being purchased may not be owned by Bluegreen.

97.     After the guest or owner makes the down payment on the "timeshare points," a "Quality Assurance Specialist" (QAS) prepares the contract documents associated with the sales transaction.

98.     The QAS inputs the information form the Purchase Proposal into a computer software program called SPI, and processes the guest's or owner's down payment.

99.     The SPI software program then determines, based on the number of "timeshare points" Bluegreen is selling the guest or owner—as well as the inventory of real property available at Club Resorts and Club Associate Resorts—where the real property Bluegreen is selling to the guest or owner actually is located and the identity of the owner and actual seller of the real property.

100.    If the real property is located at a Vacation Club Resort, the owner and actual seller is Bluegreen or one of its subsidiaries.

101.    If the real property is located at a Club Associate Resort, the owner and actual seller is a Third-Party Developer.

102.    Bluegreen sells real property owned by, and on behalf of, more than a dozen Third-Party Developers.

21

103.    Consumers, including Class Members, initially believe that they are buying points in the Bluegreen resort located in Wisconsin where they have toured and listened to a sales presentation.

104.    Bluegreen does not inform prospective buyers in Wisconsin, nor do the prospective buyers have any way to know, whether the timeshare "assigned" to them by Bluegreen is a Vacation Club Resort (owned by Bluegreen) or a Club Associate Resort (owned by a third-party developer).

105.    Prospective buyers, including the Class Members, who sign contracts in Wisconsin universally do not request that their timeshares be located in other states; rather, it is Bluegreen who assigns Wisconsin buyers timeshares located in distant states after the consumers have signed the Purchase Proposal and the computer determines and spits out the location of the real estate being purchased and name of the resort.

106.    When buyers finally get a copy of the contract at the sales presentation after they have signed the Purchase Proposal and notice their timeshare is located in another state and ask Bluegreen about this, as a matter of policy and practice, the Bluegreen sales representatives tell the buyers that it does not matter where their timeshare is located.

107.    As a universal practice when selling timeshares at its sales offices in Wisconsin, Bluegreen's QAS prepares contracts consisting of multiple documents relating to the timeshare purchase and financing thereof and presents them to the purchasers to sign on the day of the sales presentation.

22

108.    In order to use their timeshares, buyers must become and remain members in good standing of the "Bluegreen Vacations Club."

109.    One of the many documents relating to timeshares sold to Class Members is called a Bluegreen Owner Beneficiary Agreement Bluegreen Vacation Club ("OBA"). The timeshare contract consists of the OBA, plus numerous other documents that are given to buyers at the time or after they sign the contract documents, and the OBA expressly incorporates by reference all terms and conditions set forth or attached hereto.

110.    As a universal practice, when selling timeshares at its sales offices in Wisconsin, the OBA portion of the timeshare contract identifies the owner of the timeshare property as the "Facilitator (being the owner and seller of the Property)" and Bluegreen Vacations Unlimited, Inc. as the "Club Developer."

111.    As a universal practice, when selling timeshares at its sales offices in Wisconsin, one or more Bluegreen representatives sign all of the point of purchase documents in Wisconsin, on Bluegreen's own behalf as the developer, as well on behalf of the Facilitator/Owner/Seller, and if the timeshare is financed, as the "Authorized Agent" of the Lender.

112.    As a universal practice when selling timeshares at its sales offices in Wisconsin, Bluegreen's QAS also signs the contract documents on the same day as the sales presentation on behalf of Bluegreen as the developer and as agent for the owner/seller/facilitator/lender of the timeshare property.

23

### B. Factual Allegations Regarding Bluegreen's Violations
### of The Wisconsin Timeshare Act - Chapter 707

### 1. Violations of Wis. Stat. § 707.55(1) False or Misleading Statements

### First Material Misrepresentation:
### "It Doesn't Matter Where the Timeshare Is Located."

113. Plaintiffs incorporate by reference the preceding paragraphs.

114. Bluegreen's statement that it does not matter where the timeshare is located is a material misrepresentation, because it **does** indeed matter where the timeshare is located. The Wisconsin Timeshare Act, Wis. Stat. § 707.59, substantially limits consumer rights if the timeshare property is located outside of Wisconsin.

115. Wisconsin Timeshare Act Wis. Stat. § 707.59 provides:

**707.59 Time-share units not within state.**

(1) Except as provided in sub. (2), if time shares in a time-share unit located outside of this state are offered or sold in this state, the laws of the state where the time-share unit is located which relate to a general matter covered by this chapter apply to the offer or sale of those time shares in this state. If the state in which the time-share unit is located has no laws relating to a general matter covered by this chapter, the provision in this chapter relating to that matter applies to the offer or sale of those time shares in this state.

(2) Section 707.55 applies to any offer or sale of a time share in a time-share unit, whether the time-share unit is located in this state or outside this state.

116. Bluegreen's sales practices of assigning Wisconsin buyers timeshares located outside of Wisconsin are designed to deprive Wisconsin buyers of additional rights they would have if the timeshare is located in Wisconsin.

24

117.   The Wisconsin Timeshare Act, Chapter 707, provides stronger consumer protections than the timeshare laws of the other states in which Bluegreen is selling timeshares to buyers in Wisconsin.

118.   Examples, without limitations, of the stronger protection of the Wisconsin Timeshare Act than the timeshare laws of other states include at least one or more of the following:

    a.   Wis. Stat. § 707.41, mandating compliance with preparation, delivery, contents, and liability relating to a Wisconsin Timeshare Disclosure Statement and which sets forth significant cancellation rights both under this statute and Wis. Stat. § 707.47;

    b.   Wis. Stat. § 707.42, pertaining to disclosures and other requirements of exchange and reciprocal programs;

    c.   Wis. Stat. § 707.43, pertaining to additional disclosures required of multi-location developers, such as Bluegreen;

    d.   Wis. Stat. § 707.46, pertaining to minimum contract requirements, including a description of the buyer's cancellation rights under Wis. Stat. § 707.47; and

    e.   Wis. Stat. § 707.47, pertaining to the buyer's cancellation rights, (although Bluegreen universally alleges in the OBA that it provides all buyers who sign timeshare contracts in Wisconsin cancellation rights under Wisconsin Timeshare law).

25

119.    Bluegreen has deprived Class Members who arbitrarily have been assigned timeshares in other states the right to cancel their timeshares under Wis. Stat. §§ 707.47 (the Right to Cancel); 707.46 (setting forth the minimum information necessary in timeshare contracts); and 707.41 (the Timeshare Disclosure Statement) as a result of Bluegreen truncating consumer protections under Wis. Stat. § 707.59(1) and then misrepresenting to consumers that their rights are the same if regardless of the state in which their timeshare is located.

120.    Bluegreen's statement that it does not matter where the timeshare is located is **also** a material misrepresentation because if it is a Club Associate Resort at the time of purchase, that resort may or may not continue to be a Club Associate Resort in the future.

121.    Upon information and belief, some of the "Club Associate Resorts" at which timeshares sold to some Class Members are located have not continued to be a part of the Bluegreen-affiliated and Bluegreen-managed resorts, and these Class Members are no longer eligible to receive the benefits or advantages they had when their assigned resort was a Club Associate Resort.

122.    As a matter of universal practice, Bluegreen sold timeshares to prospective buyers under the "Bluegreen Vacations" name and, when telling the buyers that it didn't matter where the timeshare was located, neglected to inform the buyers that if they were unfortunate enough that the SPI computer software spit out the determination that this particular buyer's assigned timeshare resort was "deleted" or did not continue to contract to associate with Bluegreen as a Club Associate Resort in the future, the buyer no longer

26

would have an association with the Bluegreen group of resorts. As a result, those particular Class Members would not have the same benefits and opportunities that they would have if they had been able to buy a Bluegreen-owned timeshare in Wisconsin, where they expected they were buying when they toured the timeshare resort in Wisconsin Dells that day.

123.    Bluegreen's universal misrepresentation that it didn't matter where the timeshare was located was also material, because upon information and belief, the buyers' use, rights, and benefits at a non-Bluegreen-owned Club Associate Resort were more limited than if the buyers were assigned a timeshare in Wisconsin owned by Bluegreen.

124.    Bluegreen's universal representation to Class Members that it didn't matter where their timeshare was located was a material misrepresentation regarding the rights and benefits they may be able to continue to enjoy.

125.    On information and belief, many Class Members who signed timeshare contracts in Wisconsin at the Bluegreen sales office would not bought the timeshares that were located outside of Wisconsin, if Bluegreen had not misrepresented that it did not matter where the timeshare is located and if Bluegreen had been truthful with these buyers that their consumer protections under the Wisconsin Timeshare Act would be significantly diminished by buying timeshares located outside of Wisconsin.

126.    As a result of Bluegreen's misrepresentation to Class Members who were arbitrarily assigned timeshares located outside of Wisconsin that it "didn't matter" where there timeshares were located, these buyers suffered damages.

27

**Second Material Misrepresentation:**
**"You Are Being Given Wisconsin Timeshare Cancellation Rights."**

127.    Plaintiffs incorporate by reference the preceding paragraphs.

128.    Bluegreen has misstated the buyer's right to cancel in **every** timeshare contract sold in Wisconsin at all relevant times, which is a material misrepresentation under Wis. Stat. § 707.55(1).  This is true whether the Class Member bought a timeshare located in Wisconsin or outside of Wisconsin.

129.    When Bluegreen sells timeshares that actually are located in Wisconsin to buyers from their sales offices in Wisconsin, Wis. Stat. § 707.47 (Wisconsin's Timeshare cancellation statute) applies, but, as alleged below, Bluegreen has misstated in all of its contracts what those cancellation rights are.

130.    When Bluegreen sells timeshares to buyers from their sales offices in Wisconsin where the actual timeshare interests sold are located *outside* of Wisconsin, the contracts Bluegreen prepares have a choice of law provision stating that Florida law applies *except* that Wisconsin law applies to the buyer's cancellation rights, as well as  the escrow payments of the purchaser before closing.

131.    Bluegreen contracts provide that the cancellation rights of the Wisconsin Timeshare Act apply to all contracts signed in Wisconsin.  Paragraph 27(a) of the "Terms and Conditions" of the OBA states (emphasis supplied):

> **GOVERNING LAW**.  This agreement shall be construed in accordance with the laws of the State of Florida; **excepting, however, that the provisions relating to the Purchaser's right to cancel this Agreement** and the escrow of Purchaser deposit payments made prior to closing, **which provisions shall be construed,**

28

**interpreted, and enforced in accordance with the laws of the state where Purchaser executes this Agreement.**

132.    Class Representatives and each of the Class Members signed timeshare contracts in Wisconsin, so according to the language of the contract drafted by Bluegreen, all of these individuals' rights to cancel their timeshare agreements "shall be construed, interpreted, and enforced in accordance with the laws of the state" of Wisconsin.

133.    Although under Wis. Stat. § 707.59(1), Wisconsin's right to cancel under Wis. Stat. § 707.47 might not otherwise have applied to contracts where the timeshares were located out of state, Bluegreen expressly contracted that Wisconsin Timeshare Act cancellation law applied to all timeshare contracts signed in Wisconsin, regardless of where the timeshare was located.

134.    However, after representing in the OBA to all Class Members that their timeshare cancellation rights would be construed, interpreted, and enforced in accordance with the laws of Wisconsin, Bluegreen then materially misrepresented to all Class Members what those Wisconsin cancellation rights were.

135.    Bluegreen's misrepresentation of Wisconsin Timeshare cancellation rights were made in the OBA, which stated (emphasis in original) as follows:

**WISCONSIN LAW PROVIDES YOU WITH THE FOLLOWING CANCELLATION RIGHTS:**

**YOU MAY CANCEL THIS CONTRACT WITHOUT ANY PENALTY OR OBLIGATION WITHIN 5 BUSINESS DAYS FROM THE DATE YOU SIGN THIS CONTRACT OR UNTIL 5 BUSINESS DAYS LATER.  IF YOU DECIDE TO CANCEL, YOU MUST NOTIFY THE DEVELOPER, IN WRITING, OF YOUR INTENT TO CANCEL.  YOUR NOTICE OF**

29

**CANCELLATION SHALL BE EFFECTIVE UPON THE DATE SENT AND SHALL BE SENT TO: BLUEGREEN VACATIONS UNLIMITED, INC., ATTN: CORPORATE SALES ACCOUNTING DEPARTMENT., 4960 CONFERENCE WAY N STE 100, BOCA RATON FL 33431-3311. ANY ATTEMPT TO OBTAIN A WAIVER OF YOUR CANCELLATION RIGHTS IS UNLAWFUL. WHILE YOU MAY EXECUTE ALL CLOSING DOCUMENTS IN ADVANCE, THE CLOSING, AS EVIDENCED BY DELIVERY OF THE DEED OR OTHER DOCUMENT TO THE TRUSTEE, BEFORE EXPIRATION OF YOUR 5 BUSINESS DAY CANCELLATION PERIOD, IS PROHIBITED.**

**In addition, if the Purchaser has used or occupied any Bluegreen Vacation Club Component Site resort for more than 12 hours prior to delivering a notice of cancellation, the funds to be returned to the Purchaser may be reduced by a reasonable charge to cover the length of stay, plus the cost for damages, if any, to the resort directly attributable to the Purchaser's use or occupancy.**

136. The cancellation rights stated in Bluegreen's OBAs materially

misrepresented Wisconsin Timeshare Act's right to cancel law in Wis. Stat. § 707.47,

which provides:

**707.47  Purchaser's right to cancel.**

(1)  Provision of statement. A person required to deliver a time-share disclosure statement under s. 707.41(2) shall, before transfer of a time share and no later than the date of any contract for the purchase of a time share, provide a prospective purchaser with a copy of the time-share disclosure statement and all amendments and supplements to the statement.

(2) Right to cancel. If delivery of a time-share disclosure statement is required under s. 707.41(2), the purchaser may cancel a contract for the purchase of a time share until midnight of the 5th business day after whichever of the following is later:

    (a) The date that the contract is executed.

    (b) The date on which the purchaser receives the last of the documents required to be provided to the purchaser under sub. (1).

(3) Activity before cancellation period expires. No title may be recorded, deed delivered or deposit released until the cancellation period under sub. (2) has expired. Nothing in this subsection or sub. (4) precludes the execution of documents before the cancellation period expires, for delivery after the cancellation period expires.

(4) Waiver prohibited. The purchaser or any person on behalf of the purchaser may not waive the right to cancel under sub. (2).

(5) Notice of cancellation. If a purchaser elects to cancel a contract under sub. (2), the purchaser may do so by personally-delivering notice of the cancellation to the seller or by mailing the notice to the developer or to the developer's agent for service of process. If mailed, any notice of cancellation shall be considered given on the date that the notice is postmarked.

(6) Refund.

> (a) Cancellation under sub. (2) shall be without penalty, and, except as provided in par. (b), all payments made by the purchaser before cancellation shall be refunded within 20 days after receipt of the notice of cancellation or within 5 days after receipt of funds from the purchaser's cleared check, whichever is later.

> (b) If the purchaser has used or occupied the time-share property for more than 12 hours before cancellation, the funds to be returned to the purchaser may be reduced by a reasonable charge to cover the length of stay plus the cost for damages, if any, to the time-share property directly attributable to the purchaser's use or occupancy of the time share property.

137.    Bluegreen represented to buyers (in the OBA) only one possible way they could cancel their timeshares: by sending written notice to "Bluegreen Vacations Unlimited, Inc., ATTN: Corporate Sales Accounting Dept., 4960 Conference Way N Ste 100, Boca Raton FL 33431-3311.  But that is not the only way under Wisconsin timeshare law that purchasers may cancel.

138.   Bluegreen materially misrepresents Wisconsin cancellation rights, because under Wis. Stat. § 707.47(5), there are two additional methods buyers may cancel their timeshares:

      1.  by personally delivering notice of the cancellation to the seller; and

      2.  by mailing the notice to the developer's agent for service of process.

139.   Under Wis. Stat. § 707.47(5), Wisconsin timeshare law expressly permits a buyer to cancel by personally delivering the cancellation notice to Bluegreen in Wisconsin, where the timeshare contract was signed and the Bluegreen resort is located. Thus, the law permits them to simply hand-deliver a cancellation notice in person to Bluegreen and not write a letter to be mailed off to Florida.  Bluegreen failed to provide this alternative as a cancellation right.

140.   Under Wis. Stat. § 707.47(5), Wisconsin timeshare law also expressly permits a buyer to cancel by mailing a cancellation notice to the developer's agent for service of process.  Bluegreen failed to provide this alternative as a cancellation right.

141.   Bluegreen's stated cancellation policy in all contracts sold in Wisconsin also provides for a reduction in the refund ranging anywhere from $75 to several hundred dollars if the buyer does not return all of the point of purchase materials. This also materially misstates Wisconsin law with respect to canceling a timeshare.

142.   The Wisconsin Timeshare Act's cancellation provisions do not permit Bluegreen to deduct from the buyer's refund *any* amount for not returning the contract documents and other point of purchase materials.  To the contrary, Wis. Stats.

32

§ 707.47(6)(a) expressly dictates what must be refunded; states that the refund is to be "without penalty"; and permits **only** deductions pertaining to compensation for staying at the timeshare and any physical damages to the timeshare. No other deductions are permitted under Wisconsin law.

143.    Bluegreen's misrepresentations of a timeshare buyer's means of canceling their timeshare and the monetary deductions that legally can be imposed are material, and they are a violation of Wis. Stats. § 707.55(1).

144.    Bluegreen's contracts consist of multiple documents containing confusing legal provisions and often contradictory terms. They are difficult to understand. Many consumers, including Class Members, desire to cancel them once they understand what they have gotten into. Bluegreen's purpose and the effect of the misrepresentation of cancellation rights is to make cancellation more difficult and burdensome.

145.    By misstating the timeshare cancellation rights of buyers who sign timeshare contracts in Wisconsin, both in the way the buyer may cancel and by how much a buyer may be charged if they do not return contract documents or other point of purchase materials, consumers who sign contracts with Bluegreen in Wisconsin are discouraged from exercising their contract rights.

146.    Bluegreen's routine and universal misrepresentation of the cancellation rights of buyers who sign their timeshare contracts in Wisconsin is made even more material coupled with the fact that, as alleged below, Bluegreen also illegally provided in several places in the contract documents of all Class Members that they would be

33

responsible in the event of a default or breach to pay the reasonable attorney's fees, collection, and litigation costs of the Club Developer, Facilitator, and Lender. These illegal attorney's fees provisions further discouraged buyers in Wisconsin from exercising their contract rights.

147. It is particularly important for buyers of timeshare contracts sold by Bluegreen to be provided complete and accurate cancellation rights and not simply partial or inaccurate cancellation rights, because unless the timeshare contracts are canceled properly (or judicially rescinded or Bluegreen forecloses on the timeshare property), the buyers are responsible for paying expenses relating to the timeshares, including contract payments, taxes, maintenance and other fees, costs, and any special assessments, **in perpetuity**.

**Third Material Misrepresentation:**
**That Prospective Buyers Have Been Provided Documents And**
**Have Been Given A Chance to Read Them When That is Untrue**

148. Plaintiffs incorporate by reference the preceding paragraphs.

149. As a matter of routine and universal practice, Bluegreen represented to the Plaintiffs and to all Class Members that they had been given certain documents and that the buyers had read them and/or had an opportunity to read these documents before they signed contract documents, even though Bluegreen knew that this statement was patently false every single time.

150. In the OBA, Bluegreen routinely stated in two separate places that the purchaser acknowledges by signing the OBA that "prior to execution of this Agreement,

Purchaser has received and had an opportunity to read a copy of the Bluegreen Vacation Club Multi-Site Public Offering Statement and the Exhibits attached thereto relating to the Bluegreen Vacation Club and the Property, as well as a copy of any applicable exchange program documents."

151.   As a universal practice, at the time Bluegreen required Plaintiffs and other Class Members to sign the "acknowledgment" described in the preceding paragraph, Bluegreen knowingly and deliberately misrepresented that these purchasers had read or even been given the documents referred to in that paragraph.

152.   Upon information and belief, as a universal practice, the last document Bluegreen provided Plaintiffs and other Class Members with was the Bluegreen Vacation Club Multi-Site Public Offering Statement (the "POS,"), which is several hundred pages in length.

153.   The POS, which is part of the timeshare contract, routinely was not even provided to buyers until after the all contract documents were signed. As a routine practice, the POS was provided to Class Members at the very end of the sale. It was routinely provided in the form of a sealed CD that Bluegreen placed in the file or bag or folder with copies of contract documents which were handed to purchasers as they were leaving.

154.   The OBA vaguely refers to the Agreement being subject to "all terms and conditions hereafter set forth, or attached hereto, which are incorporated herein by reference."  Such documents are not identified, and the only way that anything is

35

"attached" at all is by Bluegreen presenting all point of purchase materials to buyers in a folder or file or bag as they were leaving.

155.    The misrepresentation that prior to signing the contracts, the buyers had been given copies of and an opportunity to read all of the documents, including the POS, is material, because Bluegreen uses this misrepresentation against buyers to provide Bluegreen deniability when the consumers later complain that the program was not working as it had been explained to them.

156.    In such instances, as a universal practice, Bluegreen deflects those complaints by pointing out that the buyers signed contracts saying that they had been given all of the documents and an opportunity to read them before signing.  This is yet another way Bluegreen discourages buyers from exercising their cancellation and other contract rights.

### 2.   Factual Allegations Regarding Bluegreen's Violations of Wis. Stat. § 707.55(2) Offering Incentives Good For "Today Only"

157.    Plaintiffs incorporate by reference the preceding paragraphs.

158.    As part of its usual and customary practice and Bluegreen's high pressure sales techniques, Bluegreen offers incentives such as special prices, discounts, special memberships and prizes to prospective purchasers which Bluegreen tells the prospective buyers are good only for that day.

159.    Wis. Stat. § 707.55(2) provides:

**707.55  Prohibited advertising and sales practices.** In connection with the offer or sale of a time share, no person may engage in any of the following practices:

36

(2) Incentives. Making any assertion, representation or statement that any incentives, including discounts, special prices, merchandise awards, types of memberships or other financial benefits, are only available to a prospective purchaser for the remainder of the day on which the assertion, representation or statement is made, except that the person may state that the incentives are not guaranteed in the future and that they may be subject to negotiation in the future.

160.    Bluegreen's routine representations that incentives to purchase are available "today only" is a deceptive and misleading sales practice prohibited by Wis. Stat. § 707.55(2).

161.    As part of its regular and universal business practices, Bluegreen violates the "today only" prohibition of Wis. Stat. § 707.55(2).

162.    As a universal practice during the relevant period, before they sign their timeshare contracts, Bluegreen does not permit prospective buyers in Wisconsin to take copies of the numerous legal documents (totaling hundreds of pages) which Bluegreen states are part of their contract away with them to review and decide at a later time whether they want to proceed with buying the timeshare on another date. This universal practice deprives buyers from carefully reviewing (or even completely reading) the contract documents or consulting with legal counsel or another individuals about the documents and whether they should enter into these real estate purchases.

163.    Upon information and belief, if prospective purchasers ask Bluegreen to let them to take away copies of the proposed contract documents with them before signing so that the prospective buyers can take time to consider whether they want to make the timeshare purchase, as a universal practice, Bluegreen refuses to let them do so.

164. Upon information and belief, if prospective purchasers ask Bluegreen to let them take away copies of the contract documents with them to review or so the prospective buyers can take the documents to a lawyer for legal advice before signing them, as a universal practice, Bluegreen refuses to let them do so.

165. Unlike the purchase of other kinds of real estate, in which the closing typically is scheduled many days or weeks after an offer or purchase proposal is made, Bluegreen's universal business model rushes consumers to sign numerous real estate contract documents (which Bluegreen refers to in its OBA as "closing documents") on the same day that the sales presentation is made.

166. Bluegreen's practices described in this section are universal and were designed to create a false sens of urgency and pressure Class Members into entering into expensive and improvident contracts which will obligate them in perpetuity.

### 3. Violations of Wis. Stat. §§ 707.55(8) and 707.55(1)
**Failing to Identify the Actual Seller and That Timeshares Are Being Sold
and Misrepresenting that BGVU is the Seller**

167. Plaintiffs incorporate by reference the preceding paragraphs.

168. Wis. Stat. § 707.55(8) (which applies to all timeshare purchases made in Wisconsin, regardless of where the real property is located) prohibits, in connection with the offer or sale of a time share, failing to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with a prospective purchaser, if the contact is initiated by or on behalf of a seller.

38

169.    As a universal practice, Bluegreen solicits prospective customers, both

"guests" and "owners," to attend in-person sale presentations through various means,

including through the mail, telephone, and in-person solicitations.

170.    Upon information and belief, every timeshare offered or sold to every Class

Member resulted from a contact initiated on behalf of a seller.

171.    As a universal practice, through whatever means is used to solicit new

prospective buyers (or existing timeshare owners to "upgrade" or buy additional

timeshares), at no time during the initial contact does Bluegreen "clearly disclose the

seller's identity" or state that timeshares are being sold.

172.    Even during the sales presentation, which is well beyond the initial contact,

the Purchase Proposal states the following: "The seller is Bluegreen Vacations Unlimited,

Inc."

173.    The statement that "The seller is Bluegreen Vacations Unlimited, Inc." is a

misrepresentation, because it fails to identify the owner of the timeshare resort and actual

seller of the timeshare.

174.    Upon information and belief, Bluegreen Vacations Unlimited, Inc. does not

own any of the timeshare resorts being sold to prospective purchasers.

175.    BGVU is selling timeshares on behalf of either Vacation Club Resorts or

Club Associate Resorts; it is not an owner or "seller" of either kind of resort. At most, if

the timeshare property is a Vacation Club Resort, the owner of that resort is a corporate

affiliate of BGVU.  BGVU is, at best, a selling agent on behalf of the actual seller, the

owner of the property.

176.    Upon information and belief, the OBAs signed by Class Members all identify BGVU as the "Club Developer," and they identify the particular resort owner in each case as the "facilitator," "owner," and "seller."

177.    As a universal practice, in no instance does Bluegreen identify the actual "seller" or "owner" of the timeshare resort at the beginning of the initial contact made in Wisconsin to offer or sell timeshares *and cannot do so* under the Bluegreen business model, because even Bluegreen does not know the facility or even the state where the purchaser will be buying their timeshare until the computer spits out that information – and only after the buyer has provided a down payment.

178.    As a universal practice, Bluegreen's system of assigning timeshares though the SPI software of their computer and first disclosing the name of the seller and the location of the timeshare resort after Class Members have signed a purchase proposal and made a down payment violates Wis. Stat. § 707.55(8).

179.    Bluegreen's failure to disclose the actual identity of the seller at the beginning of the initial contact is a violation of Wis. Stat. § 707.55(8) in every timeshare sale made to Class Members.

180.    The statement that "The seller is Bluegreen Vacations Unlimited, Inc." also is a material misrepresentation and a violation of Wis. Stat. § 707.55(1) in cases where the timeshare resort is located outside of Wisconsin, because consumers would not buy the timeshare if they knew they were buying real estate located in another state and that

40

they lose Wisconsin consumer protections and be subject to the laws of another state.

### 4. Violations of Wis. Stat. § 707.55(11)
### Requesting Person to Certify Absence of Misrepresentation
### or Other Violations of Wis. Stat. § 707.55.

181.    Plaintiffs incorporate by reference the preceding paragraphs.

182.    Wis. Stat. § 707.55(11) (which applies to all timeshare purchases made in Wisconsin, regardless of where the real property is located) prohibits, in connection with the offer or sale of a time share, entering into or requesting a person to enter into any agreement or stipulation that requests the person to certify the absence of any misrepresentation or other violation of this section.

183.    As a universal practice, when selling timeshares from its Wisconsin sales offices, Bluegreen requires buyers to initial multiple paragraphs and sign a document called an "Owner Confirmation Interview" while the Bluegreen QAS reads the document and audio records that portion (and only that portion) of the timeshare sale.

184.    As a universal practice, one paragraph of the Owner Confirmation Interview that Bluegreen requires timeshare purchasers in Wisconsin to initial states:

> You understand that you have been given, among other documents, an executed Owner Beneficiary Agreement and a Bluegreen Vacation Club Public Offering Statement, which together contain all of the conditions of this purchase. Salespersons are not authorized to make oral representations, promises, or offers that modify such documents. Your purchase is for personal use and enjoyment only. Please list promises or commitments, if any that were important to your decision to purchase that have not been covered in writing. (If none, indicate 'None').

185.    Upon information and belief, in all timeshare sales in Wisconsin during the relevant period, as a universal practice, Bluegreen had not in fact given the buyers an

41

executed OBA or any other documents at the time buyers are asked to sign and initial the Owner Confirmation Interview.

186.    In all timeshare sales in Wisconsin during the relevant period, as a universal practice, Bluegreen had not given the buyers a Bluegreen POS at the time buyers are asked to sign and initial the Owner Confirmation Interview document saying they had received it and had a chance to read it (all several hundred pages).

187.    In all timeshare sales in Wisconsin during the relevant period, as Bluegreen knew, there is no possible way that the purchasers could know what promises or commitments made to them by salespersons had "not been covered in writing," because as a universal practice, Bluegreen had not given the buyers *any* of the writings covering the terms and conditions at the time buyers were asked to sign and initial the Owner Confirmation Interview.

188.    In all timeshare sales in Wisconsin during the relevant period, as a universal practice, by requiring Class Members to sign and initial the Owner Confirmation Interview form, Bluegreen asked Class Members to agree or stipulate to and/or certify the absence of any misrepresentation or other violation of Wis. Stat. § 707.55.

189.    Bluegreen universally engaged in this prohibited practice in order to give itself instant deniability, because the purpose of this practice was so that Bluegreen could use this certification against timeshare buyers who later complained that they had been promised something important to them or that what was told to them turned out to be false.

42

190.    When purchasers later complain about inconsistencies between what they were told and what documents provided to them said, Bluegreen, as a universal practice, reminds timeshare buyers the Owner Confirmation Interview is recorded and that the buyers had signed and initialed a document certifying the absence of such a misrepresentation or promise.

191.    Upon information and belief, as part of its regular operating system and its universal practice, Bluegreen also dispatches with buyers' complaints to Bluegreen and to third parties by reminding the buyers that had agreed they had been given all point of purchase documents and had a chance to read these documents and that they buyers had signed on the Owner Confirmation Interview form a paragraph agreeing that no important promise or representation had been made to them which had not been covered in writing.

192.    Bluegreen's universal practice of requiring buyers to certify, stipulate, or agree to the absence of any misrepresentation or violation of Wis. Stat. § 707.55 is both a violation of Wis. Stat. § 707.55(11) and a material misrepresentation under § 707.55(1) designed to discourage buyers from pursuing remedies for Bluegreen's violations of law.

### 5.  Factual Allegations Regarding Bluegreen's Violations of Wis. Stat. § 707.41 - Wisconsin Timeshare Disclosure Statement

193.    Plaintiffs incorporate by reference the preceding paragraphs.

194.    Bluegreen was a "developer" in all of the timeshare contracts sold to Class Members in Wisconsin, whether the timeshares were located in Wisconsin or outside of Wisconsin.

43

195. Upon information and belief, as a usual and customary practice when selling timeshare interests in Wisconsin (regardless of where the timeshare property was located), Bluegreen provided all purchasers with the OBA, which identified Bluegreen Vacations Unlimited, Inc. as the "Club Developer."

196. Wis. Stat. § 707.41(1) requires a developer who offers interests in timeshares to prepare a Timeshare Disclosure Statement which conforms to the requirements of Wis. Stat. § 707.41.

197. Wis. Stat. § 707.41(1) requires a developer to deliver a Timeshare Disclosure Statement to prospective purchasers in the manner prescribed in Wis. Stat. § 707.47(1)(the right to cancel statute).

198. Wis. Stat. § 707.46(1) sets forth the minimum information that must be provided in a Wisconsin timeshare contract. One such provision, § 707.46(1)(f) requires the timeshare contract to set forth the purchaser's cancellation rights under Wis. Stat. § 707.47.

199. In all timeshare contracts signed in Wisconsin, Bluegreen failed to completely and accurately disclose the buyer's cancellation rights under Wis. Stat. § 707.47.

200. Wis. Stat. § 707.41(4) enumerates the specific contents which must be contained in or fully and accurately described in the Wisconsin Timeshare Disclosure Statement.

44

201.    Bluegreen was required under Wisconsin Timeshare Law to provide a complete and accurate Timeshare Disclosure Statement, with all amendments and supplements thereto, to all Class Members who bought in Wisconsin during the relevant period, timeshares located in Wisconsin.

202.    Upon information and belief, when selling timeshares in Wisconsin during the relevant period, as a universal practice, Bluegreen failed to provide any prospective purchasers or purchasers of timeshares with a complete and accurate Timeshare Disclosure Statement, including all amendments and supplements thereto.

203.    Because Bluegreen never provided members of the Class who bought in Wisconsin timeshares which were located in Wisconsin a complete and accurate Timeshare Disclosure Statement complying with Wis. Stat. §§ 707.41 and 707.47, the "clock" on these buyers' five business day cancellation period never began to run under Wis. Stat. § 707.47(2), so their cancellation rights have not yet expired.

204.    Class Members who bought timeshares in Wisconsin that were located in Wisconsin during the relevant period have had a continuing right to cancel their timeshare contracts, because under Wis. Stat. § 707.47(2), the start of their five business day cancellation period does not begin to run until after whichever of the following is later: (a) The date that the contract is executed; or (b) The date on which the purchaser receives a complete and accurate Timeshare Disclosure Statement complying with Wis. Stat. § 707.41, including all amendments and supplements thereto.

45

205.    Because Bluegreen never gave these purchasers a compliant Wisconsin Timeshare Disclosure Statement, these Class Members have a right to cancel their timeshare contracts to this very day.

### C.  Factual Allegations Regarding Bluegreen's Illegal Referral Selling Program

206.    Plaintiffs incorporate by reference the preceding paragraphs.

207.    As a matter of its usual and universal business practices, Bluegreen used a referral selling program to induce the sales of timeshare interests.

208.    The product being sold by Bluegreen is vacation ownership interests (VOIs) or timeshares, which Bluegreen sells primarily for personal, family, or household purposes.

209.    As part of the program, as an inducement to selling timeshares to prospective buyers, Bluegreen solicited names from prospective buyers of other people who might be interested in touring Bluegreen as prospective buyers and/or to help Bluegreen in making other consumer sales.

210    Upon information and belief, Bluegreen trained and required its sales representatives to tell prospective buyers about the referral selling program and to explain the program to them during the sales presentation.

211.    Upon information and belief, Bluegreen required each of its sales representatives to get a certain number of referrals from prospective buyers attending a sales presentation and Bluegreen incentivizes the sales people to use a referral selling program to induce the sale of timeshares.

46

212.   Bluegreen promised to pay money to prospective buyers for each qualified person who toured Bluegreen that the prospective buyer referred.

213.   Prospective buyers in the Class gave names of others to Bluegreen under its referral program.

214.   Bluegreen did not first give prospective buyers the full amount of potential compensation offered to them before using Bluegreen's referral selling plan to induce the sale of vacation timeshares, which is a violation of Wisconsin law.

215.   Whether or not prospective buyers gave Bluegreen referral names and contact information, as a regular and universal practice, the prospective buyer was told about and was aware of the referral  program before they purchased a timeshare themselves. Once the referral selling program is explained out loud, the prospective purchaser is aware of the program and is influenced by it.

216.   Class Members were induced to purchase expensive timeshares as a result of Bluegreen's referral selling program and suffered pecuniary losses.

### D.   Factual Allegations Regarding Illegal Attorney's Fee Provisions in Timeshare Contracts -Wis. Stat. § 428.103, Wis. Stats.

217.   Plaintiffs incorporate by reference the preceding paragraphs.

218.   Wisconsin Chapter 428 pertaining to first lien real estate and other mortgage loans for $25,000.00 or less applies to loans taken out in Wisconsin to finance the purchases of timeshares (wherever located).

219.   As a universal practice, many Class Members purchasing timeshares at Bluegreen sales offices in Wisconsin who did not pay for their timeshares in full on the

47

date of purchase (which, upon information and belief was the majority of buyers) obtained purchase money financing secured by a first lien real estate mortgage or equivalent security interest.

220.    Wis. Stat. § 428.103(3)(e) provides:

**428.103 Limitations** (e) The creditor shall not contract for or charge its attorney fees to the customer except as follows:

1. Reasonable fees for opinions of title.

2. In foreclosure cases, 5 percent of the amount adjudged due the creditor; or if the dispute is settled prior to judgment, a reasonable fee based on the time, nature and extent of the work involved, but not to exceed 2-1/2 percent of the unpaid principal balance of the loan.

221.    Wis. Stat. § 428.102(2) defines "creditor" as "a person who regularly engages in, arranges for or procures from 3rd persons, loans within the scope of this subchapter."

222.    Wis. Stat. § 428.102(4) defines "loan" as "the creation of debt by the creditor's payment of or agreement to pay money to the customer or to a 3rd party for the account of the customer, or a forbearance by a lender of a debt arising from a loan."

223.    As a universal practice, when selling timeshares at its sales offices in Wisconsin that were being financed in connection with the transaction, a Bluegreen employee (the Bluegreen QAS) prepared and arranged for Class Members to sign all financing documents in order to finance the purchase of the timeshares. The Bluegreen QAS also signed the finance documents, including the loan contract, as an authorized representative on behalf of the lender.

48

224.    As a universal practice, these financing documents included, without

limitation, a loan application, a Promissory Note, a Truth-in-Lending Statement, a HUD

Settlement Statement, a HUD Good Faith Estimate, a UCC Financing Statement, a

Service Disclosure Statement of the owner/facilitator/lender, and an Affiliated Business

Arrangement Disclosure Statement.

225.    The "Affiliated Business Disclosure Statement" is a document which

disclosed that Resort Title Agency, Inc., to whom timeshare buyers pay a "Provider and

Settlement Service Charge," is a wholly-owned subsidiary of Bluegreen Corporation and

that Bluegreen Corporation may be provided a financial or other benefit for that referral.

226.    As a universal practice, when selling timeshares at its sales offices in

Wisconsin to Class Members financing the purchases through these loans, *no one other

than a Bluegreen representative presented, witnesses, or signed the documents* on behalf

of the facilitator or lender, who is the actual owner and the seller of the timeshare being

sold.  That is, there is no one else present to sign documents besides the Bluegreen QAS

employee signing documents on behalf of the owner or lender, as well as signing on

behalf of BGVU.

227.    As a universal practice, the OBAs in **all** timeshare sales Bluegreen made to

Class Members provided, in pertinent part:

> **FINANCED PURCHASE**.  If Purchaser desires purchase money financing in
> connection with the transaction contemplated hereunder, a loan application will be
> completed and submitted by Purchaser as part of this Agreement. In such even, this
> Agreement shall be contingent upon Purchaser obtaining a loan equivalent to a
> commitment for the amount specified in the face of this Agreement.  If the
> Purchaser fails to qualify for purchase money financing, this agreement is null and

49

void and all moneys paid by Purchaser will be refunded. Purchaser acknowledges any such loan shall require the Trustee to execute, grant, and, and deliver a mortgage or other collateral security instrument encumbering the Property (the "Mortgage") to Facilitator or Lender or their designee on behalf of Purchaser, which Mortgage shall provide the Property as collateral for such loan, and to the extent that Trustee is required by Facilitator or Lender to execute such Mortgage, Purchaser hereby directs and authorizes the Trustee to execute, grant, and deliver such Mortgage. Purchaser shall deliver to Facilitator or Lender a promissory note (the "Note")(together with the Mortgage executed by the Trustee and such security instruments requested by Facilitator or Lender) for the balance of the Purchase Price if such is not paid for fully, at closing, in cash or certified funds. Purchaser agrees to provide a security instrument, including a UCC financing statement, to Facilitator, Lender, or their designee and their respective assignees, respecting Purchaser's Owner Beneficiary Rights, including appurtenant Vacation Points, if requested to do so in connection with purchase money financing. Trustee shall not be liable or responsible for payment of the Note or any Mortgage executed by Trustee on behalf of Purchaser nor shall Trustee assume such Note or Mortgage upon its acceptance of title to the Property. Facilitator and Lender reserve the right to charge Purchaser a reasonable fee for services performed by or on behalf of Facilitator or Lender in connection with this loan, including but not limited to services such as providing a payment history or copies of statements to Purchaser, etc. Upon repayment in full of such purchase money loan, Purchaser shall pay to Facilitator or Lender the stipulated cost of $25 for a loan payoff processing fee. In no event shall the interest rte charged in connection with the purchase money financing exceed the maximum interest rate permitted by applicable law.

228.    As a universal and standard practice, under the terms of the OBA, all timeshares sold to Class Members who did not pay off the timeshare in cash or certified funds on the date of the purchase was required to apply for and qualify for a loan (and the loan application was incorporated by reference into the OBA) which was arranged for and processed by the Bluegreen QAS employee at the time of the timeshare purchase.

229.    According to Bluegreen's 10-K filed in March 2019 with the SEC, Bluegreen directly profits from arranging the financing of loans for VOIs, stating:

[W]e provide other fee-based services that produce revenue without the significant capital investment generally associated with the development and acquisition of

resorts. These services include, but are not limited to, title and escrow services for fees in connection with the closing of VOI sales, servicing notes receivable held by third parties, typically for a fee equal to 1.5% to 2.5% of the principal balance of the serviced portfolio....

230.    Bluegreen also directly profits from securitizing VOI financed contracts,

stating in its most recently filed 10-K:

Our ability to sell or borrow against our VOI notes receivable has historically been an important factor in meeting our liquidity requirements. The vacation ownership business generally involves sales where a buyer is only required to pay 10% of the purchase price up front, while at the same time selling and marketing expenses related to such sales are primarily cash expenses that exceed the down payment amount. For the year ended December 31, 2018, our sales and marketing expenses totaled approximately 49% of system-wide sales of VOIs. Accordingly, having facilities for the sale or hypothecation of VOI notes receivable, along with periodic term securitization transactions, has been a critical factor in meeting our short and long-term cash needs.

231.    Bluegreen was a "creditor" within the meaning of Wis. Stat. § 428.102(2)

as to loans made to Class Members in one of two ways: 1) as either a direct lender

providing loans where a Bluegreen affiliate owned the timeshare resort; or 2) by

arranging for loans to Class Members purchasing from third-party timeshare owners who

provided loans through forbearance.

232.    Upon information and belief, as a regular practice during the relevant

period, Bluegreen Corporation directly made loans to some of the Class Members, by

providing financing on timeshare purchases at resorts owned by a Bluegreen affiliate.

233.    As a regular practice, Bluegreen also arranged loans for Class Members

who purchased timeshares owned by third party developers at Club Associate Resorts.

51

**234.** **As a matter of regular and universal practice, when selling timeshares from its sales offices in Wisconsin during the relevant period, Bluegreen assigned the same contract number to all of a buyer's documents prepared and signed that day, including the OBA, the Promissory Note, and numerous other documents provided to the buyer. These documents are all part of the same contract between the purchaser, developer and owner/seller/lender.**

235.    All of the Class Members' OBAs state that "the parties hereto [i.e., BGVU as the Club Developer, the resort owner as the Facilitator (and who is also the lender), and Purchaser(s)] agree that this Agreement, along with the documents referred to herein, are the only agreements and disclosures between them."

236.    The parties' timeshare contracts include the OBAs as well as all documents referenced therein and provided to the purchaser, including all financing documents where the buyers obtained financing.

237.    As a universal practice, the OBA references the following documents and incorporates them by reference into the parties' timeshare contracts either specifically or categorically (listed in order of appearance in the OBA):

    a.      Bluegreen Vacation Club Trust Agreement;

    b.      Trust Fund Budget;

    c.      Lender's Title Insurance Policy;

    d.      Bluegreen Vacation Club Multi-Site Public Offering Statement;

    e.      Exchange Company Disclosure Statement;

f.      Bluegreen Vacation Club multi-site Timeshare Plan;

g.      Trust Agreement (timeshare instrument) and related documents;

h.      Component Site Underlying Declaration;

i.      Underlying Declaration of the POS & Exhibits thereto;

j.      Club By-laws;

k.      Loan application (expressly said to be incorporated by reference);

l.      Mortgage and Promissory Note;

m.      UCC Financing Statement;

n.      Articles of Incorporation;

o.      Club Rules and Regulations;

p.      Vacation Guidelines;

q.      Pre-Authorized Check Plan ("PAC Plan") and Note (terms and
        conditions of PAC Plan and Note are incorporated by reference);

r.      Pre-Authorized Check Plan Agreement ("PAC Plan Agreement")
        (terms and conditions of PAC Plan Agreement are incorporated by
        reference);

s.      All documents referred to in the OBA are part of the contract per the
        language of the OBA;

t.      Warranty deed or other instrument conveying the Property to the
        Trustee (incorporated by reference);

u.      Club Management Agreement;

53

v.      Multi-Site Public Offering Statement Text and Exhibits and any

approved amendments thereto, and any other Component Site

documents as described in §§ 721.07 and 721.55; and

w.      All terms and conditions set forth or provided with the OBA, which

are incorporated by reference.

237.    As a matter of universal practice, all of the documents Bluegreen prepared

and presented to Class Members to sign and which Bluegreen also signed, either as the

developer or the authorized agent for the facilitator/owner/seller were part of the parties'

timeshare purchase contracts.  This includes all contracts related to financing where

Bluegreen provided or arranged for the loans and signed either on its own behalf or as an

authorized representative of the facilitator/owner/seller.  Loan documents, including the

loan application and promissory note, are part of the entire timeshare contracts between

the parties.

238.    As a matter of universal practice, for all timeshare sales made in Wisconsin

to Class Members, the OBA contained "Purchase Terms," which included the amount

financed, if any, through the loan Bluegreen prepared and arranged for the buyers to

obtain that day.

239.    As a matter of universal practice, Bluegreen prepares and presents one such

document, the "Assignment of Beneficial Interest" referencing the connection between

the timeshare contracts purchased in Wisconsin and the financing Bluegreen arranged for

that purchase, which states, in pertinent part:

54

[T]he Promissory Note was executed in connection with that Certain Bluegreen Owner Beneficiary Agreement executed among Bluegreen Vacations Unlimited, Inc., a Florida Corporation (as "Club Developer"); [name of the resort in which the timeshare interest is purchased], (as "Facilitator") and Purchaser(s)(the "Purchase Agreement") for the purchase of the herein described Trust Interval Interest in connection with the Purchaser's admission into the Bluegreen Vacation Club Multi-site Timeshare Program.

240.    As a matter of regular and universal practice, various contract documents during the relevant period that Bluegreen prepared and  arranged for purchasers in Wisconsin to sign on the day of the timeshare purchase (regardless of where the timeshare is located), provided for the buyer to pay the attorney's fees and all costs of collection of the seller and/or lender and/or creditor in the case of default or breaking any promise related to the contract.  These documents included, without limitation:

a.    **The Promissory Note** for the principal amount due on the timeshare after the down payment, plus interest.  As a universal practice, this Note is prepared by the Bluegreen QAS, who arranges the loan, presents the Note to the buyers and witnesses their signatures on the Note.  The Note provides for payment by the timeshare buyers of all costs of collection, including reasonable attorney's fees, for breaking any promises under the Note, mortgage, deed of trust, or other security interest.

b.    **The OBA** prepared by Bluegreen and presented to the buyers to sign for all timeshare sales made in Wisconsin to Class Members.  The OBA, by its terms is an agreement between the timeshare Purchasers, the "Facilitator" (or owner/seller/lender) of the timeshare property, and Bluegreen Vacations

Case 2:18-cv-00994-PP   Filed 04/01/19   Page 55 of 94   Document 42

Unlimited, Inc. (the Club Developer). This document provides that in the

event of a default on payments or if the Purchaser fails to comply with any

portion of the parties' Agreement:

> Purchaser shall be liable for the Club Developer's, Facilitator [sic], and/or Lender's reasonable attorney's fees and costs incurred by it by virtue of any litigation as to the parties' rights hereunder if any of the Club Developer, Facilitator and/or Lender (as applicable) is the prevailing party. Purchaser acknowledges and agrees that in the event the Bluegreen Vacation Club, Inc., (or the Vacation Club Managing Entity), refers Purchaser's outstanding Club Dues and/or Common Assessment Fees account(s) for collection, Purchaser shall also be obligated to pay, in addition to the principal amount owed by Purchaser hereunder in respect thereto, costs and collection fees in the maximum amount permitted by law. Purchaser agrees to defend and indemnify Club Developer, Facilitator, and Lender against all claims of real estate brokers or sales personnel due to acts of Purchasers or Purchaser's representatives, other than brokers or sales personnel employed by the Club Developer, Facilitator, and Lender.

c.      **Bluegreen Vacation Club Compliance Agreement** is prepared by and

presented to the buyers for signature and witnessed by the Bluegreen QAS

to require the buyers, as borrowers, to make certain promises relating to the

loan and agreeing that if they default under the Note and Mortgage deed or

security interest signed in connection with the loan, the lenders or its

successors or assigns are entitled to the remedies available in these

documents (which include the payment by the borrower of reasonable

attorney's fees).

d.      **Assignment of Beneficial Interest** in Trust assigning an undivided

beneficial interest in the Trust by the Assignor (the Club Trustee) to the

"Assignee (Seller)." This document, as a matter of universal practice,

provides that in the event of a default on the Note or this instrument, the Assignee may exercise all remedies provided for in the Note (which includes an attorney fee provision).

240. In some of the timeshare purchases in Wisconsin during the relevant period, Bluegreen Corporation directly and regularly provided financing and was the lender on the loan and/or accepted loan payments, as well as being the arranger of the loan.

241. In other of the timeshare purchases in Wisconsin during the relevant period, Bluegreen arranged for credit for customers with third-party lenders, who forebeared on the debts arising from the loan.

242. In all timeshare purchases in which the buyer obtained a loan to finance a timeshare purchase signed in Wisconsin, Bluegreen universally arranged the credit, either directly or through a third-party lender.

243. In all timeshare purchases in Wisconsin in which the buyer obtained a loan to finance the timeshare purchase, the loans were made on the day of the sales presentation. Bluegreen universally presented the buyers with various "closing documents" that buyers signed on the same day they purchased the timeshares.

244. Bluegreen's practice of contracting for and arranging for buyers to sign timeshare contracts providing that in the event of a broken promise or default by consumers, the consumers would be responsible to pay the creditor's or seller's or facilitator's or developer's or lender's attorney's fees was illegal and was a violation of Wis. Stat. § 428.103 with respect to Class Members, including the Plaintiffs or Class

57

Representatives.

245.    The purpose and effect of Bluegreen's illegal attorney's fee provision is to materially increase the liability consumers perceive that they face if they attempt to cancel or decide not to proceed with their timeshare purchases, thus discouraging and deterring cancellation of undesirable and expensive contracts.

### E.  Factual Allegations Regarding Bluegreen's Unconscionable Conduct Under Wis. Stat. § 707.06

246.    Plaintiffs incorporate by reference the preceding paragraphs.

247.    All of Bluegreen's conduct complained of in this pleading and which was directed at Class Members as a universal practice and course of conduct was unconscionable in the marketing, sales, contract documents, ownership and use of the timeshare and violated multiple provisions of the law.

248.    Wis. State. § 707.06 provides:  Unconscionable contract.

(1)  Unconscionability; remedy. If a court as a matter of law finds that any aspect of a contract relating to the use or ownership of a time share, any conduct directed against the purchaser by a party to the contract, or any result of the contract is unconscionable, the court shall, in addition to the remedy authorized in sub. (4), either refuse to enforce the contract against the purchaser, or so limit the application of any unconscionable aspect or conduct as to avoid any unconscionable result.

(2) Factors. Without limiting the scope of sub. (1), the court may consider, among other things, any of the following as pertinent to the issue of unconscionability:

(a) That those engaging in the practice know of the inability of a party to receive benefits properly anticipated from the time share and related goods or services.

(b) That there exists a gross disparity, at the time of contracting, between the price of the time share and related goods or services and their value as

58

measured by the price at which similar time shares or related goods or services were readily obtainable or by other tests of true value, except that a disparity between the contract price and the value of the time share measured by the price at which similar time shares were readily obtainable in similar transactions does not, of itself, render the contract unconscionable.

(c) That the practice may enable one party to take advantage of the inability of the other party reasonably to protect his or her interests by reason of physical or mental infirmities, illiteracy or inability to understand the language of the agreement, ignorance or lack of education or similar factors.

(d) That the terms of the contract require a party to waive legal rights.

(e) That the terms of the contract require a party to unreasonably jeopardize money or property beyond the money or property immediately at issue in the transaction.

(f) That the natural effect of the practice would reasonably cause or aid in causing a party to misunderstand the true nature of the contract or his or her rights and duties under the contract.

(g) That the writing purporting to evidence the obligation of the party under the contract contains terms or provisions or authorizes practices prohibited by law.

(h) Definitions of unconscionability in statutes, rules, regulations, rulings and decisions of legislative, administrative or judicial bodies.

(3) Course of conduct. Any charge or practice expressly permitted by this chapter is not in itself unconscionable, but even though a practice or charge is authorized by this chapter, the totality of a party's conduct may show that such practice or charge is part of an unconscionable course of conduct.

(4) Other remedies. In addition to the protections afforded in sub. (1), a party shall be entitled upon a finding of unconscionability to recover from the person responsible for the unconscionable conduct a remedy in accordance with s. 707.57 (1).

249.    The Court should find, as a matter of law, that Bluegreen's violations of law

59

complained of in this pleading, both individually as a practice and as a course of conduct was unconscionable, and that the results to Class Members were unconscionable.

250.    The Court should refuse to enforce the timeshare contracts of those Class Members who wish to cancel their contracts with Bluegreen and provide all of the appropriate remedies of Wis. Stat. §§ 707.06 and 707.57.

### V.  Factual Allegations of Class Representatives

#### A.  Melissa Landon and Edward Landon

251.    Plaintiffs incorporate by reference the preceding paragraphs.

252.    On or about January 18, 2015, Melissa and Edward Landon, a married couple, went to Christmas Mountain Village Resort after receiving a telephone call a few weeks earlier from Bluegreen soliciting them to come to Christmas Mountain Village Resort.

253.    The Landons were told that they would receive a $100 gift card if they spent 60 minutes listening to a presentation.

254.    A Front-Line sales representative made a high-pressure sales pitch to the Landons to buy timeshare points.

255.    The Landons did not receive their $100 gift card until after the sales presentation was completed.

256.    In the sales presentation, Bluegreen told the Landons that certain incentives to purchase, such as the Charter VIP 20,000 Points program giving them unlimited bonus times at Bluegreen Resorts and discounted prices on rooms and the waiver of their

60

Travelers Plus program were available that day only.

257. Bluegreen's representing incentives to purchase as being available "today only" is a deceptive and misleading sales practice prohibited by Wis. Stat. § 707.55(2).

258. In the sales presentation and during the sales negotiations, Bluegreen told the Landons that they could save money on maintenance fees if they gave Bluegreen the names of friends or relatives who might be interested in coming to tour Bluegreen.

259. The sales representative told the Landons that they would get $50 off maintenance fees for every person who toured Bluegreen that the Landons referred.

260. Bluegreen discussed the referral program before the Landons purchased the timeshare interest, and the sales representative explained that people have gone for years not paying any maintenance fees just through their referrals to Bluegreen.

261. The Landons gave Bluegreen the names of people to tour Bluegreen as potential referrals.

262. Bluegreen did not give the Landons compensation for the names they gave in the referral program, either at the time they gave Bluegreen the referrals or at any time.

263. The Landons were induced, in whole or in part, to buy the timeshare as a result of Bluegreen's referral selling program.

264. The Landons suffered a pecuniary loss as a result of Bluegreen's violations of Wisconsin law regarding referral selling.

265. As a matter of its usual business practices, Bluegreen used a referral

61

program to induce the sales of timeshare interests.

266.    As a matter of its usual business practices, Bluegreen never gave any compensation to its buyers at the time they made referrals.

267.    After the Landons agreed in the sales presentation to buy 6,000 bi-annual "points" for $8,300 and paid $1,180 down, they were given a "Purchase Proposal" which stated that "The seller is Bluegreen Vacations Unlimited, Inc."

268.    According to the purchase contract documents eventually presented to the Landons for signature, the property was not owned by Bluegreen Vacations Unlimited, Inc.; the seller and creditor was Cibola Vista Resort & Spa in Peoria, AZ.

269.    When the Landons noticed that their timeshare location was in Arizona, they were puzzled and questioned this, because they did not want to own a timeshare in Arizona.

270.    The Landons thought they were buying a timeshare interest in Christmas Mountain Village, where they had toured and seen the property and which was located much closer to them than Arizona.

271.    In response to their inquiry, the Bluegreen representative told them that the Arizona timeshare was simply a matter of assignment, and that it did not matter where the timeshare was  located, because the Landons would have all of the same rights and benefits as they would have with a Wisconsin timeshare at Christmas Mountain Village.

272.    The statement that owning a timeshare in Arizona was the same as owning a timeshare in Wisconsin and that it didn't matter where the timeshare was located was a

material misrepresentation, in violation of Wis. Stat. § 707.55(1).

273.    The location of a timeshare matters greatly when the purchase is made in Wisconsin, because Wis. Stat. § 707.59 significantly limits the rights and consumer protections under the Wisconsin Timeshare Act of timeshare owners who buy a timeshare located outside of Wisconsin.

274.    The Landons were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex legalese, and refered to and/or incorporate other documents which were are not given to them in hard copy (or at all) at the time the Landons signed the documents.

275.    According to the contract documents presented to the Landons, their timeshare contract or agreement consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents. The documents provided to the Landons included, without limitation:

  a.  Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club;

  b.  the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

  c.  the "Underlying Declaration" of the Trust Agreement;

  d.  the Bluegreen Vacation Club Multi-State Public Offering Statement

63

and any approved amendments thereto and any other Component Site documents;

e.  the Bluegreen Vacation Club Articles of incorporation and By-Laws;

f.  Bluegreen Vacations credit application;

g.  Promissory Note - Cibola Vista Resort and Spa, LLC;

h.  a Mortgage executed by the Trustee of the Trust Agreement;

i.  any security instruments requested by the Facilitator or lender, including a UCC financing statement;

j.  Temporary Payment Coupon for 2/17/15 Mortgage payment - to be paid to Bluegreen Corporation;

k.  All documents referred to in the Bluegreen Owner Beneficiary Agreement;

l.  Special Warranty Deed (CV Condominiums) the Property to the Trust;

m.  the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n.  the Multi-State Vacation Plan;

o.  The title insurance policy of Resort Title Agency, Inc. [a wholly owned subsidiary of Bluegreen Vacations Corporation, fka Bluegreen Corporation];

p.  the applicable Exchange Company Disclosure Statement(s);

64

q.    Biennial Owner Confirmation Interview;

r.    the Bluegreen Vacation Club binder;

s.    Truth-in-Lending Disclosure Statement;

t.    Settlement Statement (HUD-1);

u.    Good Faith Estimate (GFE);

v.    Bluegreen Vacation Club Alternate Media Disclosure Statement for
      Multi-State Timeshare Plan;

w.    the Bluegreen Vacation Club Certificate of Owner Beneficiary
      Rights;

x.    Bluegreen Vacations Privacy Notice;

y.    Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to
      Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.    Bluegreen Corporation Affiliated Business Arrangement Disclosure
      Statement

aa.   Bluegreen Vacation Club Compliance Agreement;

bb.   Cibola Vista Resort & Spa, LLC Service Disclosure Statement;

cc.   Cibola Vista Resort & Spa Privacy Notice;

dd.   Deed of Trust, Assignment of Rents And Security Agreement;

ee.   Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program
      Enhanced/Traveler Plus Membership Enrollment Agreement;

ff.   Bluegreen Vacations Membership Application;

65

gg.    Information on referral selling program;

ii.    Bluegreen Resorts Purchase Proposal form with some writing and notes on it;;

jj.    First Visit Incentives Good for Today Only!

kk.    Charter Certificate for VIP Program;

ll.    Bonus Certificate;

mm.    Bluegreen Vacations Maintenance Fee and Club Dues Waiver Certificate;

nn.    Consent to Be Contacted by Bluegreen Corporation and affiliates and others;

oo.    Request for Taxpayer Identification Number and Certification for Melissa Landon;

pp.    Request for Taxpayer Identification Number and Certification for Edward Landon;

qq.    Acknowledgment, Disclosure Statement, and Terms and Conditions of Use For Cruise Vacation Certificate Benefit;

qq.    Bluegreen Vacations How to Redeem Your Cruise Certificate;

rr.    30 Day Same as Cash Payoff Coupon (to be submitted to Bluegreen Corporation - Mortgage Operations);

ss.    Quorum Membership Application; and

tt.    CD of Public Offering Statement.

66

276. The Landons returned to Christmas Mountain Village on or about May 30, 2015 after receiving a letter asking them to return so that Bluegreen could further explain their benefits.

277. On their second visit, an In-house sales representative made a sales presentation to the Landons to persuade them to buy more points, ostensibly so that they could better use their timeshare interest.

278. The sales representative offered a "highly reduced cost" for 6,000 additional points, telling the Landons that they needed to buy more points in order to properly use their first timeshare.

279. Once again, the Landons negotiated "timeshare points" and did not know until they made a down payment who the seller would be or where the timeshare would be located.

280. Once again, the Landons were presented with a "Purchase Proposal" form stating "The seller is Bluegreen Vacations Unlimited, Inc."

281. The Landons eventually learned (when asked to sign contract paperwork) that the timeshare they bought in May 2015 would be located in Virginia, and it was called Landmark Resort Properties of VA, LLC.

282. The Landons never requested or desired to own a timeshare located in Virginia and never mentioned Virginia as a place they wanted to own real property.

283. Once again, Bluegreen assured the Landons that it did not matter where their timeshare was located and that they had all the privileges and rights to the Virginia

67

timeshare as they would have at Christmas Mountain Village in Wisconsin.

284.    In both of their 2015 timeshare purchases, the Landons were presented with numerous documents to sign relating to the timeshare contracts, including documents containing provisions that required them to pay attorney's fees of the developer, seller, facilitator, and lender, if the Landons committed a default or breach, in violation of Wis. Stat. § 428.103.

285.    In May 2015, the Landons again were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex legalese, and refered to and/or incorporated other documents which were are not given to them in hard copy or at all at the time of closing.

286.    According to the contract documents presented to the Landons, their second timeshare contract or agreement consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents.  These documents Bluegreen provided to the Landons included, without limitation:

    a.    Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club;

    b.    the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

    c.    the "Underlying Declaration" of the Trust Agreement;

68

d. the Bluegreen Vacation Club Multi-State Public Offering Statement and any approved amendments thereto and any other Component Site documents;

e. the Bluegreen Vacation Club Articles of incorporation and By-Laws;

f. Bluegreen Vacations credit application;

g. Promissory Note - Cibola Vista Resort and Spa, LLC;

h. a Mortgage executed by the Trustee of the Trust Agreement if the buyer sought a loan in connection with the timeshare purchase;

I. any security instruments requested by the Facilitator or lender, including a UCC financing statement;

j. Temporary Payment Coupon for 2/17/15 Mortgage payment - to be paid to Bluegreen Corporation;

k. All documents referred to in the Bluegreen Owner Beneficiary Agreement;

l. the Warranty Deed or other instrument conveying the Property to the 2Trustee;

m. the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n. the Multi-State Vacation Plan;

o. The title insurance policy of Resort Title Agency, Inc. [a wholly owned subsidiary of Bluegreen Vacations Corporation, fka

69

Bluegreen Corporation];

p.      the applicable Exchange Company Disclosure Statement(s);

q.      Owner Confirmation Interview;

r.      the Bluegreen Vacation Club binder;

s.      Truth-in-Lending Disclosure Statement;

t.      Settlement Statement (HUD-1);

u.      Good Faith Estimate (GFE);

v.      Bluegreen Vacation Club Alternate Media Disclosure Statement for Multi-State Timeshare Plan;

w.      the Bluegreen Vacation Club Certificate of Owner Beneficiary Rights;

x.      Bluegreen Vacations Privacy Notice;

y.      Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.      Bluegreen Corporation Affiliated Business Arrangement Disclosure Statement

aa.     Bluegreen Vacation Club Compliance Agreement;

bb.     Southern Peaks Resorts, LLC Service Disclosure Statement;

cc.     Southern Peaks Resorts-InnSeason Resorts South Mountain Policy Regarding Your Financial Privacy;

dd.     Certificate of Beneficial Interval Ownership;

ee.  Bluegreen Vacation Club InnSeason Resorts South Mountain
      Assignment of Beneficial Interest in Trust;

ff.   Interval Ownership Declaration;

gg.  Bluegreen Vacations Membership Application;

hh.  Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program
      Enhanced/Traveler Plus Membership Enrollment Agreement;

ii.   Terms and Conditions Relating to Participants Enhanced/Traveler
      Plus;

jj.   Bluegreen Vacations Club Extra Vacations Getaway;

kk.  Bluegreen Resorts Purchase Proposal form with some writing and
      notes on it;

ll.   Charter Certificate for VIP Program;

mm.  Charter Certificate First-Visit Incentive;

nn.  Bluegreen Vacations Maintenance Fee and Club Dues Waiver
      Certificate;

oo.  Consent to Be Contacted by Bluegreen Corporation and affiliates
      and others

pp.  Request for Taxpayer Identification Number and Certification

287.   In both of their 2015 timeshare purchases, Bluegreen, as is its customary

and usual and standardized practice, presented the Landons with contracts which provided

that they had to pay the seller's or creditor's or lender's reasonable attorney's fees in the

71

event of a broken promise or default.

288.    In both of their 2015 timeshare purchases, Bluegreen misstated the

Landons' right to cancel their timeshare contracts under Wisconsin law, as Bluegreen did

in all timeshare contracts sold in Wisconsin.

289.    The Landon's second timeshare, located at Landmark Resort Properties of

VA, LLC, is not currently listed as a Club Associate Resort on Bluegreen Vacations

Corporation's 10-K filed in March 2018 by Bluegreen Vacations Corporation with the

Securities and Exchange Commission for the fiscal year ending December 31, 2017.

290.    Had Bluegreen told the truth about the timeshares the Landons bought, they

never would have purchased them.

291.    The Landons sent a written cancellation notice to Bluegreen to cancel their

timeshare contracts and transactions.

292.    Bluegreen failed and refused to honor the Landons' cancellation notice or to

refund any money the Landons paid relating to the timeshares.

293.    The Landons have suffered a monetary loss as a result of Bluegreen's

violations of law.


## B.  Shane Auxier and Mu Hpare

294.    Plaintiffs incorporate by reference the preceding paragraphs.

295.    On or about September 28, 2014, Shane Auxier and Mu Hpare went to

Christmas Mountain Village Resort after being solicited in person while checking in to

72

the Poseidon Resort a few miles away from Bluegreen's Christmas Mountain Village Resort in Wisconsin Dells.

296. The woman who solicited them told Mr. Auxier and Ms. Hpare ("the Auxiers") that they would receive a free $100 VISA gift card if they spent 60 minutes listening to a presentation at Christmas Mountain Village.

297. The "free $100 gift card" Bluegreen used to induce the Auxiers to listen to the sales presentation was not given to them until they were leaving Christmas Mountain Village after buying a timeshare.

298. The Auxiers initially spent approximately two hours listening to a sales presentation at Christmas Mountain Village given to a group of people, including them.

299. After the group presentation was completed, a Front-Line sales representative made a high-pressure sales pitch to the Auxiers to buy timeshare points, offering them inducements to buy, such as "free" and reduced-price vacations in all Bluegreen locations, a cruise, free RCI membership and other incentives.

300. The Bluegreen sales representative increased their offer to provide additional incentives that Bluegreen offered to induce the sale of 20,000 points.

301. In the sales presentation, Bluegreen told the Auxiers that certain incentives to purchase, such as the Charter VIP 20,000 Points program giving them unlimited bonus times at Bluegreen Resorts and discounted prices on rooms and the waiver of their Travelers Plus program were available that day only.

302. In the sales presentation and during the sales negotiations, Bluegreen told

73

the Auxiers that they could save money on maintenance fees if they gave Bluegreen the names of friends or relatives who might be interested in coming to tour Bluegreen.

303.     The sales representative told the Auxiers that they would get $50 off maintenance fees for every person who toured Bluegreen that the Auxiers referred.

304.     The referral program was explained before the Auxiers purchased the timeshare interest.

305.     Although the Auxiers were hesitant about whether they could afford the timeshare, the prospect of paying their maintenance fees through referring names to Bluegreen helped justify the cost to them.

306.     Mu Hpare gave Bluegreen the names of people to tour Bluegreen as potential referrals.

307.     Bluegreen did not give the Auxiers compensation for the names they gave in the referral program, either at the time they gave Bluegreen the referrals or at any time.

308.     The Auxiers suffered a pecuniary loss as a result of being induced to buy a timeshare, in whole or in part, by Bluegreen's referral selling techniques during the sales presentation.

309.     After the Auxiers agreed in the sales presentation to buy 20,000 annual "points" for $27,000.00 and made a down payment of $3,050.00, they were given a "Purchase Proposal" form which stated that "The seller is Bluegreen Vacations Unlimited, Inc."

310.     According to the purchase contract documents eventually presented to the

74

Auxiers for signature, the property was not owned by Bluegreen Vacations Unlimited, Inc.; the seller and creditor was InnSeason Resorts South Mountain Condominium in Lincoln, NH.

311.    When the Auxiers noticed that their timeshare location was in New Hampshire, they questioned this, because they did not want to own a timeshare in New Hampshire.

312.    The Auxiers thought they were buying a timeshare interest in Christmas Mountain Village in Wisconsin Dells, where they had toured and seen the property and which was located much closer to them than New Hampshire.

313.    In response to their inquiry, the Bluegreen representative told them that it did not matter where the timeshare was located, because the timeshare need not be used at a specific location. Bluegreen said that they simply needed to put in a physical address for the paperwork only. The Auxiers understood they would have all of the same rights and benefits as they would have with a Wisconsin timeshare at Christmas Mountain Village.

314.    The statement that owning a timeshare in New Hampshire was the same as owning a timeshare in Wisconsin and that it didn't matter where the timeshare was located was a material misrepresentation, in violation of Wis. Stat. § 707.55(1).

315.    The Auxiers' timeshare, InnSeason Resorts South Mountain Condominium in Lincoln, NH, is not currently listed as a Club Associate Resort on Bluegreen Vacations Corporation's 10-K filed in March 2018 by Bluegreen Vacations Corporation with the Securities and Exchange Commission for the fiscal year ending December 31, 2017.

75

316.    At the closing on September 28, 2014, the Auxiers were presented numerous contract documents to sign and initial, many of which were multiple pages filled with complex legalese, and refer to and/or incorporate other documents, which were are not given to them in hard copy or at all. These documents included provisions that required them to pay attorney's fees of the developer, seller, facilitator, and lender, if the Auxiers committed a default or breach, in violation of Wis. Stat. § 428.103.

317.    According to the contract documents presented to the Auxiers, their timeshare contract consisted of multiple documents, including all documents presented to them and/or referred to within the Bluegreen Owner Beneficiary Agreement and accompanying documents. The documents Bluegreen gave to the Auxiers included, without limitation:

    a.    Bluegreen Owner Beneficiary Agreement for the Bluegreen Vacation Club;

    b.    the Bluegreen Vacation Club Amended and Restated Trust Agreement, also referred to as "Trust Agreement (timeshare instrument) and related documents";

    c.    the "Underlying Declaration" of the Trust Agreement;

    d.    the Bluegreen Vacation Club Multi-State Public Offering Statement and any approved amendments thereto and any other Component Site documents;

    e.    the Bluegreen Vacation Club Articles of incorporation and By-Laws;

f.      Bluegreen Vacations credit application;

g.      a promissory note ("the Note") with Southern Peaks Resorts, LLC;

h.      a Mortgage executed by the Trustee of the Trust Agreement if the buyer sought a loan in connection with the timeshare purchase;

I.      any security instruments requested by the Facilitator or lender, including a UCC financing statement;

j.      A Pre-Authorized Check Plan ("PAC Plan");

k.      All documents referred to in the Bluegreen Owner Beneficiary Agreement;

l.      the Warranty Deed or other instrument conveying the Property to the Trustee;

m.      the Management Agreement with Bluegreen Resorts Management, Inc. (the "Vacation Club Managing Entity")'

n.      the Multi-State Vacation Plan;

o.      The title insurance policy of Resort Title Agency, Inc. [a wholly owned subsidiary of Bluegreen Vacations Corporation, fka Bluegreen Corporation];

p.      the applicable Exchange Company Disclosure Statement(s);

q.      Owner Confirmation Interview;

r.      the Bluegreen Vacation Club binder;

s.      Truth-in-Lending Disclosure Statement;

t.      Settlement Statement (HUD-1);

u.      Good Faith Estimate (GFE);

v.      Bluegreen Vacation Club Alternate Media Disclosure Statement for Multi-State Timeshare Plan;

w.      the Bluegreen Vacation Club Certificate of Owner Beneficiary Rights;

x.      Bluegreen Vacations Privacy Notice;

y.      Bluegreen Vacations Privacy Opt-Out Mail-in Form [to be mailed to Bluegreen Corporation, nka Bluegreen Vacations Corporation];

z.      Bluegreen Corporation Affiliated Business Arrangement Disclosure Statement

aa.     Bluegreen Vacation Club Compliance Agreement;

bb.     Southern Peaks Resorts, LLC Service Disclosure Statement;

cc.     Southern Peaks Resorts-InnSeason Resorts South Mountain Policy Regarding Your Financial Privacy;

dd.     Certificate of Beneficial Interval Ownership;

ee.     Bluegreen Vacation Club InnSeason Resorts South Mountain Assignment of Beneficial Interest in Trust;

ff.     Interval Ownership Declaration;

gg.     Bluegreen Vacations Membership Application;

hh.     Bluegreen Vacations Unlimited, Inc., Bluegreen VIP Program

Enhanced/Traveler Plus Membership Enrollment Agreement;

ii. Terms and Conditions Relating to Participants Enhanced/Traveler Plus;

jj. Bluegreen Vacations Club Extra Vacations Getaway;

kk. Bluegreen Resorts Purchase Proposal form with some writing and notes on it;

ll. Charter Certificate for VIP Program;

mm. Charter Certificate First-Visit Incentive;

nn. Bluegreen Vacations Maintenance Fee and Club Dues Waiver Certificate;

oo. Consent to Be Contacted by Bluegreen Corporation and affiliates and others

pp. Request for Taxpayer Identification Number and Certification

qq. Vacation Membership Application at Quorum Federal Credit Union

rr. Quorum Visa Platinum Credit Card Account Opening Disclosure

318. Bluegreen did not provide the Auxiers copies of all of the documents which comprised their contract and which were referred to in their contract documents as being part of their agreement.

319. Had Bluegreen not misrepresented the timeshare to the Auxiers and/or not engaged in the referral selling program, they would not have purchased the timeshare.

320. The Auxiers sent a written cancellation notice to Bluegreen to cancel their

timeshare contract and transaction.

321. Bluegreen failed and refused to honor the Auxiers' cancellation notice or to refund any money they paid relating to the timeshare.

322. The Auxiers have suffered a monetary loss as a result of Bluegreen's violations of law.

## VI. FIRST CLAIM FOR RELIEF
## VIOLATION OF THE WISCONSIN TIMESHARE ACT

323. Plaintiffs incorporate by reference the preceding paragraphs.

324. Bluegreen committed numerous violations of the Wisconsin Timeshare Act, Wis. Stats. Chapter 707, including without limitation: Wis. Stats. §§ 707.41, 707.46, 707.47, 707.55, and 707.06.

325. Wis. Stats. § 707.47 applies to all contracts signed with Bluegreen in Wisconsin, because these contracts all specify that the Wisconsin Timeshare law applies to cancellation rights.

326. At least with respect to Class Members who purchased timeshares located in Wisconsin § 707.41 (requirements of a Timeshare Disclosure Statement) and § 707.46 (Minimum contract requirements) are incorporated into the cancellation law.

327. Bluegreen failed to provide a Timeshare Disclosure Statement which complied with Wis. Stat. §§ 707.41, 707.46 and 707.47 to any person who purchased in Wisconsin timeshares located in Wisconsin.

328. Under the express terms of Wis. Stat. § 707.59(2), Wis. Stat. § 707.55 (Prohibited Advertising and Sales Practices) applies to any offer or sale of a timeshare in

80

a time-share unit, whether the time-share unit is located in this state or outside this state.

329. Bluegreen contracted to provide all Class Members (including Class Members who signed timeshare contracts in Wisconsin for timeshares located out of Wisconsin) with cancellation rights that are to be construed, interpreted, and enforced in accordance with Wisconsin law, which is set forth in Wis. Stat. § 707.47.

330. Bluegreen's contracts materially misrepresented and failed to accurately disclose complete and accurate timeshare cancellation rights under Wisconsin law to all Class Members, in violation of Wis. Stat. § 707.55(1) and 707.47.

331. Bluegreen materially misrepresented to all Class Members who purchased timeshares located outside of Wisconsin that it did not matter where the timeshare was located.

332. Bluegreen materially misrepresented in the documents given to all Class Members that they had been given documents that they had not, in fact received, and that they had been given an opportunity to read the documents before signing the timeshare contracts.

333. Bluegreen offers incentives such as special prices, discounts, special memberships and prizes to prospective purchasers which Bluegreen tells the prospective buyers are good only for that day, in violation of Wis. Stat. 707.55(2).

334. With regard to all Class Members, in connection with the offer or sale of a time share, Bluegreen failed to clearly disclose the seller's identity and that time shares are being offered for sale at the beginning of an initial contact with a prospective

purchaser.

335.    With regard to all Class Members, in connection with the offer or sale of a time share, Bluegreen asked Class Members to agree or stipulate to and/or certify the absence of any misrepresentation or other violation of Wis. Stat. § 707.55 made by Bluegreen, in violation of Wis. Stat. § 707.55(11).

336.    Each of the Class Members were adversely affected by Bluegreen's failure to comply with the applicable provisions of the Wisconsin Timeshare Act, Chapter 707.

337.    Bluegreen's conduct was unconscionable in the marketing, sales, contract documents, ownership and use of the timeshare, Bluegreen and violated multiple provisions of the timeshare laws and other consumer protection laws.

338.    Each of the Class Members are entitled to the remedies of Wis. Stat. § 707.57(1), which provides:

**Private remedies.**

(a) If a developer or any other person subject to this chapter fails to comply with this chapter or the time-share instrument, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief, including but not limited to damages, injunctive or declaratory relief, specific performance and rescission.

(b) A person or class of persons entitled to relief under par. (a) is also entitled to recover costs, disbursements and reasonable attorney fees, notwithstanding s. 814.04 (1).

339.    Each of the Class Members are also entitled to have the Court declare as a matter of law that Bluegreen's marketing and sales practices, contracts, and conduct directed against Class Members, or the result thereof is unconscionable, and refuse to

enforce the contract against the purchaser, or so limit the application of any unconscionable aspect or conduct as to avoid any unconscionable result.

## CLASS ALLEGATIONS

340. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

341. The class consists of (a) any person (b) who purchased in Wisconsin (c) from either defendant (d) one or more timeshares (whether for property in Wisconsin or elsewhere) (e) on or after a date six years prior to the filing of this action.

342. The class includes at least hundreds of persons and is so numerous that joinder of all members is not practicable.

343. There are questions of law and fact common to class members, which common questions predominate over any questions relating to individual class members.

344. The predominant common questions include:

    a.    Whether Bluegreen provided compliant (or any) Timeshare Disclosure Statements to the class members;

    b.    Whether Bluegreen's contracts with the class members correctly stated their right to cancel under Wisconsin law;

    c.    Whether Bluegreen's contracts with the class members improperly provided for reductions in the required refund;

    d.    Whether Bluegreen told class members that the offer of incentives to purchase were good for only the day of the presentation;

e.      Whether Bluegreen violated Wis. Stat. § 707.55(1) by making assertions, representation, or statements of material fact that were false, deceptive or misleading relating to the buyers' cancellation rights;

f.      Whether Bluegreen violated Wis. Stat. § 707.55(1) by making assertions, representations, or statements of material fact that were false, deceptive or misleading relating to where the timeshares were located and that it did not matter to buyers signing contracts in Wisconsin as to where their timeshares were located;

g.      Whether Bluegreen violated Wis. Stat. § 707.55(1) by making assertions, representations, or statements of material fact that were false, deceptive or misleading relating to Bluegreen providing Class Members with certain timeshare documents and an opportunity to read them before signing documents;

h.      Whether Bluegreen violated Wis. Stat. § 707.55(8) by failing to identify the seller and that timeshares were being offered for sale at the beginning of the initial contact with the prospective purchaser, if the contact was initiated by Bluegreen;

i.      Whether Bluegreen violated Wis. Stat. § 707.55(11) by requesting the class member to enter into any agreement or stipulation that requested that person to certify the absence of any misrepresentation

84

or other violation of Wis. Stat. 707.55; and

j.     Whether Bluegreen's conduct with respect to Class Members was unconscionable in the marketing, sales, contract documents, ownership and/or use of the timeshares.

345.    These questions predominate over any questions peculiar to individual class members.

346.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

347.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer litigation.

348.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.     Members of the class are likely to be unaware of their rights;

b.     There is no reason to have multiple lawsuits raising the same issues;

c.     Prior individual lawsuits have not been effective in halting the practices complained of.

## VII.  SECOND CLAIM FOR RELIEF
### ILLEGAL REFERRAL SELLING
### WISCONSIN ADMIN. CODE CHAPTER ATCP 121
### AND WIS. STAT. § 100.20(5)

349.    Plaintiffs incorporate by reference the preceding paragraphs.

350.    Bluegreen is a "seller" as defined in Wis. Admin. Code Chapter ATCP § 121.01(4).

85

351.    The vacation timeshare sales Bluegreen made to Class Members were primarily for personal, family, or household purposes and are therefore "consumer sales" as defined in Wis. Admin. Code Chapter ATCP § 121.01(2).

352.    A "referral selling plan" is "any method of sale where the seller or lessor, as an inducement for a consumer sale, offers compensation to a prospective buyer or lessee either for a) names of other prospective buyers or lessees, or b) otherwise aiding the seller or lessor in making consumer sales" under Wis. Admin. Code Chapter ATCP § 121.01(3).

353.    " Compensation" means "anything of value, including commissions, fees, money, credits, discounts, rebates, premiums, goods, or any other kind of property and services" under Wis. Admin. Code Chapter ATCP § 121.01(1) .

354.    Wis. Admin. Code Chapter ATCP § 121.02 provides: "No seller or lessor may use any referral selling plan to make a consumer sale unless the seller or lessor first gives the buyer or lessee the full amount of potential compensation offered to that buyer or lessee under that plan."

355.    Bluegreen, as an inducement to sell the Class Members timeshares, offered compensation to each of the Class Members, as prospective buyers, either for (a) names of other prospective buyers or lessees, or (b) otherwise aiding Bluegreen in selling timeshares to others.  Thus Bluegreen used a "referral selling plan" as that term is defined in Wis. Admin. Code Chapter ATCP § 121.01(3).

356.    Bluegreen required its in-house sales representatives to ask customers and prospective customers for the names of other people to refer to Bluegreen's marketing

department for the purpose of a future Bluegreen sales presentation.

357. Bluegreen sales representatives obtained referral names from guests and owners during the sales presentation and before the completion of the sale.

358. Bluegreen solicited names from the Class Members as an inducement to make a consumer sale before their purchase of a timeshare interest was finalized.

359. Bluegreen, as a universal practice to induce the sale of timeshares, tells guests and owners about its referral plan during its sales presentation and does not give guests or owners the gifts it promises until after a the referral attends a sales presentation in the future.

360. Bluegreen did not first give the Class Members the full amount of potential compensation offered to those buyers and instead induced the sales of timeshares to Class Members under Bluegreen's referral selling plan that promised future benefits that may or may not have come to fruition.

361. Bluegreen's practice of how it used its referral selling program was universal and Bluegreen's standard practice.


362. Bluegreen solicited names from the Class Members as an inducement to make a consumer sale of timeshares to them and offered compensation for the names of other prospective buyers or for other aid in making subsequent consumer sales.

363. None of the Class Members received the promised compensation prior to the completion of the sale of the consumer transaction (i.e., the sale of timeshares) to them.

364. Many Class Members gave Bluegreen the names of other prospective buyers as a result of Bluegreen's referral selling program; however, in the case of *Pliss/Phelps v. Peppertree Resort Villas, inc. et al.,* 264 Wis. 2d 735, 748, 663 N.W.2d 851858 (Ct. App. 2003), the Wisconsin court of appeals held a claim for violation of referral selling under Wis. Admin. Code Chapter ATCP § 121.02 did not require that consumers provided names or were due compensation at the time of sale.

365. The Wisconsin Department of Agriculture, Trade, and Consumer Protection issued an order in 2001clarifying the purpose of ATCP § 121.02 as follows:

> A referral selling plan operates like a pyramid scheme or lottery. Each buyer purchases in reliance upon promised future payments that *may* result if the buyer refers other sales prospects who purchase in turn. But the payments may never occur, and the "chain" of prospects inevitably breaks. In 1968, the department prohibited referral selling plans unless the seller compensates the buyer *before* making any sale to *that* buyer (thus eliminating the element of "Chance"). This rule clarifies but does not change the current prohibition.

Wisconsin Admin. Reg.. No. 543, at 17 (emphasis in original.)

366. Once Bluegreen told the Class Members of their referral selling program during the sales presentation and the promise in the future of money or other compensation for each referral that came to Bluegreen for a sales presentation, that knowledge influenced the Class Members and induced them into buying vacation timeshares as a result, creating a pecuniary loss for the Class Members.

367. The Class Members suffered pecuniary losses due, in whole or in part, as a result of Bluegreen's use of the illegal referral selling program to induce the sale of timeshares.

88

368.    The measure of pecuniary loss in the case of sale of vacation timeshares

through the use of referral selling is the amount actually paid for the timeshare.  In

*Pliss/Phelps v. Peppertree Resort Villas, inc. et al.,* 264 Wis. 2d 735, 74, 663 N.W.2d

851, 858 (Ct. App. 2003), the Wisconsin court of appeals held:

> [T]he prohibition is designed to protect buyers from being induced into a consumer
> sale by a referral selling plan by promising future payments that may never occur.
> Therefore, the pecuniary loss is not any lost referral compensation, but rather, the
> money paid for the product that the consumer was improperly induced into buying
> due, in part or in whole, to the referral selling plan.

369.    The Class Members suffered pecuniary losses because of Bluegreen's

violations of Wis. Admin. Code Chapter ATCP 121, and are entitled to recover double

their pecuniary loss, together with costs and reasonable attorney fees from Bluegreen,

pursuant to Wis. Stat. § 100.20(5).

## CLASS ALLEGATIONS

370.    Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P.

23(a) and 23(b)(3).

371.    The class consists of (a) any person (b) who purchased in Wisconsin

(c) from either defendant (d) one or more timeshares (whether for property in Wisconsin

or elsewhere) (e) on or after a date six years prior to the filing of this action.

372.    The class includes at least hundreds of persons and is so numerous that

joinder of all members is not practicable.

373.    There are questions of law and fact common to class members, which

common questions predominate over any questions relating to individual class members.

89

374.    The predominant common questions include:

    a.      Whether Bluegreen, as an inducement to sell the Class Members timeshares, offered compensation to each of the Class Members, as prospective buyers, either for (a) names of other prospective buyers or lessees, or (b)  otherwise aiding Bluegreen in selling timeshares to others.

    b.      Whether Bluegreen failed to first give the Class Members the full amount of potential compensation offered to those buyers under Bluegreen's referral selling plan, thus violating Wis. Admin. Code Chapter ATCP § 121.02.

    c.      The appropriate remedy.

375.    These questions predominate over any questions peculiar to individual class members.

376.    Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

377.    Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer litigation.

378.    A class action is superior for the fair and efficient adjudication of this matter, in that:

    a.      Members of the class are likely to be unaware of their rights;

90

b.    There is no reason to have multiple lawsuits raising the same issues;

c.    Prior individual lawsuits have not been effective in halting the

practices complained of.

## VIII.  THIRD CLAIM FOR RELIEF
## ILLEGAL ATTORNEY'S FEES PROVISIONS
## WIS. STAT. § 428.103(1)(e)

379.    Plaintiffs incorporate by reference the preceding paragraphs.

380.    With respect to Class Members who obtained purchase money financing for

their timeshare contracts, one or both of Defendants regularly engaged in, arranged for or

procured from 3rd persons, loans under Chapter 428 of the Wisconsin Statutes.

381.    The loans obtained for Class Members that Bluegreen engaged in, arranged

for, or procured from 3rd persons to finance the timeshare contracts were secured by a first

lien real estate mortgage or equivalent security interest, and the amount financed was

$25,000 or less.

382.    Defendants violated Wis. Stat. § 428.103(1)(e) by contracting for the

timeshare purchasers to pay attorney's fees in excess of the amounts permitted.


383.    This provision was common to all timeshare and/or loan contracts in the

state of Wisconsin where purchasers obtained financing for the timeshares in the amount

of $25,000.00 or less and defendants engaged in, arranged for, or procured from 3rd

persons loans connected with the sale of those timeshares to Class Members.

## CLASS ALLEGATIONS

384. Plaintiffs bring this claim on behalf of a class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

385. The class consists of (a) any person (b) who purchased in Wisconsin (c) on or after a date six years prior to the filing of this action (d) one or more timeshares (whether for property in Wisconsin or elsewhere) (e) where the credit extended was $25,000 or less (f) and the loan was made by, arranged by, or procured from a third party by one or both of the Defendants; and (g) the timeshare contracts were secured by a first lien real estate mortgage or equivalent security interest.

386. The class includes at least hundreds of persons and is so numerous that joinder of all members is not practicable.

387. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.

388. The predominant common questions include:

    a.    Whether Bluegreen contracted for improper attorney's fees; and

    b.    The appropriate remedy.

389. These questions predominate over any questions peculiar to individual class members.

390. Plaintiffs' claims are typical of the claims of the class members. All are based on the same factual and legal theories.

391. Plaintiffs will fairly and adequately represent the class members. Plaintiffs have retained counsel experienced in class actions and consumer litigation.

392.    A class action is superior for the fair and efficient adjudication of this

matter, in that:

    a.    Members of the class are likely to be unaware of their rights;

    b.    There is no reason to have multiple lawsuits raising the same issues;

    c.    Prior individual lawsuits have not been effective in halting the

        practices complained of.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class Members respectfully request that

judgment be entered as follows:

    i.    Certifying the Classes as requested herein;

    ii.   Providing that each plaintiff and class member may elect to cancel or rescind
          their timeshare contract and obtain a refund or restitution of amounts paid,
          under Wis. Stat. § 707.57(1);

    iii.  Awarding double the pecuniary loss of those Class Members whom
          Bluegreen engaged in illegal referral selling, under Wisconsin Admin. Code
          Chapter ATCP § 121 and Wis. Stat. § 100.20(5);

    iv.   Awarding double the finance charge up to $1,000.00 for all class members
          who obtained a loan of $25,000.00 or less arranged by Bluegreen and signed
          contracts relating to those loans which provided for potential payment of
          illegal attorney's fees in violation of § 428.103(2);

    v.    A declaration that Bluegreen violated Wis. Stats. §§ 707.55, 707.41, 707.46,
          707.47 and 707.06 of the Wisconsin Timeshare Act, as well as Wis. Admin.
          Code ATCP Chapter 121, and § 428.103(1)(e);

    vi.   Injunctive relief enjoining Bluegreen from engaging in future violations of
          Stats. §§ 707.55, 707.41, 707.46, 707.47 and 707.06 of the Wisconsin
          Timeshare Act, as well as Wis. Admin. Code ATCP Chapter 121, and
          § 428.103(1)(e);

93

vii.     All reasonable and necessary attorneys' fees and costs provided by Wis. Stats. §§ 707.57, 100.20(5), 428.106(1), 425.308, and the Court's inherent power; and

viii.    for such other and further relief as the Court deems just and proper.

## X.  JURY DEMAND

Plaintiffs hereby demand that this case be tried by a jury.

Dated this 1st day of April, 2019.

/s/__DeVonna Joy_____
DeVonna Joy
Attorney for Plaintiffs

Consumer Justice Law Center, LLC
P.O. Box 51
Big Bend, WI 53103-0051
Tele:  262- 662-3982
E-mail: djlaw@wi.rr.com; jgiove@wi.rr.com;
consumerjusticelaw@wi.rr.com

Daniel A. Edelman
Cathleen M. Combs
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
Tele: 312-739-4200
Fax: 312-419-0379 (FAX)
E-mail address for service: courtecl@edcombs.com