UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

MELISSA S LANDON, et al.,

                Plaintiffs,

                                                  Case No. 18-cv-0994-bhl

   v.

BLUEGREEN VACATIONS UNLIMITED INC,
BLUEGREEN VACATIONS CORPORATION,

                Defendants.
_____

## ORDER DENYING CLASS CERTIFICATION
_____

        Between 2014 and 2015, two couples, Plaintiffs Melissa and Edward Landon and Shane Auxier and Mu Hpare purchased timeshare interests from Defendants Bluegreen Vacations Unlimited, Inc. and Bluegreen Vacations Corporation (collectively Bluegreen). According to Plaintiffs, in the course of selling these interests, Bluegreen violated the Wisconsin Timeshare Act by: (1) misrepresenting that the location of the timeshare did not matter; (2) misrepresenting that Plaintiffs were given Wisconsin timeshare cancelation rights; (3) failing to identify the actual seller and misrepresenting the actual seller; (4) misrepresenting that Plaintiffs were given a chance to read documents; and (5) offering same-day incentives in violation of the Act. (ECF No. 107 at 3.) Based on these allegations, Plaintiffs filed a class action complaint against Bluegreen and, on May 3, 2021, moved for class certification. In their motion, Plaintiffs seek to represent a class consisting of (a) any person (b) who purchased in Wisconsin, (c) from either defendant, (d) one or more timeshares for property outside of Wisconsin, (e) on or after June 28, 2012 and on or before April 17, 2017. (ECF No. 104 at 2.) After the motion was fully briefed, the Court heard argument and took the motion under advisement. Because Plaintiffs fail to demonstrate commonality, predominance, and superiority, their motion for class certification will be denied.

# FACTUAL BACKGROUND

Bluegreen Vacations Unlimited, Inc. is a vacation ownership company that sells vacation ownership interests (VOIs) and accompanying vacation points to over 68 vacation ownership properties. (ECF No. 107 at 2.) Unlike a traditional timeshare, in which the consumer purchases a designated week at a particular property, Bluegreen's Vacation Club uses a points-based system that affords owners the flexibility to stay in open units at any Bluegreen resort, and gives them access to almost 11,000 other hotels and resorts through partnership and exchange networks. (*Id.*) Bluegreen's "points" are associated with real estate, mostly outside of Wisconsin. (ECF No. 104 at 2.) Bluegreen or affiliates known as Bluegreen Vacation Club Resorts (BVCs) own some of the real estate in question. (*Id.*) But in about 20% of its sales transactions, Bluegreen merely contracts with Club Associates (unrelated entities) who are the actual owners of the subject properties. (*Id.*) In 2017, for example, Bluegreen's network included 43 BVCs and 24 Club Associate Resorts. (*Id.*)

Plaintiffs in this case, the Landons and Hpare-Auxiers, executed agreements to purchase vacation ownership interests from Bluegreen after attending face-to-face sales presentations at Christmas Mountain Village in Wisconsin. (ECF No. 107 at 2.) Mr. Landon brought his family to Christmas Mountain Village after Bluegreen contacted him in response to a sweepstakes he entered at a local mall. (*Id.* at 6.) The sweepstakes entry form identified Bluegreen at the top and said, "THIS ADVERTISING MATERIAL IS BEING USED FOR THE PURPOSE OF SOLICITING THE SALE OF TIMESHARE INTERESTS" on the back. (*Id.*) Mr. Auxier agreed to attend a Bluegreen sales presentation after visiting a stand in a hotel lobby in the Wisconsin Dells. (*Id.*) The stand was labeled as belonging to Bluegreen, and Mr. Auxier received a written invitation that identified Bluegreen as "the developer/seller of the Bluegreen Vacations Club, a registered timeshare plan in Florida and elsewhere." (*Id.* at 6-7.) The entire sales presentation, from arrival to signing (including a tour of the facilities) was scheduled for two hours. (ECF No. 104 at 18.)

At the time of purchase, Plaintiffs were told they were acquiring vacation points and that those vacation points were a form of currency that permitted them to vacation at different Bluegreen resorts. (ECF No. 107 at 3.) The Owner Beneficiary Agreements (OBAs) that Plaintiffs ultimately executed, however, confirm that the vacation points they purchased were actually associated with interests in real estate. (ECF No. 107 at 3.) Plaintiffs only learned the location of

the real estate associated with their vacation points after they agreed to purchase and signed a Purchase Proposal. (*Id*. at 3-4.) Bluegreen did not ask prospective buyers where they wanted the real estate associated with their points to be located, nor did it disclose that the real estate might be located outside of Wisconsin. (ECF No. 104 at 3.) In fact, even if the buyer requested such information, Bluegreen staff could not provide an answer. (*Id*. at 4.) Only after the buyer made a down payment on the points did a Quality Assurance Specialist (QAS) input information into a software program that generated the documents associated with the sales transaction. (*Id*. at 4-5.) The software determined the location of the real property based on the number of timeshare points the buyer purchased and the inventory of real property available at BVCs and Club Associate Resorts. (*Id*. at 5.)

Based on the software's analysis, Mr. and Mrs. Landon received interests in real estate owned by Cibola Vista Resort & Spa in Peoria, Arizona. They later made a second purchase and received interests in real estate owned by Landmark Resort Properties of VA, LLC. The Hpare-Auxiers received an interest in real estate located at InnSeason Resorts South Mountain Condominium in Lincoln, New Hampshire. (*Id*. at 2.)

Plaintiffs allege that when they asked, Bluegreen staff told them the location of the real estate did not matter. (ECF No. 107 at 3.) Not inconsistent with this allegation, Cynthia Callan-Hinds, the Landons' sales representative, confirmed that while she never told prospective buyers that she did not know the location of their real estate, this was "because it doesn't matter." (ECF No. 104 at 3.) And Inventory Specialist Jon Roxen testified that, if asked, he would explain to buyers that the location of their real estate would not affect how they could use their points. (ECF No. 107 at 5.) Other witnesses, including QASs Beth Davis, Rebecca Riberich, and Steven Tucker did not remember ever telling customers that the location of the real estate did not matter. (*Id*. at 4.) Sales Associates Michael Thomas and John O'Brien also denied that they told customers that location did not matter. (*Id*. at 4-5.) O'Brien added that such questions almost never arose. (*Id*. at 5.)

Plaintiffs also allege that Bluegreen offered illicit "Today Only" purchase incentives. (*Id*. at 7.) They point to a "Charter Certificate," which advertised "first-visit incentives." (*Id*. at 7-8.) The Certificate stated: "By not purchasing today, you acknowledge that you may not be entitled to receive this charter certificate benefit in the future." (*Id*.) In addition, the Landons received a document entitled: "First Visit Incentives Good For Today Only!" (ECF No. 104 at 19-20.) Mr.

Auxier testified that he was shown a copy of a document with "Today Only" language, but did not have a copy, and it was different from the document the Landons produced. (ECF No. 107 at 8.)

In the OBA, the Plaintiffs acknowledged that "prior to the execution of this Agreement, [you] received and had an opportunity to read a copy of the Bluegreen Vacation Club Multi-Site Public Offering Statement and the Exhibits attached thereto relating to the Bluegreen Vacation Club and the Property[.]" (*Id*. at 7.) The Public Offering Statement is over 440 pages long, and most buyers receive it on a CD-ROM. (ECF No. 104 at 17.) As part of the sales process, Bluegreen requires buyers to initial multiple paragraphs and sign a form document called an "Owner Confirmation Interview" while the Bluegreen QAS reads the document verbatim and audio records that portion (and only that portion) of the timeshare sale. (*Id*. at 16.) There are several versions of the "Owner Confirmation Interview" depending on what is purchased. (*Id*.) In the "Owner Confirmation Interview" they signed, Plaintiffs were asked to "[p]lease list promises or commitments, if any, that were important to your decision to purchase that have not been covered in writing." (ECF No. 107 at 7.) Neither the Landons nor the Hpare-Auxiers inserted any promises or commitments. (*Id*.) The Hpare-Auxiers testified that the most significant motivating factor for them was the ability to use points for airline miles and that "[n]othing else would benefit us." (*Id*. at 12.) Both the Landons and Hpare-Auxiers also claimed they based their purchases, in part, on Bluegreen's promise that they could pay maintenance fees by making referrals. (*Id*.)

According to Plaintiffs, about 20% of all Bluegreen customers actually rescind their timeshare purchases within 5 days. (*Id*. at 6.) The OBAs that Plaintiffs signed provided that "Wisconsin law gives [the buyer] the following cancelation rights" and explained that the buyer could cancel within five business days of signing the contract or receiving a public offering statement, whichever came later, by mailing written notice to Bluegreen. (*Id*. at 5.) In addition to cancelation by mail, Bluegreen also allowed buyers to cancel by providing written notice of cancelation at the sale site. (*Id*.) According to Mr. Auxier, he called the Christmas Mountain office the day after his purchase, and a Bluegreen representative told him that he could cancel in person at Christmas Mountain outside of the five-day window. (*Id*. at 6.) But when he returned more than a month later, he was told he could no longer cancel. (*Id*.)

## ANALYSIS

A party seeking class certification under Federal Rule of Civil Procedure 23 "bears the burden of proving by a preponderance of the evidence all necessary prerequisites." *Priddy v.*

*Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017).  This is not "a mere pleading standard."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The party "must affirmatively demonstrate his compliance with the Rule." *Id*.  Here, Plaintiffs seek certification of a class under Rule 23(b)(3) and therefore must satisfy the requirements of both Rule 23(a) and Rule 23(b)(3).

> Under Rule 23(a), the moving party must demonstrate that:
>
>> (1) the class is so numerous that joinder of all members is impracticable;
>> (2) there are questions of law or fact common to the class;
>> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>> (4) the representative parties will fairly and adequately protect the interests of the class.
>
> Rule 23(b)(3) permits class certification only if:
>
>> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

In this case, based on the record Plaintiffs have presented to the Court, it is clear that individual inquiries predominate, and Plaintiffs' proposed classwide remedy nullifies any potential efficiency benefits of a class action.  As a result, Plaintiffs have failed to show commonality, predominance, and superiority, so their motion for class certification must be denied.

**I.  The Existence of Substantial Individualized Experiences Within the Proposed Class Means Plaintiffs Cannot Establish Predominance Under Rule 23(b)(3).**

The Supreme Court has explained that "'[w]hat matters to class certification is not the raising of common questions—even in droves—but rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of litigation." *Wal-Mart*, 564 U.S. at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).  Thus, in ruling on class certification, the Court has a "duty to take a 'close look' at whether common questions predominate over individual ones." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).  When the case involves individual injuries, predominance is satisfied if the existence of the individual injuries is "'capable of proof at trial through evidence that [is] common to the class rather than individual to its members.'" *Id*. at 30 (quoting *Behrend v. Comcast Corp.*, 264 F.R.D. 150, 154 (E.D. Pa. 2010) *rev'd on other grounds*, 569 U.S. 27 (2013)).  "If class certification only serves to give rise to hundreds or thousands of individual

proceedings . . . it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claim." *Andrews v. Chevy Chase Bank*, 545 F.3d 570, 577 (7th Cir. 2008).

### A. Unique Oral Representations Necessitate Individualized Inquiry into Each Class Member's Claims.

Plaintiffs' claims are largely based on alleged oral misrepresentations made during timeshare sales pitches. Class members' individual reliance on these oral statements creates a significant hurdle for class certification. Oral representations that vary from one occasion to another can destroy the commonality of a plaintiff's claims. *See also Szabo v. Bridgeport Machine, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001). In fact, it is "'the general rule that an action based substantially on oral rather than written communications is inappropriate for treatment as a class action.'" *Glick v. E.F. Hutton & Co.*, 106 F.R.D. 446, 449 (E.D. Pa. 1985) (quoting *Seiler v. E.F. Hutton & Co., Inc.*, 102 F.R.D. 880, 888 (D.N.J. 1984) (citing *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880, 882 (5th Cir. 1973); *Westlake v. Abrams*, 575 F. Supp. 58, 61-63 (N.D. Ga. 1983); *McHan v. Grandbouche*, 99 F.R.D. 260, 266 (D. Kan. 1983); *Seiden v. Nicholson*, 69 F.R.D. 681, 686 (N.D. Ill. 1976)). Class certification is permissible notwithstanding this general rule if the oral misrepresentations were uniform, as they might be in a standard sales pitch. *See Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307 (5th Cir. 1977). But "[i]t is part of the plaintiff's overall burden . . . to demonstrate that the defendant's communications to the proposed class were uniform in nature." *Glick*, 106 F.R.D. at 450.

Here, Plaintiffs have not met their burden. While they characterize Bluegreen's agents as Chatty Cathy dolls, parroting a limited handful of recurrent stock phrases, the record before the Court shows no such adherence to a script. For instance, although Plaintiffs allege that Bluegreen employees uniformly responded, "it doesn't matter" when pressed on the location of timeshare real estate, no QASs or Sales Associates could recall using that phrase, and one employee remarked that most customers never even inquired about property location. (ECF No. 107 at 4-5.) While a single Inventory Specialist admitted to telling buyers that their property location did not affect how they could use their points, that sole witness's admission hardly establishes commonality. (*Id*. at 5.) Likewise, the Landons' Sales Representative's assertion that it did not matter that employees did not know where prospective buyer's property would be located does not establish a common issue among the proposed class. (ECF No. 104 at 3.)

Plaintiffs do not fare better on their other alleged misrepresentations. None of the Plaintiffs recall hearing the same promise of "Wisconsin cancelation rights." (*Id*. at 5.) Mr. Auxier remembered someone telling him he had five business days to cancel. (*Id*.) Mr. Landon had no recollection of anything like that. (*Id*.) And Ms. Hpare testified that she paid no attention to most of the presentation. (*Id*.) Likewise, Plaintiffs' claims that Bluegreen representatives misrepresented or failed to disclose the sellers of the properties also lack commonality. The record shows that Plaintiffs and proposed class members learned the identity of both Bluegreen and the ultimate entities from whom they obtained timeshare interests in a variety of ways. Mr. Landon learned about Bluegreen when he entered a mall sweepstakes. (ECF No. 107 at 6.) Mr. Auxier spoke with a representative in a hotel lobby. (*Id*. at 6-7.) Other buyers heard of Bluegreen through telemarketing, off-premise contact, or face-to-face marketing.[1] (ECF No. 115 at 11.) The identities of the properties associated with the purchased timeshare interests were learned after the decision to purchase was made. (ECF No. 104 at 4-5.) Thus, Bluegreen would have disclosed its identity as seller to some of these putative class members orally, some in writing, and perhaps, some not at all.

In the end, Plaintiffs' common claims boil down to the uniform assertion that particular Bluegreen employees may have violated the Wisconsin Timeshare Act in particular instances to every member of the class. But this is no argument for a class action. *Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 991 & n. 5 (N.D. Ill. 1991). Plaintiffs must prove uniformity. *Id*. The record instead indicates that Bluegreen employees were not interchangeable parts. Ironically, the class certification record shows that Plaintiffs, in their quest to unearth a uniform pattern of behavior, paradoxically exposed autonomous actors and diverse sales pitches undercutting their class certification efforts. Far from mandated conformity, variation seems to have been the standard at Bluegreen. Its agents were not Shakespearean actors beholden to the Bard's chosen words; they conducted exactly the type of improvisational sales pitches that class actions are poor vehicles to address. *Id*.

    **B.    The Materiality Inquiry Might Require Thousands of Individualized Adjudications.**

---

[1] Off-Premise Contact occurs when a Bluegreen representative offers a gift in exchange for listening to the sales presentation. Face-to-Face Marketing occurs when a Bluegreen representative offers a two-to-three-day vacation with a sales presentation in the middle. (ECF No. 115 at 11.)

Three of Plaintiffs' five claims are premised on alleged misrepresentations. Section 707.55(1) of the Wisconsin Timeshare Act prohibits the use of a "false, deceptive, or misleading" "material fact" in connection with the sale of a timeshare interest. Under Wisconsin law, a misrepresentation is material, "if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by misrepresentation." *First Nat. Bank & Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 222-23 (1980). In the class action context, the materiality requirement for a misrepresentation claim often stands as an obstacle to certification. But, if the alleged misrepresentations, "whether material or immaterial, would be so equally for [the entire] class," then the class is cohesive, and the materiality inquiry will not defeat class certification. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459-60 (2013). Here, the class is not cohesive because the entire class will not "prevail or fail in unison." *Id*. at 460. "[I]ndividual circumstances of particular class members [will] bear on the inquiry." *Id*.

Plaintiffs posit that the location of the timeshare is always material because real estate outside of Wisconsin is not afforded the same legal protections as real estate in Wisconsin. (ECF No. 115 at 3-4.) If that were true, then the class would live or die by that single, common question. Unfortunately for Plaintiffs, the question of materiality is not resolved so simply. In *Amgen*, the Supreme Court confronted several securities-fraud class actions, where the materiality inquiry can be conclusively determined by an objective assessment of the misrepresentation made to an impersonal marketplace. *Id*. at 461. In that setting, the Court held that class action plaintiffs did not need to prove materiality at the certification stage because the impersonal nature of the misrepresentation meant it would either be material or immaterial to the entire class. *Id*. The present case is much different, however. Here, various Bluegreen agents engaged in thousands of one-on-one interactions with thousands of putative class members. Therefore, the materiality question would not necessarily be settled with a single stroke. Rather, if the timeshare location was found objectively immaterial, the Court would still have to investigate whether any individual Bluegreen agent in any particular instance knew that telling a particular plaintiff, "Location doesn't matter" would induce assent *in that particular plaintiff*.

The same issue confronts Plaintiffs on their cancelation rights claims. A finding of objective immateriality would not end the Court's work. In fact, it would dramatically expand it.

Once again, the Court would have to ask if a Bluegreen agent that misrepresented the existence of Wisconsin cancelation rights did so knowing it would induce a specific buyer to assent.

The notion that Bluegreen misrepresented that Plaintiffs had an opportunity to read the documents they signed fares no better.[2] First, the record shows that not all potential class members received the documents in the same format. Some got paper copies, while others got CD-ROMs. (ECF No. 104 at 17.) Further, some putative members asked for time to read the documents, while others signed on sight. (ECF No. 127.) These stark divergences muddy materiality and make class resolution untenable. Thus, because the materiality inquiry here is not solely objective as it was in *Amgen*, a class action is not the proper vehicle for adjudicating these claims.

### C. Plaintiffs Have Not Shown an Issue Central to the Validity of Any Claim That Can Be Resolved in One Stroke.

"An issue 'central to the validity of each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class treatment." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013) (quoting *Wal-Mart*, 564 U.S. at 350). In *Wal-Mart*, for example, class certification was improper because the plaintiffs sued over millions of allegedly discriminatory employment decisions but failed to tie the reasons for those decisions together. *Wal-Mart*, 564 U.S. at 352. Conversely, in *Sears, Roebuck & Co.*, the Seventh Circuit vacated the lower court's denial of class certification because there was a single, central, common issue of liability: "whether the Sears washing machine was defective." *Sears, Roebuck & Co.*, 727 F.3d at 801.

This putative class looks more like *Wal-Mart* than *Sears, Roebuck & Co.* Plaintiffs present no analog to a defective washing machine. To the contrary, as with the employment decisions in *Wal-Mart*, it appears the individual sales pitches at issue were not subject to some overriding corporate policy. Thus, the Court cannot simply power up a single washing machine and conclusively determine liability. The necessary inquiry here would be akin to traveling across town, testing every single washing machine, and noting defects on a case-by-case basis. None of Plaintiffs' claims—misrepresentation, failure to identify the seller, or "Today Only" incentives—reduce to a single, common question of law or fact.

---

[2] The Court acknowledges that "a party who agrees to terms in writing without understanding or investigating those terms does so at his own peril." *Bayo v. Napolitano*, 593 F.3d 495, 502-03 (7th Cir. 2010). However, for the purposes of this section, the Court assumes that Plaintiffs can argue that their decision to agree to the terms represented misrepresentation.

Consider the "Today Only" incentive language. Disagreement exists even between the Landons and Hpare-Auxiers as to the specific language used and whether this language was used at all. (ECF No. 104 at 19-20 & ECF No. 107 at 8.) Adding 8,000 new opinions to the debate is unlikely to clarify the matter. "In other words, it [is] 'not even clear that the plaintiffs [have] *identified* a common issue," let alone one resoluble in a single stroke. *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 377 (7th Cir. 2015) (quoting *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014)). In fact, the only thing common to all putative class members in this case is the variation of their individual experiences. This will not satisfy predominance.

The numerous individual issues that predominate across all of Plaintiffs' allegations makes this case ill-suited for class adjudication. But even if the individual factual and legal issues on liability were ignored, as discussed below, the remedy Plaintiffs have framed for the class makes class certification inappropriate.

**II.     Plaintiffs Recission Remedy Independently Precludes Findings of Predominance and Superiority under Rule 23(b)(3).**

It is generally true that individual damages issues are no barrier to Rule 23 class certification. *Arreola v. Godinez*, 546 F.3d 788, 800-01 (7th Cir. 2008). The Seventh Circuit has held, however, that "where a class action seeking rescission . . . would require a multitude of individual rescission procedures," certification must be denied. *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 n. 5 (7th Cir. 2012) (citing *Andrews*, 545 F.3d at 577). This holding aligns with the Supreme Court's teaching in *Comcast Corp.*, 569 U.S. at 34 (finding Plaintiffs could not show Rule 23(b)(3) predominance when "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class"). Additionally, when individualized rescission inquiries predominate, the class also flunks the superiority requirement because "proceeding as a class to 'unwind' hundreds or thousands of individual credit transactions would not promote the primary purposes of the class-action mechanism: judicial economy and efficiency." *Andrews*, 545 F.3d at 577. Plaintiffs' attempt to certify a class to achieve rescission thus dooms their certification request, even if the myriad of previous issues were resolved in Plaintiffs' favor.

Plaintiffs argue for a narrow interpretation of *Andrews*, insisting the holding only applies to class actions seeking rescission under the Truth in Lending Act (TILA). *Id*. at 571. They contend *Andrews* has no relevance to class treatment of rescission claims under the Wisconsin

Timeshare Act. Despite Plaintiffs' best efforts to distinguish *Andrews*, the logic of the Court of Appeals' analysis applies with even greater force to the facts in this case.

In *Andrews*, the Seventh Circuit detailed several reasons that a rescission remedy is poorly suited for class actions. The Court noted that "variations in the transactional 'unwinding' process that may arise from one rescission to the next make it an extremely poor fit for the class-action mechanism." *Id*. at 575. It referred to rescission remedies generally as "inherently personal," not just those contemplated by the TILA. *Id*. at 577. It also held that a class action seeking rescission was not a "superior" means of adjudication where a lone plaintiff could expect to receive "over $50,000, plus attorney's fees and costs" since those awards could sustain an individual lawsuit. *Id*. Finally, the Court found that the class action mechanism would not be superior because it would give rise to "hundreds or thousands of individual proceedings requiring individually tailored remedies." *Id*.

This reasoning is as germane to Plaintiffs' class certification motion under the WTA as it was to *Andrews*' class under the TILA. Here, Plaintiffs seek to unwind thousands of individual transactions. And each unraveling raises unique, "inherently personal" problems. Some class members financed their purchases, while others did not. (ECF No. 115 at 13.) Different entities hold the various class members' notes. The interest rates on those notes are not uniform. Those interest rates may be fixed or variable. Some notes may include an acceleration clause while others do not. Bluegreen is entitled to offset costs for use or damages, but within the relevant five-year period, class members will have used and damaged timeshares to varying degrees. (ECF No. 107 at 21.) Many of these same problems were cited in *Andrews*. *See Andrews*, 545 F.3d at 577. (detailing the difficulty of managing varying loan transactions.) So, as opposed to being distinguishable, this case is almost an *Andrews* doppelgänger.

Even worse, Plaintiffs barely tease a method by which rescission could be economically effectuated. They propose using Bluegreen's records to determine damages and relying on Bluegreen's rental rate calculations to establish use value. (ECF No. 115 at 14.) Despite having had months to conduct class discovery, Plaintiffs offer no such calculations or proposed damages; they merely suggest that such calculations are possible. But at this stage, Plaintiffs have the burden of coming forward with proof that such calculations can be done; mere allegations of possible calculations are insufficient to carry their burden. *See Parko*, 739 F.3d at 1086. Moreover, even if one assumed that Bluegreen could reconstruct use value calculations it made nearly 10 years

ago, this reliance on Bluegreen files does nothing to ameliorate the problem of inherently individualized inquiries. Each rescission would still be subject to specific scrutiny related to the particular class member's case file.

Moreover, Plaintiffs' proposed remedy flunks the superiority test. The Landons seek $50,737.68 in damages, while the Hpare-Auxiers seek $64,920.78. (ECF No. 107 at 22.) These are not insignificant amounts. And, if they prevail, the WTA authorizes them to recover their attorney's fees. Wis. Stat. §707.57(1)(b). Given these economics, the Court cannot conclude that rescission under the WTA is "the sort of remedy that would not otherwise be sought unless the class-action mechanism were available." *Andrews*, 545 F.3d at 577-78. Once again, the facts of this case align with those that led the *Andrews* Court to reject class certification. *Compare Andrews*, 545 F.3d at 577-78 (finding that damages over $50,000 and right to attorney's fees weakened the argument for superiority), *with* ECF No. 107 at 22 (noting that Plaintiffs seek damages in excess of $50,000 and attorney's fees). The same significant damages awards, plus the availability of statutory attorneys' fees, that led the Seventh Circuit to conclude a class action was not superior to individual lawsuits in *Andrews* are also present here. This is true even if the inefficiencies necessitated by individual mini-trials on rescission did not preclude a finding of superiority, as discussed above. *See id*. at 577.

Because their requested remedy cannot satisfy Rule 23(b)(3) predominance or superiority, Plaintiffs' proposed class cannot be certified.

## CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Class Certification under Fed. R. Civ. P. 23 (ECF No. 102) is DENIED.

Dated at Milwaukee, Wisconsin on November 5, 2021.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge
